## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| **GLOBAL EQUITY MANAGEMENT (SA) PTY. LTD.,** | |
| **Plaintiff,** | **CIVIL ACTION NO. 2:16-cv-00095-RWS** (Consolidated Lead Case) |
| **v.** | |
| **EXPEDIA, INC., ET AL.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   LEGAL STANDARDS ..........................................................................................1

III.  ANALYSIS..............................................................................................................2

     A.    The '400 Patent ..........................................................................................2

           1.     Term 1:  means for allocating a computer device's resources . . . on said computer device.................................................................................3

           2.     Term 2:  means/program code for configuring . . . ......................................6

           3.     Term 3:  means/program code for manipulating . . . ....................................8

           4.     Term 4:  means/program code for modifying. . . .....................................10

           5.     Term 5:  cabinet selection button bar.........................................................11

           6.     Term 6:  virtual cabinet[s]/virtual cabinet record/cabinet record ..............12

           7.     Term 7:  secondary storage device/secondary storage...............................12

           8.     Term 8:  secondary storage partitions window ..........................................13

           9.     Term 9:  cabinet visible partition window .................................................14

          10.   Term 10:  partition .................................................................................15

     B.    The '677 Patent ........................................................................................17

           1.     Term 11:  means for selecting . . . / selection means . . . ...........................17

           2.     Term 12:  means for suspending the currently operational virtual computer system in an active state..............................................................19

           3.     Term 13:  means for making the selected virtual computer system operable into a running state......................................................................19

           4.     Term 14:  means for switching of the virtual computer systems using a switch flag and BIOS ACPI solutions . . . power save suspend..........................................................................................20

           5.     Term 15:  said computer system having an OS-independent storage

          manager . . . and a plurality of operating systems and applications ..........20

6.     Term 16:  virtual table of contents.............................................................22

7.     Term 17:  virtual computer system[s].......................................................23

8.     Term 18:  suspend for fast switching/fast suspending..............................24

9.     Term 19:  fast switching ...........................................................................25

10.    Term 20:  power save suspend.................................................................26

11.    Term 21:  BIOS ACPI solutions/enhancements .......................................27

12.    Term 22:  power-on self-test (POST) in [the] BIOS.................................28

13.    Term 23:  at least one cabinet for isolating each virtual computer
           system ......................................................................................29

C.     Withdrawn Terms ...............................................................................29

1.     U.S. Patent No. 6,690,400..........................................................................29

2.     U.S. Patent No. 7,356,677..........................................................................30

IV.   CONCLUSION.....................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
   830 F.3d 1341 (Fed. Cir. 2016)...............................................................................7

*Augme Techs., Inc. v. Yahoo! Inc.*,
   755 F.3d 1326 (Fed. Cir. 2014)..........................................................................2, 17

*Catalina Mktg. Int'l Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002)........................................................................4, 5, 21

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
   412 F.3d 1291 (Fed. Cir. 2005).................................................................5, 10, 19

*In re Distefano*,
   808 F.3d 845 (Fed. Cir. 2015)..................................................................................3

*Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*,
   616 F.3d 1357 (Fed. Cir. 2010)..............................................................................11

*Gillespie v. Dywidag Sys. Int'l, USA*,
   501 F.3d 1285 (Fed. Cir. 2007)..............................................................................22

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
   324 F.3d 1308 (Fed. Cir. 2003)..............................................................................27

*MySpace, Inc. v. GraphOn Corp.*,
   672 F.3d 1250 (Fed. Cir. 2012)................................................................................1

*Noah Sys., Inc. v. Intuit Inc.*,
   675 F.3d 1302 (Fed. Cir. 2012)....................................................................1, 17, 18

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)....................................................................1, 24, 25

*On Demand Machine, Corp. v. Ingram, Indus., Inc.*,
   442 F.3d 1331 (Fed. Cir. 2006)............................................................................4, 5

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)..........................................................................16, 28

*Poly-Am., L.P. v. GSE Lining Tech., Inc.*,
   383 F.3d 1303 (Fed. Cir. 2004)............................................................................4, 5

*Rotatable Techs., LLC v. Motorola Mobility, LLC*,
    567 Fed.Appx. 941 (Fed. Cir. 2014) ...................................................................................4

*In re Russell*,
    48 F.2d 668 (CCPA 1931) ...........................................................................................3

*Smartflash, LLC v. Apple, Inc.*,
    77 F.Supp.3d 535 (E.D. Tex. 2014) ..........................................................................6, 7

*Smartflash LLC v. Apple Inc.*,
    No. 6:13-CV-447, 2015 WL 4208754 (E.D. Tex. July 7, 2015) .............................................7

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995).....................................................................................23

*Uniloc USA, Inc. v. Autodesk, Inc.*,
    Civ. No. 2:15-cv-1187-JRG-RSP (E.D. Tex. July 7, 2016)...................................................7

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)....................................................................................14

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)..........................................................................6, 7, 17

**Statutes**

35 U.S.C. § 112 ..................................................................................... *passim*

## I.     INTRODUCTION

Plaintiff Global Equity Management (SA) Pty. Ltd. ("GEMSA") asserts U.S. Patent Nos. 6,690,400 ("the '400 patent") and 7,356,677 ("the '677 patent") against Defendants.  The '400 patent claims a graphical user interface ("GUI") for displaying means for allocating a computer device's resources to multiple [or at least one] operating system.  Exh. A[1] at 8:63-65; 9:67-10:1. The '677 patent claims so-called "rapid switching between multiple operating system environments on a single computer."  Exh. B at Abstract.  Defendants' proposed constructions define the claim scope as reflected in the intrinsic record, and consistent with the alleged inventions.  GEMSA either offers no construction (merely asserting "ordinary meaning"), or offers constructions that impermissibly seek to broaden the claims to avoid narrowed features GEMSA convinced the Patent Office during prosecution made the asserted claims patentable. This Court should adopt all of Defendants' proposals.

## II.    LEGAL STANDARDS

Courts must consider "what was invented, and what exactly was claimed" when construing claims.  *MySpace, Inc. v. GraphOn Corp.,* 672 F.3d 1250, 1256 (Fed. Cir. 2012). "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).  A patentee may claim a means for performing a function without reciting any structure for performing the function in the claim.  *See* 35 U.S.C. § 112, ¶ 6.  But means-plus-function elements are limited to the structure in the specification that performs the function. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012).  Computer-implemented

---

[1] All exhibits are attached to the Declaration of Bryan J. Sinclair ISO Defendants' Responsive Claim Construction Brief, filed herewith.

means-plus-functions limitations "must disclose an algorithm" in their corresponding specifications to meet the definiteness requirements of § 112, ¶ 2.[2] *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1337 (Fed. Cir. 2014).

## III.   ANALYSIS

### A.   The '400 Patent

The '400 patent is titled "Graphical User Interface for Resources Management for Super Operating System Based Computers."  It is aimed at computer systems that are capable of running multiple operating systems ("OS").  Exh. A at 1:31-34.  Particularly, the "invention enables such computers to allocate computer resources graphically to one or more operating systems." *Id*. at 1:40-42.  In such systems, each OS must be restricted from overwriting the data and programs associated with other OSs. *See id*. at 2:6-11.  To do so, the '400 patent proposes that, to prevent one OS from interfering with the data and programs of another, a user may allocate physical computer resources to different OSs in "virtual cabinets" or just "cabinets." *Id*. at 2:47-52; 5:22-24.  The '400 patent claims the ability to associate physical disk partitions with a particular cabinet and OS, which, in turn, isolates and protects each OS and its related programs and data. *Id*. at 3:33-43.  Put simply, the claimed invention enables a user to allocate, configure and manipulate disk partitions and assign them to cabinets associated with different OSs such that the resources of these OSs do not overlap or interfere with each other.

The claims of the '400 patent recite several means-plus-function terms that require means

---

[2] In its Docket Control Order, the Court ordered "[i]n lieu of early motions for summary judgment, the parties are directed to include any arguments related to the issue of indefiniteness in their *Markman* briefing."  Dkt. 37 at 4.  GEMSA, however, failed to address indefiniteness in its opening brief and even stated that indefiniteness is not appropriately addressed at claim construction.  Dkt. 169 at 3-4.  By ignoring this Court's Order, GEMSA has waived the opportunity to brief indefiniteness.  Should GEMSA impermissibly attempt to do so in reply, Defendants will seek leave to address GEMSA's arguments in the form of a surreply.

for performing functions such as "allocating a computer device's resources… ," "configuring said at least one partition … ," "manipulating said at least one cabinet record … ," and "modifying said at least one cabinet record … ."  For the claims to be definite under 35 U.S.C. § 112, ¶2 and thus valid, the '400 patent specification must disclose structures (*e.g.*, algorithms) to fully perform each of the recited functions.  GEMSA's expert agrees that the specification does not describe such structures.  *See* Exh. C at 16:18-22 ("I see the disclosure in this patent and essentially the whole invention around the graphical user interface and not so much as the technical details of how virtualization is accomplished.").

Notwithstanding this failure, GEMSA argues that structure for performing these recited functions is unnecessary and that the claims are definite because the specification describes graphical user interface elements that allow a user to initiate the performance of the recited functions.  GEMSA and its expert cannot be correct, as such an interpretation means the '400 patent claims are directed solely to graphical user interface elements (i.e., pictures and icons) and nothing more, and are plainly unpatentable under the printed matter doctrine.  *In re Distefano*, 808 F.3d 845, 850 (Fed. Cir. 2015); *In re Russell*, 48 F.2d 668, 669 (CCPA 1931) ("The mere arrangement of printed matter on a sheet or sheets of paper … does not constitute 'any new and useful art…'").  If Defendants are correct, the claims of the '400 patent are indefinite.

### 1.      Term 1:  means for allocating a computer device's resources . . . on said computer device.[3]

The preamble of claim 1 requires "a graphic user interface for displaying means for allocating a computer device's resources to multiple operating system environments, partitioned

---

[3] The parties' proposed constructions are set forth in Exhibit D.

on individual virtual cabinets, on said computer device."[4]  Exh. A at 8:62-65.  That of claim 16 is

similar.  Both are means-plus-function elements for which there is no corresponding structure.

A preamble that "states the framework of the invention," is limiting.  *On Demand*

*Machine, Corp. v. Ingram, Indus., Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006).  Here, the

preamble of claim 1 recites the framework of the invention: a graphical user interface

purportedly allowing virtualization of a computer system by providing access to means for

allocating the storage resources of that computer system to operating systems partitioned on

virtual cabinets.  *See* Exh. A at 8:62-66.  Indeed, the specification proclaims the "cornerstone" of

the invention as "system virtualization" where "physical devices" of a given computer are

partitioned such that multiple virtual cabinets are configured and each cabinet contains a separate

operating system.  Exh. A at 1:57-61; *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303,

1310 (Fed. Cir. 2004) (preamble was limiting where it disclosed a "fundamental characteristic of

the claimed invention.").  Applicant emphasized during prosecution that the "cornerstone" of the

claimed invention is "system virtualization within cabinets," and confirmed that the preamble is

limiting by amending it to overcome an examiner's rejection.  Exh. E at 10.  Reliance on the

preamble "to distinguish the claimed invention from the prior art" renders the preamble a claim

limitation.  *See Rotatable Techs., LLC v. Motorola Mobility, LLC*, 567 Fed.Appx. 941, 943 (Fed.

Cir. 2014); *see also Catalina Mktg. Int'l Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed.

Cir. 2002).  Additionally, the preamble of claim 16, which was added at the same time as the

Applicant amended the preamble of claim 1 to overcome the rejection, recites the same

"cornerstone" of the invention and also provides an antecedent basis for the term "computer."

---

[4]  Defendants no longer seek construction of the preamble phrase "graphic user interface," but only seek construction of the means-plus-function limitations contained therein.

Accordingly, it is also a claim limitation.[5]  *On Demand Mach.*, 442 F.3d at 1343; *Catalina Mktg. Int'l*, 289 F.3d at 808.

Defendants identify the function as "allocating a computer device's resources to multiple operating system environments, partitioned on individual virtual cabinets, on said computer device" and note that there is no corresponding structure.  Exh. D at 1.  GEMSA contends that, because the graphical user interface "act[s] as [a] means of displaying for the purpose of allocating" it is the structure that performs the functions claimed in the preambles. Dkt. 169 at 6. But the claimed function is not "displaying for the purpose of allocating" but it is "allocating a computer device's resources . . . ."  As GEMSA admits, an interface ***displays*** information; it does not allocate computer resources, let alone constitutes an algorithm for doing so.  *Id.* at 6.  Indeed, GEMSA does not attempt to identify any algorithm required to "allocat[e] a computer device's resources to multiple operating system environments."[6]

As the patent generically explains, allocating computer resources to one or more OSs requires altering the address boundaries of the physical devices and memory at the firmware

---

[5]  Consistent with the preamble of claim 16, the specification repeatedly describes the invention as virtualization of computer resources through the allocation of hardware resources using a graphical user interface.  Exh. A, at Abstract, 3:30-35, 3:57-58.  When "the specification is replete with references" to the phrase in the preamble and reveals that the preamble "discloses a fundamental characteristic of the claimed invention,"—as each preamble does here—the preamble is necessarily limiting.  *Poly-Am., L.P.*, 383 F.3d at 1310.

[6]  Neither the '677 patent nor the '183 patent can provide structure to support the recited means of the '400 patent claims.  First, the '677 patent was filed after the '400 patent, so it is irrelevant. Second, although the '400 patent refers to the '183 patent as "related," the '183 patent is not actually incorporated by reference into the '400 patent.  MPEP 7th Ed, § 608.01(p) (1999) ("Mere reference to another application, patent, or publication is not an incorporation of anything therein into the application containing such reference for the purposes of the disclosure required by 35 U.S.C. § 112, first paragraph.").  Material not incorporated by reference cannot provide corresponding structure for a means plus function clause, nor can testimony from an expert. *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005) ("the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification").

level.  Exh. A at 3:33-35.  Displaying a picture or icon on a computer screen neither virtualizes computer hardware nor changes the mapping of physical device address boundaries.  An icon may identify a command for initiating the allocation of a computer device's resources, but more is required for actual allocation of these resources than merely a GUI icon.  Thus, even if GUI icons can be considered structure, these icons are not themselves sufficient structure to perform the claimed function.  As no other structure is described, the preambles are indefinite.

### 2.   Term 2:  means/program code for configuring . . .

Claim 16 requires "means for configuring said at least one partition of said at least one secondary storage device through said secondary storage partitions window."  Exh. A at 10:7-9; 11:8-10.  This "means for" term is governed by 35 U.S.C. § 112, ¶ 6; GEMSA does not argue otherwise.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348-49 (Fed. Cir. 2015); Dkt. 169 at 18-19.   Claim 28 requires "program code for" performing the identical function.[7]  The function of "configuring . . . " does not itself disclosure structure to one of ordinary skill in the art.  Exh. F at ¶¶ 58-59.  This term, like the corresponding functional limitations in claim 16, is governed by 35 U.S.C. § 112, ¶ 6 because "program code," like "means," is a generic term, referring to generic software, and does not describe any specific structure.  *Williamson*, 792 F.3d at 1349; Exh. F at ¶ 54.  Defendants propose that the function is: "configuring said at least one partition of said at least one secondary storage device through said secondary storage partitions window" and explain that there is no corresponding structure.  Exh. D at 1.

GEMSA relies on *Smartflash, LLC v. Apple, Inc.*, 77 F.Supp.3d 535 (E.D. Tex. 2014) to

---

[7] Several elements of claim 28 recite "program code for . . . " functions that are identical to the means-plus-function limitations in claim 16.  *Compare* Exh. A at 11:8-10 ("program code for configuring said at least one partition of said at least one secondary storage device through a secondary storage partitions window") *with* 10:7-9 ("means for [the identical function]"); *compare id.* at 11:24-25 *with* 10:18-19; *compare id.* at 11:27-29 *with* 10:24-25.

contend that "program code" by itself is a recitation of structure. *See* Dkt. 169 at 17. First, GEMSA ignores that *Smartflash* was decided before the Federal Circuit's decision in *Williamson*. In fact, the defendants in *Smartflash* moved the court to reconsider its constructions in light of the *Williamson* decision and the court found the term "code" to refer to structure "in the present context" only because the ***defendants*** had submitted expert declarations in a companion case opining that "code" recited "a particular type of structure" in the context of the patent at issue in that case. *Smartflash LLC v. Apple Inc.*, No. 6:13-CV-447, 2015 WL 4208754, at *3 (E.D. Tex. July 7, 2015). The opposite is true here. Defendants' expert has unequivocally stated that in the context of the '400 patent, "program code" is not understood to have a definite meaning of any particular structure. *See* Exh. F at ¶ 54. And GEMSA's expert does not opine otherwise, but merely states he was "informed by counsel that phrases like 'program code' have been found by the [c]ourts to connote sufficient structure." *See* Exh. G at ¶ 77; Exh. C at 100:7-101:8.

Second, the claim 28 limitations recite "program code for" a given function and neither the specification nor the claims "describ[e] how the ['code'] operates within the claimed invention to achieve its objectives." *See Uniloc USA, Inc. v. Autodesk, Inc.*, Civ. No. 2:15-cv-1187-JRG-RSP (E.D. Tex. July 7, 2016). Instead, the patent only recites generic "program code," *i.e.* software, which has no definite structure. *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341 at 1348 (Fed. Cir. 2016) (finding that "symbol generator" is a means-plus-function term because it does not identify a structure and the claims fail to connote a "*definite* structure."). Given there is no structure for the recited functions in the claims, and the functions themselves are too generic to constitute definite structure, the "program code" limitations in claim 28 should be interpreted as means-plus-function limitations. Thus,

Defendants analyze claims 16 and 28 (and all other "means for"/"program code for") limitations together.[8]

Claim 16 and 28 both claim the function: "configuring said at least one partition of said at least one secondary storage device through said secondary storage partitions window."  GEMSA does not dispute Defendants' identification of the function.  GEMSA contends that the structure in claim 16 for performing this function is "a pointing device such as a mouse, keyboard, program code or the like."  Dkt. 169 at 18.  *First*, program code is not "a pointing device."  It is software and not hardware.  *Second*, GEMSA's expert states that the function of these terms is "to configure, or change, memory partitions or data."  Exh. G at ¶ 36.  A mouse or keyboard cannot change memory partitions or data.  At most, they can operate to point, select, or manipulate pictures, icons or text on a computer screen.  Other algorithms, undisclosed in the '400 patent, must be performed by the computer in order to manipulate memory partitions and data.  And "program code" does not connote a definite structure (*i.e.,* algorithm) for changing memory partitions or data—it is generic software and fails to disclose an algorithm, either in the claim limitation or the specification, for performing the claimed function.  GEMSA identifies nothing else as alleged structure.  *See* Exh. F at  ¶¶ 41-44; Exh. C at 81:9-87:1.  The terms are indefinite.

### 3.     Term 3:  means/program code for manipulating . . .

Claim 16 requires "means for manipulating said . . . cabinet record through said cabinet visible partition window."  This "means for" term is governed by 35 U.S.C. § 112, ¶ 6; GEMSA

---

[8] To simplify the issues for the Court, Defendants no longer seek construction of the terms "program code for accessing and displaying . . . ," "program code for displaying a cabinet selection button bar," and "program code for displaying . . . said selected virtual cabinet," from claim 28 of the '400 patent.

does not argue that § 112, ¶ 6 does not apply.  GEMSA's construction uses Defendants' identification of the term's function ("manipulating said at least one cabinet record through said cabinet visible partition window.").  Dkt. 169 at 17.  Claim 28 requires "program code for" performing the same function.  The recited "manipulating" function does not disclosure structure to one of ordinary skill in the art.  Exh. F at ¶¶ 70-71.  As described above "program code" is no different than "means" and this term is also governed by 35 U.S.C. § 112, ¶ 6 (*EON Corp. IP Holdings*, 785 F.3d at 621), and because it recites the same function as claim 16's "means for manipulating" term in claim 16, the structure for both terms must be the same.

Defendants state that there is no corresponding structure.  Exh. D at 1-2.  GEMSA's expert contends that the claimed function includes "configur[ing], or chang[ing], memory partitions or data," *i.e.* the same function as the one performed by the "means for configuring." Exh. G at ¶ 42.  Yet, GEMSA identifies a different structure for performing the same function identified for the claimed "manipulating:" "menus, menu bars, pull-down menus, link buttons, hot keys, function keys, command lines and program code and the like."  Dkt. 169 at 17. Standard GUI elements such as menus, menu bars and command lines and standard keyboard features such as hot and function keys cannot themselves change memory partitions or data— they merely allow a user to select pictures or type text displayed on a computer screen that, at best, can be used to initiate the performance of such functions.  Indeed, the specification explains that "manipulating cabinets" comprises adding, deleting and configuring partitions (*i.e.* storage), as well as "defining user access," "defining remote management functions" and "booting the cabinet."  Exh. A at 5:30-35.

Second, standard GUI elements and keyboard functions are not "program code" (even if they may be represented to the user through the execution of program code).  Generic "program

code," without an express disclosure of the steps that are executed by the code does not connote a structure sufficient to render the terms definite; instead, either the claims or the specification must describe an algorithm for changing memory partitions.[9]  Exh. F at ¶¶ 54, 58, 62, 66, 69, 74. And GEMSA agrees that there is none.  *See* Exh. C at 43:18-44:24; 91:12-92:13, 94:4-14.  The terms are indefinite.

### 4.    Term 4:  means/program code for modifying. . .

Claim 16 requires "means for modifying said at least one cabinet record through said cabinet visible partition window."  Claim 28 requires "program code" for performing the same function.  Defendants proposed function is: "modifying said at least one cabinet record through said cabinet visible partition window" and that there is no corresponding structure.  Exh. D at 2.

The recited function of "modifying …" does not itself disclosure structure to one of ordinary skill in the art.  Exh. F at ¶¶ 51-52, 74-75.  Thus, both "means for" and "program code for" claims are governed by 35 U.S.C. § 112, ¶ 6.  *EON Corp. IP Holdings*, 785 F.3d at 621. The specification equates a "cabinet record" with a "cabinet" (Exh. A at 2:47) and states that "a cabinet is defined herein as a virtual storage device, capable of containing, typically through the use of virtual table of content pointers, all (or partitions of) shared (or non-shared) operating systems, application software (both OS dependent and No-OS embedded), databases and memory."  *Id.* at 2:47-52.  The specification does not describe how the claimed modification of the cabinet record, i.e. a virtual storage device, is accomplished.

GEMSA's expert states that the "modifying" function is the same as the "means for manipulating" and "means for configuring" functions, *i.e.*, "configur[ing], or chang[ing],

---

[9]  When the specification fails to disclose any corresponding structure for a recited means-plus-function limitation, this failure cannot be cured by the knowledge of one of ordinary skill in the art.  *Default Proof Credit Card Sys., Inc.*, 412 F.3d at 1302.

memory partitions or data."   Exh. G at ¶ 48; *see also* Exh. C at 96:17-97:4.   GEMSA, again, contends that a structure performing this function is "a pointing device such as a mouse, keyboard, program code or the like."   Exh. G at ¶ 49.   But hardware devices are not software; neither can change memory partitions.   And generic program code, without a specific algorithm, is not sufficient structure for changing memory partitions or "modifying said at least one cabinet record through said cabinet visible partition window."   *Id.*   As nothing more exists in the claim or specification regarding this function, the terms are indefinite.

5.      **Term 5:  cabinet selection button bar**

Defendants propose that this term means "a row of user selectable graphical icons, each representing a virtual cabinet."   Exh. D at 2.   GEMSA's discussion of this phrase is unhelpful and proposes three distinct possibilities: (1) no construction; (2) plain and ordinary meaning; or (3) "a graphical menu bar representing more than one virtual cabinet." Dkt. 169 at 15. GEMSA argues that "Expedia has not shown these words to have specific technical meanings in the '' [*sic*] 400 Patent's field."   *Id.*   "Cabinet selection button bar" is not a term of art, nor is it a term that would be familiar to a jury.   *See Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010).   Construction would thus assist the jury.

The '400 patent and its file history depict a "cabinet selection button" at item **70** (of Figure 1) as a row of user selectable graphical icons that each represents a virtual cabinet— consistent with Defendants' proposed construction. Moreover, when distinguishing prior art during prosecution of the '400 patent, the applicants emphasized that their invention depicted the individual cabinets "visually" with "icons." *See* Exh. E at 11-12.   This alleged point of novelty supports defendants' proposed construction.

While GEMSA's third option at least seeks to explain what this term means, it is less clear than Defendants' proposal because GEMSA is silent as to what aspect of the bar represents

the multiple cabinets.

### 6.  Term 6:  virtual cabinet[s]/virtual cabinet record/cabinet record

The terms "virtual cabinet[s]," "virtual cabinet record," and "cabinet record" are not terms of art.  Defendants propose that they mean: "virtual storage device capable of containing all (or partitions of) shared (or non-shared) operating systems, application software (both OS dependent and No-OS embedded), databases and memory."  Exh D at 3.  The '400 patent states:

> For the purposes of this invention and disclosure, the terms "Virtual Cabinet", "Cabinet Record" and "cabinet" are synonymous. A cabinet is *defined* herein as a virtual storage device capable of containing, typically through the use of virtual table of content pointers, all (or partitions of) shared (or non-shared) operating systems, application software (both OS dependent and No-OS embedded), databases and memory.

Exh. A at 5:22-29 (emphasis added); *see also* 2:46-47.  Defendants' proposed construction is consistent with this express definition, merely clarifying it by removing some of its non-limiting definitional language.

GEMSA's construction is not helpful. GEMSA objects to use of the word "virtual" in Defendants' construction for being found in the claim term while doing the same thing for "virtualized software."  GEMSA also omits part of the express definition in the '400 patent, *i.e.*, that the virtual storage device contains "*all* (or partitions of) shared (or non-shared) operating systems, application software (both OS dependent and No-OS embedded), databases and memory."  *Id.* at 5:23-29 (emphasis added).

### 7.  Term 7:  secondary storage device/secondary storage

Unlike many claim terms of the '400 patent, "secondary storage" is understood in the field of computing as computer storage other than RAM.   Indeed, Microsoft's Computer Dictionary defines "storage device" as follows:

> *Storage device*: "An apparatus for recording computer data in permanent or semipermanent form. When a distinction is made between primary (main)

storage devices and *secondary* (auxiliary) *storage devices*, the former refers to random access memory (RAM) and the latter refers to disk drives and other external devices."

Exh. H at 424 (emphasis added). This definition is consistent with the '400 patent itself, which does not require that the secondary storage be separate from the computer device.  Indeed, the '400 patent discloses that "secondary storage devices [are] found in the computer system."  Exh. A at 7:7-10.  Defendants' proposed construction ("hardware storage device other than random access memory"), which covers a situation where secondary storage devices are within the computer displaying the user interface, is consistent with the ordinary and customary definition. Exh. D at 3.

GEMSA's construction, which requires the secondary storage be separate from the computer running the claimed user interface, improperly excludes a preferred embodiment. GEMSA attempts to justify this exclusion by citing to U.S. Patent No. 6,401,183 ("'183 patent") to "note[] that secondary storage devices are 'separate' and 'independent,'" and that such devices are "attached to the computer device."  Dkt. 169 at 7-8, n. 36-37.  However, GEMSA offers no explanation of how these assertions support its construction.  For example, a computer hard disk would generally be considered a "secondary storage device," and is frequently contained within a computer device running a user interface.  This common situation, described in the '400 patent's preferred embodiments, would fall outside the scope of GEMSA's construction.  Because GEMSA offers no description of what "separate from the computer device" means, its construction is unhelpful.

### 8.    Term 8:  secondary storage partitions window

"Secondary storage partitions window" is not a term of art. However, the '400 patent expressly defines this term as item **80** in Figure 1, noting, "[t]he contents of the *all secondary storage devices found in the computer* system are depicted in Secondary Storage Partitions

Window **80** as Secondary Storage Icon **180** and Secondary Storage Text Descriptor **186**." Exh. A at 7:7-9 (emphasis added). Defendants' proposal ("a window in the GUI depicting the contents of the all secondary storage devices found in the computer system") adopts this term as coined in the '400 specification.

GEMSA contends that Defendants' construction is circular, while claiming that "GEMSA's construction is consistent with the intrinsic evidence." Dkt. 169 at 9. For support, GEMSA relies on extrinsic evidence, not intrinsic evidence, the most important of which is the definition at 7:7-9 of the '400 patent (referring to Fig. 1, item **80**). GEMSA's citations to the '400 patent and '183 patent do nothing to define a "secondary storage partitions window" other than to indicate it may be attached to a computer device, and it only cites Dr. Rosenberg's declaration "*generally*." *Id.* at 9, n. 43. None of these citations offer insight into the meaning of this term, or support GEMSA's assertion that the secondary storage is "separate" from the computer running the claimed GUI. Thus, GEMSA's construction has no support in the specification, and, in fact, deviates from it by omitting the requirement that the "secondary storage partitions window" depict the contents of ***all*** secondary storage devices.

### 9.    Term 9:  cabinet visible partition window

Defendants' proposed construction ("a window in the GUI showing all of the contents of a selected cabinet") follows from the claim language as well as the '400 patent's written description. Exh. D at 3. The phrase "cabinet visible partition window" is recited in each independent claim. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention."). Each time, the claim requires that the "cabinet visible partition window" illustrates the contents, namely the "operating system plus application software, databases and memory" of the "*selected* virtual cabinet record." *See*, Exh. A at claims

1, 16, 28; Fig. 1 at 90; and 7:1-32.

On the other hand, GEMSA's proposed construction is unduly broad by not including the requirements that the disputed claim language requires (1) "all" of the contents, and (2) of a "selected" cabinet. Although GEMSA criticizes Defendants' construction, it provides no explanation why it believes its own construction is correct. GEMSA cites the patent's written description, and cites "*generally*" to Dr. Rosenberg's testimony (Dkt. 169 at 14, n. 61, n. 62), but nothing in GEMSA's citations would support a broader claim construction that does not require that the window show "all" of the contents of a "selected" cabinet as set forth by the claim language itself. *See*, Exh. A at claims 1, 16, 28; Fig. 1 at 90; and 7:1-32. For example, GEMSA cites to the discussion of a "***Master*** Cabinet Visible Partition Window" as "depict[ing] all cabinets, both selected (active) and non-selected (inactive), booted and non-booted." Dkt. 169 at 14; *see* Exh. A at 7:30-32. But this ignores the remainder of the plain language of the claims, which specifies the contents of the "cabinet visible partition window," and clarifies its reference to the "*Active Selected* Cabinet Visible Partition Window."

### 10. Term 10: partition

Defendants rely on the asserted patent specifications and propose that this term means: "a stable and rigid portion of a secondary storage device that is logically distinct from other portions based on firmware-level address boundaries of the storage device." Exh. D at 3. GEMSA relies on a description of "partitions" in the '183 patent, elevating that description over the '400 and '677 patents and ignoring what they say. The '400 patent expressly states that partitions "need to be set up as stable and rigid partitions or mappings so that the operating systems do not mix, intermingle, call on each other, or exchange data, unless the user desires such exchange." Dkt. 169 at 13 (citing '400 patent at 1:61-65). Yet, GEMSA argues that these are optional characteristics that are not necessarily true of every "partition." *Id*. But "partition"

15

is not being construed in a vacuum.  Rather, the Court must consider both the surrounding claim language and the specification.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005).  "Partitions" are consistently described in the patents as "stable and rigid" to prevent different operating systems from accessing the same data, which can lead to instability in the overall system.  Exh. A at 1:61-65, 2:1-11; Exh. B at 8:4-14, 8:28-33, 8:65-9:6.   The Court's construction of "partition" should reflect this description.

GEMSA's reliance on the '183 specification also contradicts its arguments.  For example, GEMSA objects to the "logically distinct" and "secondary storage device" aspects of Defendants' construction, but cites to the '183 patent's description of a "partition" as a "***distinct*** segment of physical ***secondary storage***."  Dkt. 169 at 12 (citing '183 patent at 5:20-22) (emphasis added).  This description supports Defendants' proposed construction by making clear that partitions are "distinct"—which in computer terminology is essentially the same as "logically distinct"—segments of "secondary storage.".

GEMSA also argues that because the '400 patent describes that address boundaries "can be" implemented at the firmware level, they do not have to be implemented in that way.  *Id.* at 12-13.  This argument ignores the '400 patent's description that the alleged invention, "at its firmware level, enables a user to define and alter the address boundaries of the physical devices and memory."  Exh. A at 3:33-35.  The statement GEMSA relies on relates to the advantages that such firmware-level implementation provides—namely, that it allows all address access requests, regardless of origin, to be subject to the firmware-defined boundaries.  *Id*. at 3:39-44.  Defendants' proposal to limit this term to firmware-level address boundaries is consistent with the specification.

B.      **The '677 Patent**

1.      **Term 11:  means for selecting . . . / selection means . . .**

These claim terms, which are similar in scope are presumptively means-plus-function terms because they contain the phrase "means for."  *Williamson*, 792 F.3d at 1348.  The claim terms themselves lack structure for performing the claimed function, so the presumption is not overcome.  *Id*.  Construction of these terms therefore involves (1) determining the claimed function and (2) "identify[ing] the corresponding structure in the written description of the patent that performs the function."  *Noah*, 675 F.3d at 1311.

As Defendants propose, the claimed functions are "sequentially choosing from among said plurality of operating systems" or "selecting one of said virtual computer systems to become next operable before suspending a currently operational virtual computer system."  Exh. D at 3-4.  One of ordinary skill in the art would understand that these functions "cannot be performed by any general purpose computer, but instead must be performed by a general purpose computer specially programmed with a particular algorithm."  Exh. F at ¶¶ 83, 87.  To meet the definiteness requirements of 35 U.S.C. § 112, ¶ 2, the specification "must disclose an algorithm for performing the claimed-function."  *Augme Techs.*, 755 F.3d at 1337.  Such an algorithm, whether it be expressed in pseudocode, mathematical formulas, prose, flow charts, or any other form, does not appear anywhere in the specification of the '677 patent.  *See generally* Exh. A; *see also* Exh. F at ¶¶ 81, 83.

GEMSA does not attempt to rebut the presumption that these claim elements are means-plus-function elements.   Rather, it purportedly identifies structure, arguing that "GEMSA's proposed structures are clearly linked or associated to the configuring function by the '677 patent or its prosecution history," while citing several sections from the specification, none of which ties the structure that GEMSA identifies to the recited function. Dkt. 169 at 28.  Instead, the

17

identified passages merely discuss the focus of the '677 patent--fast switching--without

disclosing any algorithm.

| GEMSA Citation[10] | Summary of Citation |
|---|---|
| 4:33-55 | Provides a general description.  It mentions "modified use of the BIOS power management standard" for Fast Switching.  Does not disclose any algorithms. |
| 5:4-14 | Discusses the "novel use of the power management (ACPI or APM or alike) [to] support functions of the runtime (standard) OS and the BIOS."  Does not disclose any algorithms. |
| 5:28-6:5 | Discusses the objectives of the invention and lists its capabilities.  Does not disclose any algorithms. |
| 8:15-9:16 | Passage discusses the function of the VTOC data structure.  Does not disclose any algorithms. |
| 6:39-57 | Provides a general description of the claimed invention and mentions the "special use of the prior art power management ('PM') support functions of the runtime operating system and the basic input/output system ('BIOS')."  It does not disclose any algorithms. |
| 9:58-10:8 | Defines the Super OS GUI and states that it "provides a selection means for choosing one of the available operating systems and corresponding virtual computer systems."  Does not disclose any algorithms for this choosing. |
| Figure 9 | "FIG. 9 illustrates a GUI with an option box for the user to Suspend or shutdown the currently running Operating System."  6:25-27.  Does not disclose any algorithms. |
| Figure 12 | "FIG. 12 is a flowchart depicting the Super OS Fast Suspend operation block diagram."  6:32-33.  Does not disclose any algorithms. |

None of these passages describes an algorithm that performs the function of ***selecting*** a

virtual computer system to become next operable.  *See* Exh. B at 16:17-19, 16:43-44.  Nor would

a person of ordinary skill in the art have recognized a structure for performing the function.  Exh.

F at ¶ 86.  These claim term are thus indefinite and claims 1 and 3 are invalid under 35 U.S.C.

§ 112, ¶ 2.  *Noah Sys.*, 675 F.3d at 1312.

---

[10] All citations in this table are to Exhibit B.

### 2.    Term 12:  means for suspending the currently operational virtual computer system in an active state

Because this claim contains "means for" language, there is a presumption that 35 U.S.C. § 112, ¶ 6 applies.  GEMSA does not attempt to rebut this presumption.  As Defendants propose, the identified function is "suspending the currently operational virtual computer system in an active state."  Exh. D at 4.  While the claims are silent as to an algorithm for achieving this function, the specification discloses a three-step algorithm that performs the claimed function. Exh. B at 16:20-21, 10:15-27.  GEMSA has not identified any additional algorithms (its only citation is to the "677 Patent": Dkt. 169 at 29, n.90), and its failure to meaningfully address why this term is not a means-plus-function term renders Defendants' § 112, ¶ 6 construction unrebutted.  GEMSA's referenced "BIOS ACPI enhancements" may be a description of *where* the algorithm steps are performed, but does not in itself identify an algorithm (or even provide an indication of what these "enhancements" are that would provide the recited function of the claim).[11]   The Court should adopt Defendants' proposal.

### 3.    Term 13:  means for making the selected virtual computer system operable into a running state

This terms falls within 35 U.S.C. § 112, ¶ 6 because it contains the phrase "means for" and does not recite adequate structure to rebut the presumption that it is means-plus-function claiming.  GEMSA does not attempt to rebut this presumption.  As Defendants propose, the required function is "making the selected virtual computer system operable into a running state." Exh. D at 5.  Defendants' construction recites the only algorithm disclosed in the '677 patent for

---

[11] GEMSA repeatedly recites "BIOS ACPI enhancements/solutions" in its proposed constructions for individual means-plus-function limitations without indicating what these "enhancements" actually are, or where they are disclosed within the '677 patent.  In each instance, they are insufficient to provide corresponding structure for a given means phrase. *Default Proof*, 412 F.3d at 1298.

accomplishing the recited function.  Exh. B at 16:20-21, 10:31-44.  GEMSA's string citation neither discloses an algorithm, nor meaningfully addresses why its identification of "BIOS ACPI enhancements/solutions" recites an algorithm as required by Federal Circuit precedent.  Thus, the Court should adopt Defendants' proposal.

### 4.     Term 14:  means for switching of the virtual computer systems using a switch flag and BIOS ACPI solutions . . . power save suspend

This term falls within 35 U.S.C. § 112, ¶ 6 because it contains the phrase "means for" and does not recite adequate structure to rebut the presumption that it constitutes means-plus-function claiming.  GEMSA does not attempt to rebut this presumption.  As Defendants propose, the function is "switching of the virtual computer systems using a switch flag and BIOS ACPI solutions, and without initialization of power-on self test (POST) in the BIOS, wherein the switch flag is a flag that is set up in storage to differentiate between suspend for fast switching and power save suspend."  Exh. D at 6.  Defendants' construction recites the only algorithm disclosed in the '677 patent for accomplishing the recited function.  Exh. B at 12:15-41.  GEMSA's string citation neither discloses an algorithm, nor meaningfully addresses why its identification of "BIOS ACPI enhancements/solutions" recites an algorithm as required by Federal Circuit precedent.  Thus, the Court should adopt Defendants' proposal.

### 5.     Term 15:  said computer system having an OS-independent storage manager . . . and a plurality of operating systems and applications

Defendants propose that this phrase means: "a firmware-level storage manager that enables dynamic manipulation of the master boot record and partition table such that each OS virtually runs in its native environment, without any changes, and is restricted and "believes" to be the entire computer storage."  Exh. D at 6.  GEMSA argues it is not necessary to construe this phrase because it appears in the preamble, which it asserts "has not been shown to be limiting.".  Dkt. 169 at 20.  GEMSA is incorrect.  During prosecution, Applicant amended the preamble of

claim 1 of the '677 patent to add the underlined language: "an OS-independent storage manager operating through a firmware level and a plurality of operating systems and applications."  Exh. I at 2.  This amendment was made in response to the rejection of claim 1 as obvious.  Exh. J at 7-8; *see also* Exh. K at 10 (arguing that the prior art does not teach OS-independent storage management of Applicant.").  As such, the "an OS-independent storage manager" is an affirmative limitation, added for patentability purposes.  *Catalina Mktg. Intl.*, 289 F.3d at 807–11.

GEMSA alternatively argues that, if this phrase is an affirmative limitation, it should be given its plain and ordinary meaning.  GEMSA also objects to Defendants' construction as "impermissibly incorporat[ing] limitations from embodiments."  Dkt. 169 at 20.  First, GEMSA has done nothing to establish that this phrase had a plain and ordinary meaning in the art at the time of the alleged invention, or what this meaning was.  *Id.*  Second, Defendants' proposed construction reflects the express definition Applicant gave to the phrase "OS-independent storage manager" during prosecution.

During prosecution, Applicant defined "OS Independent Storage Management" to mean that "each OS virtually runs in its native environment, *without any changes*, and that it is restricted and 'believes' to be the entire computer storage (its cabinet)."  Exh. K at 6 (set forth in "Definition Pertinent to Response" section) (emphasis original).  Applicant also stated "[i]n an OS-Independent storage system environment, VTOC [virtual table of contents] and DTOC [disk table of contents] enable dynamic manipulation of the master boot record (MBR) and partition table for each OS as necessary."  *Id*. at 6-7.

Defendants' construction is not merely an embodiment, as GEMSA suggests.  Rather, it is the express definition Applicant gave the phrase.  As such, the Court should adopt Defendants'

proposal.  *Gillespie v. Dywidag Sys. Int'l, USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("The patentee is held to what he declares during the prosecution of his patent.").

### 6.      Term 16:  virtual table of contents

The parties agree that "virtual table of contents" ("VTOC") should be construed to be "a data structure maintained on secondary storage, but outside the primary file systems."  GEMSA asserts that the VTOC contains "all necessary information about the Virtual Personal Computer ('Virtual PC') environment of a physical computer."  Dkt. 169 at 20-21.  Defendants contend that the VTOC contains "all necessary information about each virtual computer system(s) of the physical computer including storage information, partitions and file systems."  Exh. D at 6.

GEMSA disagrees with Defendants' use of "each virtual computer system(s)," arguing that the VTOC need only contain information relating to a single "Virtual Personal Computer ('Virtual PC') environment."  Dkt. 169 at 21.  To the extent GEMSA uses "environment" to refer to a *single* virtual computer system, GEMSA is incorrect.  GEMSA argues that its construction "follows the patentee's expressed definition of this term," citing the '677 specification.  *Id.* at 21 n.75.  However, GEMSA ignores the entirety of this portion of the specification, which further states that "the VTOC defines Cabine*ts* (Virtual PC*'s*)."  Exh. B at 7:28-29 (emphasis added); *see also id.* at Fig. 4 (illustrating multiple Virtual PCs in a VTOC).

This description in the specification is consistent with the plain language of the claims, as well as the prosecution history.  Claim 1 of the '677 patent, for example, recites, "said storage manager having a virtual table of contents for organizing and accessing a plurality of partitions of relevant data ***and having a plurality of virtual computer systems***."  Exh. B at 16:9-12 (emphasis added).  During prosecution, Applicant also stated that "[t]he VTOC defines cabinets, or virtual PC's, wherein the cabinets are a set of partitions and file systems that are visible and available to a given operating system environment when that environment is actively executing

on the physical computer." Exh. L at 2 (emphasis original).  In sum, all intrinsic evidence requires that the VTOC contain information for each of the virtual computer systems configured on a given physical computer, and the Court should adopt Defendants' proposal.[12]

### 7.    Term 17:  virtual computer system[s]

The parties' proposed constructions for "virtual computer system[s]" are the same, with the exception of the following underlined language from Defendants' proposal: "set of storage information, partitions and file systems that are visible and available to a given operating system environment, having a unique master boot record and its own partition table, when that environment is actively executing on the physical computer."  Exh. D at 7.

Both GEMSA's and Defendants' proposals reflect the specification statement that "[a] Cabinet or Virtual PC is a set of partitions and file systems that are visible and available to a given operating system environment when that environment is actively executing on the physical computer."  Exh. B at 7:29-32.  But Defendants' proposal incorporates the definition Applicant offered during prosecution in distinguishing the prior art.  Exh. K at 21.  Specifically, Applicant argued that a virtual computer system of the claimed invention "owns its own unique master boot record (MBR) and partition table distinct from other virtual environments."  *Id*.  Thus, Applicant further limited the "virtual computer system" beyond what is set forth in the specification.  This additional limit cannot be ignored.  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.").  The Court should adopt

---

[12]  Defendants' proposed construction further requires that the "necessary information" include "storage information, partitions  and file systems," based on an express statement in the specification.  Exh. B at 7:27-28.  GEMSA does not dispute that the "necessary information" includes this information.  Dkt. 169 at 20-21.

Defendants' construction, which reflects both the specification and prosecution history.

### 8. Term 18: suspend for fast switching/fast suspending

Defendants propose that these terms mean: "making modified use of the BIOS power management standard to provide fast shutdown of an operating system to its suspended state by swapping out or remapping the current address space of the active program or OS without device power-down." Exh. D at 7. GEMSA does not offer a construction for these terms. Instead, it argues that they do not require construction because Defendants have "not shown construction of these terms to be necessary to decide [a] specific and concrete infringement or invalidity dispute." Dkt 169 at 23. GEMSA has not cited any authority for the proposition that, before obtaining a claim construction, the parties must identify how it will affect infringement or invalidity. It is incumbent on the Court to decide the scope of a claim term where, as here, there is a dispute between the parties concerning its appropriate construction. *O2 Micro*, 521 F.3d at 1360-62. Nevertheless, Defendants submit that adoption of their construction will result in non-infringement of all asserted claims of the '677 patent. GEMSA also argues that terms "suspend[ing]" and "fast switching" are separately presented for construction and therefore no construction is required for these terms; GEMSA has offered no construction for those terms either, and therefore those terms do not assist in the present task.[13] Dkt. 169 at 23, 26.

According to the specification, the "Fast Suspend method makes modified use of the BIOS power management standard, providing fast shutdown of an operating system to its suspended or hibernated state." Exh. B at 4:43-46. The specification further states that "[o]ne of the ***key features of this invention*** is the novel use of the power management (ACPI or APM or

---

[13] These terms can be grouped together for efficiency in the claim construction process, although they are different terms that cannot be given an identical construction.

alike) support functions of the runtime (standard) OS and the BIOS to temporarily evict that OS from memory and switch to the next OS requested by the user." *Id.* at 5:4-8 (emphasis added). During prosecution, Applicant contrasted "Hibernate", which involves a power down, with "Fast Suspend," which "means swapping out or remapping the current addressed space of the active program or OS, so no device power-down (power off or spin down) is required." Exh. K at 6. The Court should adopt the Defendants' construction.

### 9.      Term 19:  fast switching

GEMSA does not offer a construction for this term.  Dkt. 169 at 26.  The Court should construe this term, which is disputed.  *O2 Micro*, 521 F.3d at 1360-62.  Adoption of Defendants' proposed construction ("making modified use of the BIOS power management standard to fast suspend one operating system environment, followed by a fast resume of another operating system environment from a suspended state, without device power-down") will also result in non-infringement of all asserted claims of the '677 patent.  Exh. D at 7.

According to the specification, "Fast Switching" is "comprised of a Fast Resume method and a Fast Suspend method." Exh. B at 4:33-35.  As described above, the "Fast Suspend method makes modified use of the BIOS power management standard, providing fast shutdown of an operating system to its suspended or hibernated state." *Id*. at 4:43-46.  "Fast Resume" also makes modified use of the BIOS standard, allowing the user to "quickly transfer" to an operating system environment that is currently suspended, as an alternative to the "slow process" of starting with Power-On Self-Test and loading all operating system components via initialization programs.  *Id*. at 4:35-43.  The specification provides a list of steps performed for "OS Switching" via the suspend/resume procedures, and provides a more detailed algorithm for OS Switching.  *Id*. at 10:1-55; 12:1-42.  Although Defendants do not contend that the term "fast

switching itself must be limited to this specific algorithm[14], the disclosed algorithm demonstrates that "fast switching" involves modified use of the BIOS standard to implement a fast suspend of one operating system followed by a fast resume of another operating system, without power down.  The Court should adopt Defendants' proposed construction.

### 10.    Term 20:  power save suspend

This term appears in claims 1, 3, and 6 of the '677 patent, which recite a switch flag that differentiates between two alternatives: "suspend for fast switching" and "power save suspend." Defendants propose that this term means: "the customary and systematic termination of all services that forces the closure of all open files and cached information, shutdown of all devices and drivers and system power off."   Exh. D at 7.   "Suspend for fast switching" (*i.e.*, "Fast Suspend") is described as an "an alternative to the customary and systematic termination of all services that forces the closure of all open files and cached information, shutdown of all devices and drivers, and system power off."   Exh. B at 4:46-50.   This alternative corresponds to the claimed "power save suspend," which should therefore be construed to mean "the customary and systematic termination of all services that forces the closure of all open files and cached information, shutdown of all devices and drivers and system power off."

GEMSA's argument that this term does not require construction should be rejected for the reasons described above, as the Court's adoption of Defendants' proposed construction would result in noninfringement.   Alternatively, GEMSA argues that "power save suspend" should be given its plain and ordinary meaning, but fails to identify what that meaning is.  The Court should adopt Defendants' proposal, using the express disclosure of the '677 patent.

---

[14]  This is in contrast to the means-plus-function terms, discussed *supra*, where Applicant's choice to use the phrase "means for" limits the functional claim limitations to the specific algorithms disclosed in the '677 specification.

### 11.    Term 21:  BIOS ACPI solutions/enhancements

"BIOS ACPI solutions" appears in claim 1 of the '677 patent, and "BIOS ACPI enhancements" appears in claims 3 and 6.  Defendants propose these terms be construed to mean "modifications made to standard BIOS ACPI power management software."  Exh. D at 7.  This is consistent with the '677 specification's description of a "Standard BIOS" having one series of steps, and a "Super OS BIOS" having additional steps in excess of the series of steps associated with a "Standard BIOS" (*i.e.,* "enhancements").  Exh. B at 11:27-62.  It is also consistent with the prosecution history, where Applicant noted its "fast suspend and fast resume totally rely on applying BIOS ACPI enhancements," and argued the cited prior art did not "teach how to fast suspend and fast resume by enhancing the ACPI standards and technology to prevent power down of devices."  Exh. K at 27.  In other words, "BIOS ACPI enhancements" refers to additions made to Standard BIOS without which the functions of "Fast Suspend"/"Fast Resume" cannot be performed.  *See id.* at 6 ("Only hardware equipped with 'Flash Vos Super OS Flag and Bios enhancements' can support Super OS and 'VTOC-based OS independent storage management' to gain Fast Suspend/Fast Resume OS-Switching Capability."); *see also* Dkt.169 at 28-30.

GEMSA argues that these terms do not need to be construed because they only appear within a larger "means for switching" term that is being separately construed.  *Id.* at 25.  That is not correct.  "BIOS ACPI enhancements" is not part of any other disputed phrase.  With regard to "BIOS ACPI solutions," it is proper to address its meaning even though it is part of a means-plus-function term.  *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003) ("[We] construe the meaning of the words used to describe the claimed function, using ordinary principles of claim construction.").  GEMSA is also mistaken in arguing that these terms only appear in a preamble.  Dkt. 169 at 25 (referencing "claim 28," even though

there are only 7 claims in the '677 patent).  They only appear in individual limitations of claims 1, 3, and 6—not in the preambles.  GEMSA then argues that its "construction is consistent with the intrinsic evidence."  *Id.*  Given that GEMSA has not even offered a construction, this assertion cannot be correct and the Court should construe the terms as Defendants' propose.

### 12.   Term 22:  power-on self-test (POST) in [the] BIOS

This term appears in asserted claims 1, 3, and 6 of the '677 patent.  Defendants propose that this phrase means: "diagnostic test sequence performed by BIOS to determine if various system components are properly connected and operating and, if successful, pass control to the system's bootstrap loader."  Exh. D at 8.  GEMSA argues that this term does not require construction but, if construed, should be given its plain and ordinary meaning.  However, GEMSA again provides no indication of what that meaning is.  Dkt. 169 at 25-26.

The '677 specification describes a computer "power on" operation as the "typical BIOS boot sequence Power-On Self-Test ('POST') check."  Exh. B at 13:26-28.  It does not explain in detail what that check entails, other than to list a series of operations such as "Check Flags," "Check Memory," "Check Devices," etc., which are themselves not further defined.  *See id.* at 11:6-11.  However, the terms "power-on self test" and "self-test" had well-understood meanings in the art when the '677 patent was filed.

The Federal Circuit has recognized that technical dictionaries can help courts understand the way in which persons of ordinary skill use technical terms.  *Phillips*, 415 F.3d at 1318.  The Microsoft Computer Dictionary, published in 1999, defined "power-on self test" as "[a] set of routines stored in a computer's read-only memory (ROM) that tests various system components such as RAM, the disk drives, and the keyboard to see if they are properly connected and operating."  Exh. H at 352.  The Dictionary further described that, "[i]f the power-on self test is

successful, it passes control to the system's bootstrap loader." *Id*.  The Dictionary also provided a definition for "self-test": "[a] set of one or more diagnostic tests that a computer or peripheral device (such as a printer) performs on itself." *Id*. at 402.

The Court should adopt Defendants proposal, which reflects the well-understood meaning of the term to a person of skill in the art, and is consistent with the '677 specification.

### 13.  Term 23:  at least one cabinet for isolating each virtual computer system

This phrase appears in claim 6 of the '677 patent.  Defendants propose that this phrase mean:  "at least one cabinet for physically separating each virtual computer system from any other virtual computer system."  Exh. D at 8.  GEMSA argues that this phrase is not limiting because it appears in the preamble, and that Defendants have not demonstrated that construction is necessary to decide an infringement or invalidity dispute.  Dkt. 169 at 27.  GEMSA is wrong on both counts.  During prosecution, Applicant added this phrase to the preamble of claim 6 (which was claim 8 during prosecution) to overcome its rejection in view of three prior art references.  Exh. I at 3, 5-6.  Thus, it is limiting.  Defendants also note that the Court's adoption of their proposal would result in non-infringement.

Defendants' proposal is consistent with the Applicant's description of "isolation" as constituting physical separation between different systems.  Exh. B at 1:64-2:3.  GEMSA does not offer a construction.  The Court should adopt Defendants' proposal.

### C.  Withdrawn Terms

### 1.  U.S. Patent No. 6,690,400

Defendants hereby withdraw the following '400 patent claim terms, which GEMSA asserts do not require construction: "computer system with a memory, a display and multiple operating systems," as well as the assertion that the preamble of claim 28 is limiting, "operating

system[s]," "discrete operating system," "database," "a computer program product for use on a computer system . . . ."  Defendants agree with GEMSA that in order to streamline the issues for the Court, these terms can be applied according to their plain and ordinary meaning, such that no explicit construction is required at this stage.

### 2.    U.S. Patent No. 7,356,677

Defendants hereby withdraw the following '677 patent claim terms, which GEMSA asserts do not require construction: "hardware platform," "hibernate capable computer system," "operating system[s]," "partitions of relevant data," "dynamically configuring a plurality of partition tables," "sequentially choosing," "suspend[ing/ed]," "activating another virtual computer system of said virtual computer systems to a running state without rebooting and without initialization of power-on self test in BIOS."  Defendants agree with GEMSA that to streamline the issues for the Court, these terms can be applied according to their plain and ordnary meaning, such that no explicit construction is required at this stage.  However, to the extent any of these terms are part of another claim term that Defendants maintain requires construction, the Court should construe them consistent with Defendants' proposed construction for the other term or phrase.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants request that the Court adopt their proposed constructions.

Dated:  October 13,  2016                              Respectfully submitted,

                                                        /s/  *Bryan J. Sinclair*
                                                        Bryan J. Sinclair, *pro hac vice*
                                                        California Bar No. 205885

bryan.sinclair@klgates.com
Audrey Lo, *pro hac vice*
California Bar No. 253738
audrey.lo@klgates.com
Ranjini Acharya, *pro hac vice*
California Bar No. 290877
ranjini.acharya@klgates.com
**K&L Gates LLP**
630 Hansen Way
Palo Alto, CA 94304
650.798.6700
650.798.6701 *Facsimile*

John J. Cotter, *pro hac vice*
Massachusetts Bar No.554524
john.cotter@klgates.com
**K&L Gates LLP**
1 Lincoln Street
Boston, MA 02111
617.261.3100
617.261.3175 *Facsimile*

Ravi S. Deol
Texas State Bar No. 24090073
ravi.deol@klgates.com
**K&L Gates LLP**
1717 Main Street
Suite 2800
Dallas, TX  75201
214.939.5500
214.939.5849 *Facsimile*

*Attorneys for Defendants Airbnb, Inc., eBay,*
*Inc., and TripAdvisor LLC*

/s/ Carey R. Ramos
Carey R. Ramos
**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212.849.7000
Facsimile: 212.849.7100
careyramos@quinnemanuel.com

31

LEAD COUNSEL

Jeffrey S. Gerchick
Brett N. Watkins
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
777 6th Street NW, 11th Floor
Washington, D.C. 20001-3706
Telephone: 202.538.8000
Facsimile: 202.538.8100
jeffgerchick@quinnemanuel.com
brettnwatkins@quinnemanuel.com

*Attorneys for Defendants Alibaba.com Hong
Kong Limited, Alibaba.com, Inc. and
Alibaba.com Singapore E-Commerce Private
Limited*


*/s/ Todd M. Siegel*
J. Christopher Carraway (OSB 961723)
christopher.carraway@klarquist.com
Andrew M. Mason (OSB 111590)
andy.mason@klarquist.com
Todd M. Siegel (OSB 001049)
todd.siegel@klarquist.com
**KLARQUIST SPARKMAN, LLP**
121 S.W. Salmon Street, Suite 1600
Portland, Oregon 97204
Telephone: (503) 595-5300
Facsimile: (503) 595-5301

*Attorneys for Defendant Booking.com B.V.*


*/s/ J. David Hadden*
J. David Hadden
CA Bar No. 176148 (admitted E.D. Tex.)
Email: dhadden@fenwick.com
Saina S. Shamilov
CA Bar No. 215636 (admitted E.D. Tex.)
Email: sshamilov@fenwick.com
Eman Sojoodi
CA Bar No. 261293 (admitted E.D. Tex.)
Email: esjoodi@fenwick.com
Jeffrey Ware

32

CA Bar No. 271603 (admitted E.D. Tex.)
Email: jware@fenwick.com
Ravi Ranganath
CA Bar No. 272981 (admitted E.D. Tex.)
Email: rranganath@fenwick.com
**FENWICK & WEST LLP**
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Telephone:     650.988.8500
Facsimile:     650.938.5200

Counsel for Expedia Defendants
EXPEDIA, INC., HOTELS.COM LP,
HOTWIRE, INC., ORBITZ WORLDWIDE,
INC., AND CRUISESHIPCENTERS
INTERNATIONAL INC.

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that all counsel of record who have appeared in this case are being served today with a copy of the foregoing via the Court's CM/ECF system.

Date:  October 13, 2016                    */s/ Bryan J. Sinclair*
                                            Brian J. Sinclair