1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

------------------------------------------------

GLOBAL EQUITY MANAGEMENT (SA) )

PTY. LTD.,                     )

      Plaintiff,          ) CIVIL ACTION NO.

 vs.                           ) 2:16-cv-00095-RWS

EXPEDIA, INC.,                 ) (Consolidated

      Defendant.          )   Lead Case)

------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

CRAIG ROSENBERG

------------------------------------------------

9:36 a.m.

September 30, 2016

925 Fourth Avenue, Suite 2900

Seattle, Washington

REPORTED BY:  Brenda Steinman, CCR #2717

## 2

### A P P E A R A N C E S

FOR PLAINTIFF:
        WILLIAM P. RAMEY, III, ESQ.
        Ramey & Schwaller, LLP
        5020 Montrose Boulevard, Suite 750
        Houston, Texas 77006
        832.581.4221
        wramey@rameyfirm.com

FOR DEFENDANTS:
        THEODORE J. ANGELIS, ESQ.
        K&L Gates
        925 Fourth Avenue, Suite 2900
        Seattle, Washington 98104-1158
        206.623.7580
        theo.angelis@klgates.com

FOR DEFENDANTS:
        JEFFREY GERCHICK, ESQ.
        Quinn Emanuel Urquhart & Sullivan, LLP
        777 6th Street Northwest, 11th Floor
        Washington, D.C. 20001
        202.538.8128
        jeffgerchick@quinnemanuel.com

## 3

### A P P E A R A N C E S
Continued

FOR DEFENDANTS:
        TODD M. SIEGEL, ESQ.
        Klarquist Sparkman, LLP
        121 Southwest Salmon Street, Suite 1600
        Portland, Oregon 97204
        503.595.5300
        todd.siegel@klarquist.com

****** (*  Denotes Phonetic Spelling.)

## 4

### E X A M I N A T I O N

| ATTORNEY | PAGE |
|---|---|
| BY MR. ANGELIS: | 5 |
| BY MR. RAMEY: | 140 |
| BY MR. ANGELIS: | 143 |

### E X H I B I T   I N D E X

| EX# | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 50 | 9/7/2016 Declaration of Craig Rosenberg, Ph.D. | 5 |
| Exhibit 51 | Alan Freedman, The Computer Desktop Encyclopedia, American Management Association pages 921-923 | 6 |
| Exhibit 52 | Exhibit 1.  U.S. Patent 6,690,400 B1 | 13 |
| Exhibit 53 | Exhibit '183.  U.S. Patent 6,401,183 B1 | 103 |
| Exhibit 54 | Exhibit 3.  Curriculum Vitae for Craig S. Rosenberg, Ph.D. | 120 |
| Exhibit 55 | Exhibit 2.  U.S. Patent 7,356,677 B1 | 133 |

## 5

SEATTLE, WASHINGTON; FRIDAY, SEPTEMBER 30, 2016
        9:36 A.M.
                oo-OO-oo
CRAIG ROSENBERG,      witness herein, having been
        first duly sworn on oath,
        was examined and testified
        as follows:
            E X A M I N A T I O N
BY MR. ANGELIS:
    Q.  Good morning, Dr. Rosenberg.
    A.  Good morning.
    Q.  Now, I'd like to begin with your
declaration.
            (Exhibit 50 marked for
            identification.)
    Q.  (By Mr. Angelis)  Can you please turn to
paragraph nine of your declaration.
    A.  Okay.
    Q.  Now, I'm most interested in the
definitions you have under a, b, and c for the
terms emulation, simulation, and virtualization.
        Do you see those?
    A.  I see this.
    Q.  Now, what is the role of the text in
parentheses in a, b, and c?

Rosenberg, Craig

September 30, 2016

3 (Pages 6 to 9)

---

**6**

A. I guess examples, examples of emulation, simulation, and virtualization.

Q. In number c, virtualization, does that mean that -- so multiple OS environments on a server is an example of virtualization is what you're saying.

A. Yes.

Q. So does that mean that your definition of virtualization is to create or produce?

A. Yeah, at a high level, in general.

Q. Let me show you another definition and see if you agree with this definition.

(Exhibit 51 marked for identification.)

Q. (By Mr. Angelis) This is what's been marked as Exhibit 51. Let me just take you to the second page here of this document. This is a computer dictionary from 1996.

A. Okay.

Q. And the title is, it's Freedman Computer Desktop Encyclopedia.

Can you please turn to the definition for virtual machine.

A. Okay, I see it.

Q. I'll just read the first part of the

---

**7**

first definition. It says "A computer that runs an operating system that can host other operating systems or multiple copies of itself."

Do you see that?

A. I do.

Q. Does this tell one of ordinary skill in the art, is this a reasonable definition of a virtual machine?

A. I think it's reasonable. I think some with skill in the art might consider a virtual machine to be the guest OS.

Are you familiar with host OS and guest OS, those terms?

Q. Why don't you just explain them for the record.

A. Sure. So the host OS would be, let's say, well, in a Type 2 hypervisor, a host OS would be the first operating system that boots. And then through hypervisor software you could run a guest operating system. And then that guest operating system that's run on top could be considered the virtual machine itself.

So I would put that as a alternate definition of virtual machine.

Q. And you mentioned a Type 2 hypervisor.

---

**8**

What do you mean by that term?

A. Well, so there is -- basically it just means that the hypervisor is implemented in software that runs on top of the host operating system. In a Type 1 it's usually implemented in silicon, let's say EEPROM, it's burned into a chip. It's still software, but it's loaded into the chip and you get greater efficiencies and speeds associated with a Type 1, but the concept is the same.

Q. In both a Type 1 and a Type 2 hypervisor, you're talking about something that runs both software and hardware; it's a virtual machine that is running in a software and a hardware environment; correct?

A. I guess I'd want to add a little more clarity to that. When you said it runs hardware, can you -- I wouldn't characterize it that way.

Q. It runs on hardware.

A. Runs on hardware.

Q. So you're required to have, this virtual machine is depending upon both hardware and software to run.

A. Yes, all software cannot exist separate from hardware. Software doesn't run in a vacuum,

---

**9**

software runs on top of hardware; period. I think that's well understood.

Q. So just to help the court understand things, you're talking about basically a virtual machine, although it's virtual, has actual physical components that exist in physical space, and there is, for example data that would be stored magnetically, for example, on a hard drive as part of this virtual machine.

A. Yes, that is true. But like I just said, software needs hardware to run. Software cannot run in the absence of hardware.

That said, the virtual machine is representing a different configuration, a different system configuration than the actual hardware.

I'll give a for example. I'll give an example.

If I take Windows 10 and I use Virtual PC, which is a Microsoft virtualization product, to create a virtual machine of a Windows 95 computer, the software that's running on the Windows 95 virtual machine may -- will think that it has different memory resources, different network resources, different storage resources,

10

and different CPU resources than the actual resources that are on the Windows 10 computer.

So technically the virtual machine is running on that Windows 10 computer, but the operating system, this Windows 95 operating system that's been set up as a virtual machine and the software that's running on it believes, if we can use that word, that it's running on a Windows 95 computer.

Q.  Fair enough.  So in this definition of virtual machine in Exhibit 51, there is a reference, for example, to a Virtual 8086 Mode in a PC starting with a 386 computer.

A.  Um-hum.

Q.  That's more or less the same thing you were talking about with a Windows 10 and Windows 95.

A.  Yeah.  Let me just read it for completeness.  Okay.  I see that, yes.

Q.  And so you agree that's more or less the same process you were just talking about with respect to Windows 10 and Windows 95.

A.  I think it's similar.  The part that's throwing me just a bit is I'm not sure exactly what they mean by "Computers can be built with

11

hardware circuits that support a virtual machine."

Maybe they're speaking about the Type 1 hypervisor, that I was speaking, where you embed that hypervisor software in circuits.

So I'm not sure if they're making a nod, if you will, toward Type 1 hypervisors there, or if they're just saying what I said, which is the virtual machine represents an alternate system configuration, like a Windows 95 configuration with different CPU resources, different network, different memory, different storage.  It could be one of those two things.

Q.  And for what it's worth, I read it as being a nod to the Type 1 issue.

A.  Yes.

Q.  Can we just take you back to the first sentence in the definition of virtual machine in Exhibit 51.  It says "A computer that runs an operating system that can host other operating systems."

Do you see that?

A.  I see that.

Q.  And that's a fair definition of the virtualization that we're talking about in this case; isn't it?

12

A.  Well, again, like I said earlier, I think also one of skill in the art, persons of skill in the art might consider that the virtual machine isn't the computer that runs the operating system that can host other operating systems, but the virtual machine is the instance of the guest operating system.

So in my example, it would be that 95, that Windows 95 instance, would be considered the virtual machine.  I mean that's usually how I would consider it, not the modern day Windows 10 computer.

This seems to be saying it's the Windows 10 computer that's able to host other guest operating systems.

When I set up multiple virtual machines, I think it would be well understood by persons of skill in the art that that would be setting up multiple instances of other guest operating systems.

Q.  I understand your testimony.

A.  Okay.

Q.  Now, let's turn to -- well, let me just state for the record what I've done is Exhibit 50 is your declaration, but it omits the exhibits.

13

What I'm going to do is just hand you the exhibits and separately mark them as exhibits, so you don't have a 200-page document that we're trying to navigate.

A.  That's fine.

(Exhibit 52 marked for identification.)

Q.  (By Mr. Angelis)  Dr. Rosenberg, Exhibit 52 is the '400 patent.

Now, please take a look at paragraph 16 of your declaration, if you would.  So here you're talking about a particular claim element from Claim 1 of the '400 patent; correct?

A.  That's correct.

Q.  And in particular, it's "means for allocating a computer device's resources to multiple operating system environments, partitioned on individual virtual cabinets, on said computer device."

Do you see that?

A.  I do, yes.

Q.  So let's just set the table here for a second, and see if we can agree on what this claim term is talking about.

We're talking here about graphical user

Rosenberg, Craig

September 30, 2016

5 (Pages 14 to 17)

---

**14**

interface, and we're talking about means for
allocating a computer device's resources.
     And so this operates at the code level,
correct?  Means for allocating is something that
the computer does based on instructions that are
received from code; is that correct?
     A.  I think that's one way to interpret it.
But you could also say it's something that the
user does.
     The graphical user interface is the
interface between the user and the computer, and
there is much disclosure in the patent about using
mice, using point and click, using right clicks,
using drags.  I mean these are all user actions
too.
     So I would say it's a combination of
things that have to happen to invoke the
invention; that the user has to interact with the
graphical user interface and then the computer has
to interpret the actions of the user.
     Q.  Fair enough.  We're going to get to all
those parts of your opinions as we go on today.
     I want to talk about the last part of
your answer there where you said "the computer has
to interpret the actions of the user."

---

**15**

     What are you referring to in relation to
this claim term "allocating a computer device's
resources"?  What is the computer doing that
you're talking about?
     A.  Well, it's interpreting the input from
the human.  So I mean there is various ways you
can -- there is so many different frameworks and
languages; DirectX, OpenGL, GL, Microsoft
Foundation Class, Java AWT, Java Swing, I mean it
goes on and on, all these different frameworks
that you can use to create GUIs that are shown in
every figure of the '400 patent.
     So there is -- each one has its own
unique methods that interpret button downs, right
clicks, drags.  And so I think that's what I was
referring to.
     Q.  That's what I'm getting at as well.
     A.  Yeah.
     Q.  So to take this pedestrian example you
used at the end of your answer.  A user, for
example, performs a drag and drop operation,
correct?
     A.  Yes.
     Q.  That's possible.
     In the instance in this claim language

---

**16**

where we're talking about "means for allocating a
computer device's resources," what does that
instruct the computer to actually do?
     We'll talk about this on a case by case
basis.
     A.  Um-hum.
     Q.  But for allocating resources, what does
the computer have to do?  You would agree that the
computer has to take some action at the code level
to actually allocate the resources; correct?
     A.  I do, yeah.  I do.
     But I guess I don't see this patent as
being around that part of the invention.  I mean
even the title, the first words are "Graphic User
Interface For Resources Management."  Abstract,
"This invention is a Graphic User Interface that
enables a user."
     I see the disclosure in this patent, and
essentially the whole invention, around the
graphical user interface, and not so much as the
technical details of how virtualization is
accomplished.
     Q.  Fair enough.  That's helpful.
     And so just so I understand it and make
sure we're on the same page, your opinion then --

---

**17**

and we'll talk about this in detail element by
element --
     A.  Sure.
     Q.  -- is that this invention is not
concerned at all about how the resources are
actually allocated.
     MR. RAMEY:  Objection; form.
     A.  I think that -- I don't know if I want
to put a 90 percent/10 percent; I'll probably
leave that aside.  I mean as far as the vast
majority, if not the entirety, of this patent
seems to be around the user interface and the
novel user interface to graphically configure; so
what the user does, how it might be displayed to
the user.
     Yeah, I don't see much -- again, I would
need to go through it to look specifically for it,
but what happens down at the code level for the
repartitioning, if you will, or changing the
amount of memory that's available to the process,
I don't see that discussed in the patent
write-off.  I see that more as an issue with '183
and '677 patents.
     Q.  (By Mr. Angelis)  That's helpful.
     Just to take an example, if a user

---

## 18

performs a drag and drop operation, for example to copy a partition to a particular cabinet that this patent talks about, your opinion is that the patent is concerned with essentially that drag and drop, visually displaying that drag and drop, as opposed to what the computer is instructed to do to actually copy that partition into a particular virtual storage area.

A. Yes. I would say the invention that seems to be disclosed is the front end. It's that graphical user interface to allow for a much more user friendly manipulation of your virtualization environment as opposed to, let's say a command line interface, where you would have a command and many different options that would be far less intuitive and usable from a human factors perspective.

Q. So it's fair to say the invention isn't concerned about how the copying occurs, or even whether or not it occurs, it's just the interface for asking it to occur.

A. Yeah. I think it's pretty clear that -- I wouldn't go to say whether or not it occurs; it seems to me that the patentee, my understanding from reading the patent is that it had some

## 19

software that was doing this, and he wasn't just making a GUI that wasn't connected to anything in the background.

But I would agree with your characterization that the invention seems to be, to me seems to be all about the front end, or the user interface, and how that could work to create a more usable user interface for allocating resources and modifying resources of virtual environments -- of virtualized environments.

Q. So drag and drop was something that was pretty well known at this time, wasn't it, in the 1998, early 1999 time frame?

A. Yes.

Q. So we're not talking here about the invention of the drag and drop technology.

A. No. I would think it would be the application of various standard UI, UI widgets or UI elements, such as right click menus, drop downs, check boxes, icon bars, button bars, drag and drop.

I mean all of these are standard traditional user interface widgets, if you will, or interaction techniques. And they were incorporated into the creation and modification of

## 20

a virtualized -- into creation and modification of virtualized operating systems. So utilizing existing UI interaction techniques and widgets.

Q. So this was an application essentially of what you called standardized, we'll call them widgets, basic UI functionality components, into the context of a graphical user interface related to managing a virtualized system; is that fair?

A. Yes.

Q. Let me back up one paragraph, where we were before, and talk about paragraph 15 for a minute. This contains a basic overview of the '400 patent and then concludes with an opinion sentence. And I just want to make sure I understand what you're saying here.

Take a minute to read paragraph 15, please.

A. Okay.

Q. So based on this paragraph, it's fair to say your opinion is that the claimed graphic user interface enables a user to virtualize a computer system; is that correct?

A. Not exactly. I think that it allows them to create virtual cabinets, which specify the resources of a virtual -- virtualized operating

## 21

systems in a much more intuitive and user friendly manner. And not only create, but create and/or modify or delete.

Q. And are they creating the cabinets or are they creating a graphical representation of the cabinets?

A. Well, the cabinets themselves are a graphical representation. This is -- there is a term in data centers, cabinets, the 19-inch racks that represent where the computer systems -- usually they're rack-mounted computers that are in these 19-inch racks that are called cabinets, so tall cabinets. So this represents that in a graphical format, if that's what -- I want to be responsive to your question -- if that's what your question is.

Q. Let me ask it in this way. The creation of the cabinets is not the subject of the '400 patent invention; is it?

A. I think that's part of it. The graphical -- the look of the cabinet, the fact they called it a cabinet. It's a collection. It's a container, if you will, in which various properties can be stored associated with the virtualized system.

Rosenberg, Craig

September 30, 2016

7 (Pages 22 to 25)

---

**22**

Q.   Let me take you back to what you just testified to about these physical racks that occur, these 19-inch racks where there were computer systems that were actually created. Those are the type of systems that have hardware and software that we were talking about before, those are actual physical systems; correct?

A.   Um-hum.  Yes.

Q.   And the cabinet that you're talking about is not a physical system that's being created; is it?

A.   No, it's not.

Q.   So you're talking about an image of a cabinet essentially; correct?

A.   Well, that's part of it.  Part of it is the image.  But then there is the underlying properties that represent, well, the various attributes that the cabinet can contain; what kind of operating system, is it password protected, is there remote access, where the partitions lie, what the name is, what the icon.  So there is various properties that are contained within this virtualized graphic representation.  It doesn't stop, just drawing a rectangle.

Q.   Fair enough.  We'll talk about that in a

---

**23**

minute.

In the second sentence of paragraph 15 here you talk about the graphic user interface enabling a user to define a secondary storage physical device -- or secondary storage physical devices; is that right?

A.   I see that, yes.

Q.   And so it's your opinion that the claimed graphic user interface does enable a user to define a secondary storage physical device.

A.   Yes.

Q.   And is that more or less what you meant by your statement that "In my opinion, the '400 patent claims a graphic user interface for displaying virtualized storage devices of an operating system independent storage virtualization system"?

A.   Yes, it is.

Q.   What are virtualized storage devices that you're talking about there?

A.   Okay.  So it goes back to our discussion earlier about what is virtualization.  I mean there is some graphics in, I think the '183 that could be helpful for it.

But basically if you have a physical

---

**24**

disk, which would be your physical disk, one software, hypervisor software, virtualization software can create one or more virtual storage devices out of that physical disk by defining various partitions that are allocated for that virtualized storage.  And that disk can represent a different disk, you know.  Your Windows 10 disk could be utilized to create a guest OS of a Windows 95 disk, and you could use a portion of your physical disk to represent your Windows 95 disk.  So that would be an example of a virtualized storage.

Q.   So in layperson's terms, you would say -- and to not oversimplify -- a portion of a hard disk if properly configured could be essentially a virtualized storage device.

A.   Yeah, or even the entire thing, the entire thing or a portion of.

Oftentimes one might want to create several portions to represent several different resources.  Each could have -- you know, be bootable, depending on which is pointed to.  And each could be loaded with different operating systems and different applications.

Q.   So one could be a Windows 10 portion,

---

**25**

one could be a Linux portion, one could be even a macOS portion.

A.   That's correct, yes.

Q.   And what is an operating system independent storage virtualization system?

A.   Operating system independent, that's basically just what we're talking about here. It's -- so the storage system is, like I said, the disk that's been partitioned into multiple pieces, and then the operating system independent is kind of like your example where you have Linux on one partition and Mac on another and Windows on a third.

Q.   So virtualized storage device in a storage virtualization system more or less the same thing, or is a virtualized storage device one part of, so multiple virtualized storage devices could be part of a storage virtualization system.

A.   Yes.  I would characterize it that way.

Q.   And what we were just talking about was, again in the physical world, it wasn't just a graphical representation, we're talking about actually physically creating disk partitions; correct?

A.   I think mostly we were.  But there is

Rosenberg, Craig

September 30, 2016

8 (Pages 26 to 29)

---

26

1  software that aids in that.  I mean you don't go
2  in there with your hands and create the disk
3  partitions.  It's software that controls the
4  read/write heads and actually is changing sectors
5  and partitions.
6      Q.  Fair enough.
7          So turning back to paragraph 16, which
8  we just talked about briefly, and the claim
9  language.  Just so I'm clear on this, what does it
10 mean to allocate a computer device's resources to
11 multiple operating system environments?
12     A.  Okay.  So going back to what we were
13 talking about earlier where, let's use our example
14 of a Windows 10 computer, that's a modern 2016
15 computer, and we're trying to create, let's say a
16 Windows 2000 instance of an operating system and a
17 Windows 95 instance, so these are older, older
18 operating systems that were developed to run on
19 older hardware.
20         So the means for allocating the computer
21 device's resources, that's a way to allocate the
22 modern CPU and disk and memory of your 2016
23 Windows computer to these multiple, in my example
24 older, it doesn't have to be older, but in my
25 example older 2000, Windows 2000 and Windows 95

---

27

1  environments.  So you're allocating the disk,
2  potentially the network card, the CPU, the memory,
3  so that each of those guest OSes believe that they
4  are -- they have dedicated hardware.
5          They don't actually.  They don't.  All
6  of these can run simultaneously.  You could have
7  multiple users using each of those OSes, and
8  they're all really sharing the same real physical
9  CPU and physical disk, but each those OSes, those
10 guest OSes that have been virtualized, believe --
11 if I can use that word again -- have been
12 programmed to understand -- that's probably not
13 the best choice of words, but I think you
14 understand -- you may understand what I'm meaning
15 here is that the guest OS -- to the guest OS it is
16 as if it has dedicated hardware that would be
17 typical and appropriate for the time that that OS
18 was developed, I guess is the best way to put it.
19     Q.  Let's take an example.  For example, a
20 data file that we're going to allocate, we're
21 going to allow two different operating system
22 instances to have access to.  That would be within
23 the scope of this claim element; would you agree?
24         MR. RAMEY:  Objection; form.
25     A.  Yeah.  I see nothing in the claim

---

28

1  element that limits, that limits that use case, if
2  you will.
3      Q.  (By Mr. Angelis)  So what steps would
4  the computer need to perform to allocate that data
5  file to multiple operating system environments, we
6  can call them cabinets, if you'd like?
7      A.  Okay.  And I'll just modify your
8  question a little bit to what steps the user and
9  the computer would need to perform, because the
10 computer doesn't perform things on its own.
11     Q.  Fair enough.
12     A.  The user would utilize software to
13 invoke an intention, if you will, of what the user
14 wants to have happen.
15         So at a high level and in general, the
16 user would use virtualization software and
17 potentially a slick user interface, such as
18 described here in the '400 patent, a graphical
19 user interface, not necessary though.
20         But to answer your question strictly,
21 what steps would be needed to have two different
22 operating systems access the same data file?  I
23 just want to make sure I understand your question.
24     Q.  That is the question.
25     A.  Yes.  So you would use virtualization

---

29

1  software to set up one guest operating system.
2  You would load the operating system, you would
3  load any applications that you wanted, you would
4  load any data files that you wanted, presumably
5  this one data file we're talking about in the
6  second.  And then the user would go on to set up a
7  second environment with a different operating
8  system, a different set of applications most
9  likely, and potentially that same data file that
10 you're talking about.  So now at the end of all
11 that you have two different guest OSes that can
12 each access the same data file.
13     Q.  And at the system level what does the
14 computer have to be instructed to do to make sure
15 that that data file is available for both
16 instances?
17     A.  Well, it's a pretty open-ended question.
18 But typically when you load a file onto a
19 computer, whether it's virtualized or not, it's
20 copied from one storage media to another.  So the
21 file doesn't exist in thin air and gets onto a
22 hard disk; maybe it came from a USB stick, or from
23 the Internet, or from a floppy disk, or a CD-ROM
24 or something.  It's copied.  A data file is copied
25 from one storage medium to another storage medium.

---

Rosenberg, Craig

September 30, 2016

9 (Pages 30 to 33)

---

30

So if you're asking physically what happens, is that file is copied across onto the virtualized disk resources for the first guest OS. And in the same way it's copied from wherever it originally existed to the second guest -- the virtualized storage resources of the second guest OS.

Q.   Have you personally seen computer code that accomplishes this task of allocating a file to multiple operating system environments?

A.   If you're ask -- well, first off, like I said, whether or not it's virtualized or not, this act of copying of -- it seems to me your question is mostly about how is a file copied from one place to another.  Whether or not it's copied into a virtualized OS or not, the mechanism is the same.

And if you're asking have I seen low level system -- I mean I've written code to copy files from one place to another, so I guess technically, yes, I have seen code.

If you're asking have I seen source code for hypervisors, which is a much more narrow question, the answer would be no, I haven't seen source code for hypervisors.

---

31

Q.   You anticipated one of my follow-up questions, which is have you seen -- well, let me ask you this first.

Have you used a Flash VOS product that is referred to in the '400 patent?

A.   I have not.

Q.   Have you seen the code for that product?

A.   I have not.

Q.   Let's just talk briefly about, we talked about, well, consider a technologically simple case, which is allowing a data file to be accessed by two different virtual environments.  What about an application?  Because I think one of the things that we talked about is having an application be accessible by two different operating system environments.

Have you seen code that allows that to happen?

A.   Okay.  So it could be two different things you're talking about here, I just want some clarity.

It could happen in the sense of -- it could happen in the -- so like I described with the data file, in that example the data file was loaded into the guest OS A, I'll call it, and then

---

32

that same data file was loaded into guest OS B. So in the same way a given application, as long as both operating systems support that environment -- support that application, maybe -- a better way to say it as long as -- yeah, I guess that's the best way to say it.

So an application needs to run under an operating system that supports it.  You can't load a Windows program into Linux, let's say, and expect it to run.

So we're talking about a situation here where you have two guest OSes and you're asking can the application be shared in some way.  And in my mind that can be accomplished in two different ways.

It can be loaded, as long as the OS supports it, let's say Windows 95 and 2000, you could load the application under Windows 2000, you could load it under Windows 95, and as long as that application will run under both environments you could utilize each guest OS and utilize your application.

There is a second way, VMware Fusion I'm thinking of, which is an application by VMware, it runs on Mac.  It allows you to have a Windows

---

33

interface, a window that looks like the Microsoft Windows Operating System, and you can launch Windows applications.

You have to ask I think a very more -- I want to really understand your question, because I want to be responsive to your question.

Typically I think the catch here, what I'm trying to say is that the application needs to run under a certain OS.  So you can't -- with a data file -- I didn't talk about this with the data files, but like with Fusion you can have a single data file that the Windows, the virtualized Windows can operate on that data file, and then you go over to the Mac side, and they're both side by side, they're running side by side, it can operate on that same data file too because they have a way to share partitions.  It's very slick actually.

What I spoke about earlier was kind of separate.  Remember, I said you load the guest OS A and B, and you load the same data file on each, and you can work in either one, but it doesn't mean that they're shared.  Once that data file starts to be edited and modified, they're not synched across, it's not the same data file

---

34

anymore.
        Is that clear?
    Q.   It is.  That's all very helpful.
        The VMware solution that you were
talking about --
    A.   Yes.
    Q.   -- that's really essentially emulating
the operating system in instance one into instance
two to allow an application to essentially run in
its non-native operating system.
        Is that how it works more or less?
    A.   Well, I wouldn't call it emulation, it's
definitely virtualization.  Emulation has a
different meaning.  But virtualization -- it's a
virtualized Windows Operating System that runs
under macOS X.
    Q.   So you're essentially creating a new
virtualized instance within an instance to allow
that application to run.
    A.   You're creating -- yeah.  Windows
becomes a guest OS running under the host OS,
which is OS X.
    Q.   So all of the things we've been talking
about, these occur at the system level, and these
are not the kinds of things that are discussed in

35

the '400 patent at all; is that right?
        MR. RAMEY:  Objection; form.
    A.   Well, when you say all the things that
we're talking about, we've talked about graphical
user interface some, so obviously that part is
covered by the '400 patent.
        The copying files at the low level, you
know, loading applications, that doesn't seem to
be -- well, if you ask your question, I'll try to
answer.
    Q.   (By Mr. Angelis)  Sure.  And that's what
I was getting at.  The things we've talked about;
the copying files at a low level, and the
virtualization we've been talking about, the
different solutions for sharing an application,
those are not things that are covered in the '400
patent; correct?
        MR. RAMEY:  Objection; form.
    A.   I would agree with that, yeah.
    Q.   (By Mr. Angelis)  So let's turn to
paragraph 19.
    A.   But I just want to make sure I'm clear
on that.  I would agree with that to the -- I mean
this does allow operations, such as copying and
modifying, but it doesn't talk about the low level

36

underlying code to accomplish it; it's just
assumed that that happens downstream.
        I don't want to discount what is spoken
about in terms of what the user does to
manipulate, to express their intention in a
graphical way for what happens in a sense.
    Q.   So in paragraph 19 you're referring here
to particular things that you looked at to respond
and analyze -- to respond to and analyze
Mr. Goodin's opinions.
        Is that a fair characterization of
paragraph 19?
    A.   Yes.  And I also reviewed Mr. Goodin's
declaration.
    Q.   In paragraph 19, this is the complete
list of what you relied on; right?  You relied on
the '400 patent specification, the '677 patent
specification, the '183 patent specification, and
then your knowledge of the ordinary skill in the
art.
    A.   Yeah.  I think I was also shared early
on a draft claim construction that -- but I didn't
necessarily rely on it, because my opinions here
in this declaration are not around construing
claim terms.  It was just strictly around finding

37

structure for functions that are, you know,
finding structure for claim terms.
    Q.   So starting first with the '400 patent
specification, is it fair to say that the opinions
that you have in paragraphs 20 to 24, for those
opinions the only substantive information that's
discussed is from the specification of the '400
patent?
    A.   Let me just quickly review it.  Well, at
the bottom, the bottom of 22, "One of ordinary
skill in the art would understand a virtual
representation as a graphical representation,"
that comes from my many years of practice in the
field and education.
    Q.   Fair enough.  And I should have modified
my question to say that the substantive
disclosures here are based on your skill in the
art, as well as the '400 patent.  And by "here" I
mean paragraphs 20 to 24.
    A.   In 24 it says, the first sentence one of
ordinary skill in the art could create a graphic
representation of the cabinet from the teachings
of '400, '677, '183.  Namely, the '400 patent
references prior art systems for displaying --
able to create a graphic representation based

Rosenberg, Craig

September 30, 2016

11 (Pages 38 to 41)

38

1  on --
2      Q.   You don't actually mention any substance
3  from the '677 --
4      A.   Oh, no.
5      Q.   -- patent or the '183 patent; correct?
6      A.   No.  If that's what you're asking, I'm
7  not pulling in any substance from this sentence.
8      Q.   So the opinions in paragraphs 20 to 24
9  are based on your skill in the art and the
10  disclosures of the '400 patent; is that correct?
11      MR. RAMEY:  Objection; form.
12      A.   Well, I just wouldn't characterize it
13  quite that way, just because there is disclosure
14  in the '677 patent regarding various flow charts
15  and class diagrams that I think would give one of
16  skill in the art additional valuable information
17  that would aid him or her in creating such an
18  invention.
19      Q.   (By Mr. Angelis)  Are you relying on --
20  so your opinions rely on more than the '400 patent
21  in paragraphs 20 to 24.
22      A.   Well, it depends on which specific
23  opinion.  If we're just talking about -- if we're
24  narrowly talking about how the graphics are
25  defined, and how they look like, and what kind of

39

1  user interface operations are enabled by those
2  graphics, then that would just be purely the '400
3  patent.
4      If it's then trying to tie it to the
5  back end, so that there is something that the
6  computer system does, you know, more so than just
7  manipulating graphics on the screen, like actually
8  partitioning a hard disk, then I think the '677
9  and '183 add valuable information for one of skill
10  in the art to practice said invention.
11      Q.   So maybe you could help me understand in
12  paragraph 24 what you're referring to -- well,
13  let's do it this way.  Why don't we go paragraph
14  to paragraph, and then when we get to paragraph 24
15  you can let me know what you're relying on from
16  the '677 patent.
17      A.   Um-hum.
18      Q.   So in paragraph 20 you start by listing
19  four elements that you characterize as substantial
20  structure.
21      Do you see that?
22      A.   I see that, yes.
23      Q.   And then right after that you note that
24  the cabinet selection bar graphically represents
25  at least one virtual cabinet, and that at least

40

1  one virtual cabinet represents a discreet
2  operating system.  Is that correct?
3      A.   I see that, yes.  That's correct.
4      Q.   Are you opining that these structures
5  perform any function?
6      A.   I think that's the intent of the patent,
7  yes.
8      Q.   So what function do these -- what
9  function do these structures perform?  Let's start
10  with the main menu bar.
11      What function is that performing?
12      A.   Well, it depends on how it's mapped.
13  The main menu bar, is that number 60 in Figure 1?
14      Q.   Are you relying on that main menu bar to
15  perform the function that is in the claim that
16  we're talking about, which is the means for
17  allocating?
18      A.   Possibly.  It really depends on exactly
19  what's under -- what's under these menu options.
20  So like there is -- I'm looking at Figure 1 now
21  of, I guess Exhibit 51 -- 52 rather.  So the main
22  menu bar I believe is probably 60.  I haven't
23  reviewed -- I would need to review it to confirm
24  that, but it's probably 60.  And there is
25  partition, is one of the menu options.  So when

41

1  you click on that, when a user clicks on it, it
2  will drop down, and there may be various functions
3  associated with partitioning the selected cabinet.
4  So that would -- that's an example of the
5  graphical user interface performing a function.
6      Q.   Is there any disclosure in the '400
7  patent of what is underneath these individual
8  items in the main menu, what you're referring to
9  as the main menu bar, item 60 of Figure 1 of
10  Exhibit 52?
11      A.   I would have to -- I would have to look
12  for that.  I think there is probably multiple ways
13  to get at it.
14      In user interfaces there is often
15  multiple ways; you could double click to perhaps
16  open a dialogue.  You could right click and then
17  see various options there.  You could use a menu
18  bar.  So I don't -- I'm flipping through the
19  figures.  I don't believe I saw a figure with the
20  menu bar expanded, if that's your question.
21      Q.   That is the question.
22      A.   So I'm flipping through the figures
23  looking to see if I see that.  But, you know, to
24  give a complete answer, I'd want to review the
25  specification too to see if they talk about what's

42

under the menu bar.

In my example of partition, I think it was in 16 and 17. In Figure 16 and 17 there is various options associated with disk partitions.

So like I said, there could be multiple ways to get at this dialogue, maybe by double clicking on the cabinet itself. By selecting it once and hitting the partition menu, there could be an option there. There could be an option to get to it through a right click.

So it's very common in these kinds of user interfaces for there to be more than one way to get at these dialogues. And there is disclosure of how the user here can set up various sectors, the size of the sectors for a physical disk.

Q. And here you're referring to Figure 16, correct?

A. 16 and 17.

Q. We'll come back to those. But you're not tying those necessarily to the menu bar, is what you're saying.

MR. RAMEY: Objection; form.

A. Not necessarily. But like I said, getting this dialogue to come up, I think I

43

mention three possible ways, and there could be others too.

Q. (By Mr. Angelis) Let's turn to paragraph 21. In this long paragraph you begin with a block quotation from Column 5 of the '400 patent; correct?

A. I do, yes.

Q. And early on in that block quotation you say that users can allocate and manage resources by defining one or more cabinets.

Is that correct?

A. I see that, yes.

Q. And then it says, a little further down, that "This resource allocation and management is performed graphically with a pointing device and/or keyboard."

A. Yes, I see that.

Q. And then toward the bottom of the quotation it says "This invention provides, inter alia, means for manipulating cabinets. This manipulation comprises adding partitions, deleting partitions, naming the cabinet," and so on.

Do you see that?

A. I do, yes.

Q. So when a user uses a pointing device to

44

tell the computer system to, for example allocate a resource to a cabinet, what is the low level code doing to execute that operation?

A. Well, I guess in the case of partitioning a hard disk it would be instructions for the disk controller to repartition and reformat.

Q. Anything else?

A. Well, it could be, like in the case of passwords or remote access, it would be setting properties associated with network or encryption. I think there is discussion of changing the name or changing the icon; so those would be more at the higher level of the front end GUI.

I mean these are all just different options that the inventor realized were common at the time of the invention. Setting the version number, I see, looking at Figure 3.

Q. You would agree that the specification of the '400 doesn't talk about the particular instruction that the computer executes, for example, to perform the repartitioning and formatting that you talked about.

A. I would agree.

Q. So it's fair to say that your opinion is

45

that the algorithm for using a pointing device to instruct a general purpose computer -- well, let me say that a different way.

Basically this paragraph is a disclosure of how to use a pointing device to initiate a particular operation, but says nothing about the operation itself.

A. I wouldn't characterize it quite that way. I think it's clear to the user what they're doing. They're not just moving graphics around on the screen with no effects. The user has an agenda, they have a goal, and they utilize the GUI to accomplish that goal.

I would agree with you that the patent doesn't talk about the lower level computer instructions that carry out the goal. The '400 patent seems to be fully focused on the front end and that user interface, and the inventive element, if you will, of this patent is the application of this graphical user interface to creating, manipulating, editing, deleting virtualized environments.

So I think to answer your question, the user -- I believe I've already answered it, but the user has a task, they have a goal in mind of

Rosenberg, Craig                                        September 30, 2016

46

1 what they want to do, and they believe by -- it's
2 very clear in using the user interface that that
3 will happen.  I mean if they change the name --
4         I don't want to just speak without
5 answering a pending question, so if you could just
6 restate the question I'll try to be very clear and
7 concise.
8     Q.  Sure.  Let me ask you this.  Would you
9 agree that there are many ways, or at least there
10 is more than one way that a system might
11 accomplish the task that the user has in mind,
12 that the user asks the system to perform?
13     A.  I would agree, yes.
14         MR. ANGELIS:  Do you mind if we take
15 like five minutes.
16         MR. RAMEY:  Of course.
17         (Recess 10:37 a.m. to 10:48 a.m.)
18     Q.  (By Mr. Angelis)  Just before our break,
19 Dr. Rosenberg, you mentioned the application of
20 the graphical user interface in your answer, and I
21 just want to make sure I understand what you're
22 talking about there.
23         There you're talking just about the
24 user's intentionality of, for example clicking on
25 something or dragging and dropping something to

47

1 express to the system that the user would like
2 some operation to happen.
3     A.  Yes.
4     Q.  Let's talk about the natural language
5 algorithm in paragraph 21.
6     A.  Okay.
7     Q.  So would you agree that an algorithm is
8 a series of steps for accomplishing some goal?  Is
9 that a fair definition of an algorithm?
10         And feel free to modify, if you'd
11 like.
12     A.  Um-hum.
13     Q.  I'm sorry, I need an audible "yes" or
14 "no."
15     A.  Yeah, I'm just considering, considering
16 my response.  I think certainly a set of steps for
17 accomplishing a goal would be considered an
18 algorithm, yes.
19     Q.  So can you please tell me the steps that
20 the natural language algorithm in paragraph 21
21 discloses.
22     A.  Let's see.  Displaying the cabinet
23 selection button bars, displaying their contents.
24 The contents of all secondary storage devices is
25 where they're found, or found in the computer

48

1 systems are depicted in secondary storage
2 partition.
3         So the first steps would be displaying
4 the representation of the system resources, as
5 represented by the virtual cabinets.
6         The second step would be virtually
7 copying from secondary storage to the active
8 cabinet by using an input device, such as click
9 and drag.
10         You have to show the user what they're
11 going to operate on.  Then you have to allow the
12 user a action to accomplish their intention.
13         On the beginning of the following page
14 it talks about using a mouse or double clicking,
15 so more disclosure about what the action is.  Just
16 additional methods, such as right clicking.
17         These are all various ways that one
18 can -- the user can express their intention to the
19 system about what goal they want to have happen.
20         Like I said earlier, there is oftentimes
21 in GUIs multiple ways to do the same thing; click
22 and drag, double click, a menu bar.
23         In general the steps would be displaying
24 to the user what they're going to operate on,
25 providing various options to the user what they

49

1 can do, and then the user utilizing one of their
2 options to express their intention to the system.
3     Q.  So in the end the purpose of the
4 algorithm is for the user to express an intention
5 to the system; correct?
6     A.  Yes, but I think it's well understood by
7 one of skill in the art that there is some
8 downstream process that actually modifies the
9 virtual guest OS in some way.
10         Like we were speaking about earlier,
11 it's not changing graphics for the sake of
12 changing graphics, it's changing the graphical
13 representation in the system for the express
14 purpose of modifying the properties of that
15 virtual operating system.
16     Q.  But the '400 patent doesn't disclose
17 those downstream processes; correct?
18     A.  That's correct.
19     Q.  Let's turn to paragraph 22.  You begin
20 this paragraph by saying "a cabinet is a virtual
21 storage device capable of containing virtualized
22 operating systems, application software, databases
23 and memory, or partitions of any of the
24 preceding."
25         Do you see that?

Rosenberg, Craig                                September 30, 2016

14 (Pages 50 to 53)

50

1    A.  I do, yes.
2    Q.   And a cabinet is a virtual machine of
3  the type we were previously discussing.
4    MR. RAMEY:  Objection; form.
5    A.  I would say it represents a virtual
6  machine.  These cabinets that are in the pictures,
7  in the figures of the '400 patent, are
8  representations of virtual machines that we were
9  discussing earlier, yes.
10   Q.  (By Mr. Angelis)  And you've anticipated
11  my questions, to some extent, so let me just drill
12  down on that a little bit.
13       The virtual machine is a physical --
14  it's a tangible thing that has physical
15  properties; correct?
16   A.  That's a -- I don't know if I would
17  agree with that.  I mean it's almost like saying
18  an application software -- Microsoft Word is a
19  physical thing that has tangible properties.  I
20  mean that's I think a stretch to say software is a
21  physical thing that has tangible properties.  It
22  really straddles the line in so many areas.
23       Certainly a disk, a physical disk that's
24  partitioned and formatted, one could look at it
25  under a microscope and make observations about

51

1  various physical attributes of that disk.
2       So much about virtualization is software
3  and properties.  So can you really say software is
4  a physical thing with tangible properties?  You
5  really have to get down to the microscopic level
6  and look at silicon and the magnetic substrate of
7  the disks and the dipoles that are representing
8  the ones and zeros, I think to get to the level
9  you're saying, which is it's a physical thing.
10  Ultimately it's all a physical thing, once you're
11  down -- you're inspecting at a microscopic level,
12  but I think that's far beyond the question you're
13  asking.
14       Software -- it would be hard pressed for
15  I think many people of skill in the art to say
16  software is a physical thing.  And so much about
17  virtualized operating systems and virtualized --
18  this whole environment is software.
19   Q.  Let me ask two follow-up questions,
20  because I think -- I appreciate your answer in
21  trying to be precise, but I think you may have
22  misunderstood my question.
23       The virtual storage device is more than
24  just a picture; correct?
25   A.  Yes.  Yes.  Perhaps I'm reading too much

52

1  into your question.
2    Q.   Fair enough.  And you don't mean to
3  change any of your testimony earlier in the
4  morning when we were talking about virtualized
5  systems, and their use of memory for example, and
6  their use of hard drives, those sorts of things.
7  You don't mean this answer you just gave to change
8  any of that testimony; do you?
9    A.  No, I don't think so.
10       But ask your question again about when
11  you said the virtualized hard disk is a physical
12  thing.
13   Q.  It may have just been a bad question.
14   A.  Yeah.
15   Q.  I think the follow-up questions have
16  helped us.
17   A.  Okay.
18   Q.  So then at the end of this paragraph in
19  22 you have this sentence that says, "One of
20  ordinary skill in the art would understand a
21  virtual representation as a graphical
22  representation."
23       Do you see that?
24   A.  Yes, I do.
25   Q.  So how does a virtual representation

53

1  differ from a virtual storage device?
2    A.  Well, they're very different.  So
3  virtual representation is a graphical
4  representation, it's a representation on the
5  screen, in this case it's 2D computer graphics.
6       A virtualized storage device, like we
7  spoke about earlier, is a physical disk that's
8  partitioned into one or more areas, one or more
9  partitions that can each contain a file system, an
10  operating system, a set of applications, a set of
11  data.
12       So a virtual -- so software allows for
13  that partitioning of the physical disk, the
14  hypervisor software allows for that partitioning,
15  and that's what we're talking about when we talk
16  about a virtualized disk.  And a virtual
17  representation is just a GUI basically, graphical
18  user interface.
19   Q.  So you're making a distinction between
20  the virtual storage device and the graphical
21  representation of the virtual storage device.
22   A.  Yes.
23   Q.  And it's your opinion that the claim at
24  issue here is directed -- not directed to the
25  virtual storage device itself and the manipulation

54

1  of that, but rather the image that graphically
2  represents the storage device.
3      A.  That's correct, yes.
4      Q.  Now, looking at the claim language
5  itself -- and if you want to refer back, obviously
6  you can look at the patent itself or it's also in
7  paragraph 16 of your declaration.
8      A.  Okay.
9      Q.  Now, the claim says that it's a means
10 for allocating rather than being a means for
11 displaying.
12      How do you square your opinion with the
13 means for allocating, requiring there actually be
14 means for allocating, as opposed to means for
15 displaying particular information?
16      MR. RAMEY:  Objection; form.
17      A.  Well, to me everything in this patent is
18 all about the user interface; that's what they're
19 talking about here.  So when I read it, it's a
20 graphic user interface for displaying -- I sort of
21 substitute the word "the" in there, a graphic user
22 interface for displaying the means for allocating.
23      So what the purpose of this graphic user
24 interface is, the downstream purpose is ultimately
25 to allocate resources for multiple operating

55

1  systems.  But the invention is all about the
2  graphic user interface.  Everything in the patent
3  specification and the claims themself seem to be
4  talking about the graphic user interface.
5      And like I said earlier, it's not
6  manipulating graphics for the sake of manipulating
7  graphics; the intention of the user is to allocate
8  resources, but the function is manipulating the
9  graphics.  And the structure is the graphics
10 themselves and the operation that's allowed on
11 them; like double clicking, and right clicking,
12 and click and drag.
13      Q.  (By Mr. Angelis)  Have you finished your
14 answer?
15      A.  Yes.
16      Q.  We've been talking a lot about the user
17 in some of our questions and in some of your
18 answers.  Who is the user, in your opinion?
19      A.  Anybody who wants to create or configure
20 or modify a virtualized environment.
21      Q.  And the '400 patent talks about
22 superusers, for example.  Is that kind of who you
23 have in mind as to who's making these kinds of --
24 who's engaging in these kinds of operations?
25      MR. RAMEY:  Objection; form.

56

1      A.  It could be a superuser.  Superuser is a
2  class of users that typically have root password.
3  It sort of comes from the UNIX domain where
4  superusers would have what is known as root
5  password or essentially permissions to change or
6  modify anything.  But it wouldn't necessarily have
7  to only be superusers, it could be other users
8  with lesser degrees of permissions as well.
9      Q.  (By Mr. Angelis)  Because those are the
10 people who -- well, what would those users want to
11 use this graphical user interface to do?
12      A.  Like I said, to create, modify
13 virtualized operating systems.
14      Q.  Let's turn to paragraph 23.  In that
15 first sentence, at the end of that sentence, you
16 say that the structure for this claim element is
17 "a virtual storage device (e.g. a graphical
18 representation)."
19      Do you see that?
20      A.  Yeah.  Let me just read the sentence.
21      Q.  Sure.
22      A.  Yes.
23      Q.  So you previously testified that a
24 virtual storage device is this virtualized system
25 that actually stores information, for example, and

57

1  exists as a partition on a disk.
2      A.  Um-hum.
3      Q.  How is that a graphical representation?
4  Those two concepts seem discordant to me.
5      A.  Right.  Yeah.  It's confusing, and
6  perhaps I wasn't as clear as I should be -- as I
7  could have been.
8      It's really the example, the e.g., that
9  is what I meant by this.
10      Oftentimes when I think of virtual -- I
11 have a very strong background in virtual reality
12 that I studied all through my Ph.D, and it's all
13 graphical, I mean 90 percent of it is stereoscopic
14 computer graphics presented through head mounted
15 displays.
16      So whenever I think of virtual, I have
17 this -- I'm predisposed to thinking of it as
18 graphical.  But a virtual storage device could
19 also be, like I said, a physical disk that's been
20 partitioned into multiple pieces, multiple
21 partitions, for loading various virtualized
22 operating systems.
23      So I see why you have that question.
24 It's a little bit confusing.  What I mean by that
25 is my example, a graphical representation.

58

Q. So the opinion then, would it be fair to say that your opinion is that the disclosed structure is a representation, a graphical representation of a virtual storage device?

A. Yes.

Q. So then we get to the last sentence in paragraph 23, which says, "The virtual storage device is displayed on the GUI and may contain virtualized operating systems, application software, databases and memory, or partitions of any of the preceding."

Do you see that?

A. I do, yes.

Q. How does a picture contain those things, or does it just contain representations of those things?

A. It contains representations of those things, and perhaps the properties associated with those things.

Q. And tell me a little more about what you mean by "properties associated with those things."

A. Well, like for example I think we were looking at Figure 16 and 17 of the '400 patent.

Q. Fair enough. So a partition, for example, might be graphically represented as

59

having a particular number of megabytes.

A. Right. Those are properties associated with that.

Q. So the image contains those things to the extent that it refers to the fact that the actual virtual storage device is partitioned in a particular way.

A. For that example, yes. Or is this volume password protected. That might just be a boolean checkbox, yes or no. The property is password protected, yes or no. So that would be a different example for a different property.

Q. So it's a visual guide to the user of what resources the virtual storage device has.

A. Yeah, graphical and textual user friendly visual guide.

Q. The picture doesn't actually contain an operating system, for example.

MR. RAMEY: Objection; form.

A. Pictures do not contain operating systems, no.

If your question was does the picture have a label that says what version of the OS, or was it can pictures contain an operating system?

Q. (By Mr. Angelis) It was the latter, but

60

I just was using an absurd example --

A. Yes.

Q. -- to sort of make sure I understood the situation.

A. Correct. I think you understood.

Q. So if the court were to decide that "means for allocating a computer device's resources" requires more than just an image that the user can manipulate, and information in that image about the underlying resources, do you agree that there is nothing in the specification that discloses the downstream operations or that are -- strike that. I think you've already answered that question.

Let's move on to paragraph 24. Here you opine that one can create a graphic representation of the claimed cabinet and display it on the GUI based on the teachings of the '400 patent.

Do you see that?

A. I do, yes.

Q. And the '677 patent and the '183 patent.

A. I see that, yes.

Q. What are you relying on for your conclusion other than the '400 patent? What portions of the '677 patent or the '183 patent are

61

you relying on for this conclusion?

And I have them here, if you'd like them.

A. Yeah, I wouldn't mind having them.

What this says is "one of ordinary skill in the art could create the graphic representation of the cabinet and display it on the GUI."

I think that creating the graphic representation and displaying it on the GUI is very well described in the '400 patent, there is 17 figures, as well as the specification that talks about those figures, that talk about creating a graphic representation of the cabinet and displaying it on the GUI.

The '677 and '183 patent talk about some of the downstream processes, if you will, as we've been characterizing them.

Q. So are you relying on the '677 patent and the '183 patent?

A. Not for the first part of that sentence.

Q. And you're not relying on it for any part of that sentence, are you, any part of that first sentence?

A. No.

Q. So the second sentence then says,

62

1  "Namely, the '400 patent references prior art
2  systems and programs," and it goes on from there.
3      Do you see that?
4      A.  Um-hum.
5      Q.  Now, let's look at that column,
6  Column 3, lines 13-26 of the '400 patent.
7      A.  Okay.
8      Q.  What structure does Column 3 disclose,
9  that part of Column 3?
10     A.  Well, the patentee is describing
11 various, I'll call them GUI frameworks, that can
12 be used to create graphical user interfaces.  And
13 there is many more, but this is a subset of
14 graphical user interfaces, both hardware and
15 software, techniques.  Xwindows is a framework.
16 There was direct -- I think I mentioned a few of
17 them earlier in the deposition; Microsoft
18 Foundation Class, and Java AWT, and Java Swing,
19 and DirectX, Adobe Flash.  I mean all these are
20 various graphical user interface toolkits to
21 program and create graphical user interfaces.
22     Q.  And what do these disclosures tell a
23 person of ordinary skill in the art about how to
24 create a graphic representation of the claimed
25 cabinet and to display it?

63

1      A.  These are just -- these are all examples
2  of various frameworks that can be used to do it.
3  There are multiple options when you program
4  applications, including hypervisors, developers
5  have choices as far as what third-party software
6  to utilize as part of their solution.
7      Q.  So if I'm a developer, I'm a person of
8  ordinary skill in the art, and I want to create a
9  cabinet that has these different options that are
10 discussed in the '400 patent, I would know that
11 these software tools would allow me to do that?
12     A.  Yeah, these are some of the options that
13 you could use.
14     For Windows, I think MFC, Microsoft
15 Foundation Class, would be a great choice.  You
16 could use GL, which stands for graphic language,
17 or OpenGL, which is an open source version of it.
18 You could use Adobe Flash.  If you were in Java,
19 you could use Java AWT, which is Advanced Widget
20 Toolkit.
21     There is a lots of different options,
22 and each one, as I said early in the deposition,
23 has their own set of methods that you would use to
24 draw a rectangle, to draw a circle, to draw a
25 line, to put a text box, to make a drop-down

64

1  window.  They're libraries of functions that are
2  options for the developers to utilize.
3      Q.  And the reference to subentities here,
4  does that mean anything more than that it was
5  known to basically create a hierarchical GUI at
6  this time?
7      MR. RAMEY:  Objection; form.
8      Q.  (By Mr. Angelis)  Let me know if you're
9  having trouble finding the subentities.  It's in
10 line 20 or 21 of Column 3.
11     A.  Thank you.  I'll just read the full
12 sentence.
13     Yes.  I mean I read this in my review of
14 the '400 patent.  I did not read this reference,
15 '998 patent, so I guess I'd want to go down one
16 level deeper to offer my opinion as to what
17 subentities means.
18     It could be a hierarchical layout, which
19 is often done in graphics, so that you've got
20 containers with other widgets inside, and if you,
21 let's say, move the whole container, everything
22 inside it moves.  Or if you set a property at a
23 upper level, something higher in the hierarchy,
24 that will propagate down.  It could mean that.
25     It could also mean just something like

65

1  subentities or different widgets; a checkbox, a
2  radial box, a drop-down list, could be considered
3  subentities.
4      And I'd want to review the '998 patent
5  to opine which of those two versions, or if it was
6  a third variant the patentee may have been
7  referring to.
8      Q.  Fair enough.  So for purposes of your
9  opinions in paragraph 24, what you were getting at
10 is just that these programs would allow the user
11 to essentially create a graphical user interface
12 that looks like the interface discussed in the
13 '400 patent.
14     MR. RAMEY:  Objection; form.
15     A.  Yes, that these are some of the multiple
16 tools.  And I mentioned other tools as well.
17     Q.  (By Mr. Angelis)  And again, this is
18 just for drawing the graphical user interface
19 rather than creating the actual virtual storage
20 device itself.
21     MR. RAMEY:  Objection; form.
22     A.  That's correct, yes.
23     Q.  (By Mr. Angelis)  Let's move on to a new
24 claim.  Claim 16 of the '400 patent is discussed
25 in paragraph 25 of your declaration, and it's very

66

1 similar, but it's in a different claim.
2       And here we're talking about -- what I'm
3 going to do is read it as I think it was meant to
4 be drafted, rather than as it's literally drafted,
5 which is "means for allocating a computer device's
6 resources to at least one operating system on said
7 computer device."
8       Do you see that?
9  A.  I do, yes.
10  Q.  So on paragraph 27, this is very similar
11 to paragraph 19.  Again, so you relied on the '183
12 patent, the '677 patent, and the '400 patent, as
13 well as your knowledge of one of ordinary skill in
14 the art as of September 1999 to form your
15 opinions.
16  A.  That's correct.
17  Q.  And this is the complete list of what
18 you relied on to form your opinions.
19  A.  Yes.  And it's -- I mean all this is
20 responsive to Mr. Goodin's declaration.
21  Q.  Fair enough.
22       So you formulated these opinions in the
23 context of Mr. Goodin's declaration.
24  A.  Yes.
25  Q.  Let's look at paragraph 28.  So here,

67

1 once again you're talking about some structure
2 that you say is disclosed in claim 16.
3       Do you see that?
4  A.  I do.
5  Q.  And this is very similar to what was in
6 paragraph 20; correct?
7  A.  Yes.
8  Q.  So if I were to ask you the same
9 questions I asked you with respect to paragraph
10 20, would your testimony be the same?
11  A.  It would, yes.
12  Q.  Let's look at paragraph 29.  It again
13 refers back to your statements in paragraph 21.
14       Do you agree that the claim language at
15 issue here is very similar and essentially
16 identical to the claim language we were talking
17 about with respect to Claim 1?
18  A.  Well, it's certainly very similar.  I'd
19 want to look at both claims to say if they were
20 identical or not.  But just right off I can agree
21 that they're very similar, yes.
22  Q.  Well, let me ask it this way, because I
23 don't want to trick you into anything.
24       The questions that I asked you about
25 this claim, about the claim element at issue in

68

1 Claim 1, if I were to ask you the same questions
2 with respect to this claim element, would your
3 testimony be the same?
4       MR. RAMEY:  Objection; form.
5  A.  Yes, it would.
6  Q.  (By Mr. Angelis)  So paragraph 30 is
7 essentially the same as paragraph 22 of your
8 declaration; is that right?
9  A.  30 is the same as which paragraph?
10  Q.  22.
11  A.  Correct.
12  Q.  And so do you agree that the testimony
13 you gave in response to my questions related to
14 paragraph 22 would be the same for this paragraph
15 if I were to ask those same questions again?
16  A.  Yes.
17  Q.  So the first seven lines of paragraph 31
18 are very similar, and maybe the same, as the
19 opinions you provided in paragraph 23; is that
20 correct?  And take a minute, of course, to
21 confirm.
22  A.  Yeah, they follow each other.  They're
23 very similar.
24  Q.  So you'd agree that the testimony you
25 gave regarding paragraph 23, likewise applies to

69

1 the opinions expressed in the first seven lines of
2 paragraph 30.
3  A.  I agree.
4  Q.  Excuse me, paragraph 31.  I misspoke.
5  A.  Yes, I agree.
6  Q.  And again, I'm not trying to be
7 disrespectful here, I'm just trying to be
8 efficient with all of our time.
9  A.  I appreciate that, too.
10  Q.  So then at the end of paragraph 31 there
11 is a sentence that begins "Further various
12 Figures," and then it goes on from there.
13       Do you see that?
14  A.  I do.
15  Q.  So this is new.  And first you refer to
16 Figures 11-14 of the '183 patent.
17  A.  Um-hum.
18  Q.  So is it your opinion that Figures 11-14
19 provide corresponding structure for this claim
20 element?
21  A.  Well, does the claim element, you know,
22 with regard to your question, does the claim
23 element end with "on said computer device"?
24  Q.  Yes, that's what I'm talking about.  I'm
25 talking about "means for allocating a computer

70

1   device's resources to at least one operating
2   system on said computer device."
3        A.   Okay.  And we've talked about this
4   already, much during this deposition, how the '400
5   patent, in my opinion, is focusing on the front
6   end and the graphical user interface, and the '183
7   and the '677 patent brings in elements of the back
8   end.
9        So to the extent that one of skill in
10  the art wanted to duplicate this invention, if you
11  will, or create such a system on his or her own, I
12  feel that the '183 and the '677 patent would be
13  instrumental in that effort for the back end
14  piece.
15       But if we're just talking about the
16  front end piece of the graphic user interface,
17  then I think that the '400 patent could stand
18  alone, as I said earlier.
19       Q.   And to give structure to the claim
20  element that we're talking about here, do you need
21  the back end piece?  Are you relying on the back
22  end piece to fulfill the structure for the claimed
23  function here?
24       MR. RAMEY:  Objection; form.
25       A.   My read of this claim is that this is,

71

1   as I testified earlier, that it's all about the
2   graphic user interface, how -- the purpose of it
3   is for allocating a device's resources.  But how
4   it's done, the structure that allows it to be done
5   is the graphic user interface itself.
6        So I think the answer to your question
7   is to satisfy this claim element, one would only
8   need the '400 patent.
9        Q.   (By Mr. Angelis)  And for your opinion
10  you're relying only on the '400 patent as
11  structure to satisfy this claim element.
12       MR. RAMEY:  Objection; form.
13       A.   Unless the question or the discussion is
14  widened to the fact -- to bring in to the fact of,
15  okay, now the user's intention has been indicated
16  to the computer in a very user friendly way, such
17  as this graphical user interface that's been
18  disclosed, and now we need to send program code to
19  the disk controller to reformat partitions; if
20  you're talking about that second piece, the back
21  end piece, then the '183 and the '677 patent would
22  be helpful.  I guess that's the best way I could
23  put it.
24       Q.   (By Mr. Angelis)  Well, let me ask this.
25  Can you actually allocate resources without the

72

1   back end piece?
2        A.   No.
3        Q.   And for purposes of your opinion
4   regarding this claim element -- and forgive me,
5   your answers have been very helpful, I appreciate
6   them, but I just want to make sure I understand
7   this.
8        For purposes of your opinion on this
9   claim element, you are relying only on the
10  disclosures in the '400 patent.
11       MR. RAMEY:  Objection; form.
12       A.   Yes, because this claim element to me is
13  talking only about the graphic user interface.
14       Q.   (By Mr. Angelis)  Fair enough.  That's
15  helpful.  Thank you.
16       A.   Um-hum.
17       Q.   So the final sentence of paragraph 31
18  begins "Further various Figures, including, but
19  not limited to Figures 1-17 of the '400 patent,"
20  and it goes on from there.
21       Do you see that?
22       A.   I do, yes.
23       Q.   This really just encapsulate -- we've
24  already been talking about as to your opinions
25  regarding how one of ordinary skill in the art

73

1   would be instructed to create this GUI; correct?
2        MR. RAMEY:  Objection; form.
3        A.   If you could -- I'm sorry, let me just
4   finish reading it and then you can ask your
5   question.
6        Q.   (By Mr. Angelis)  Go ahead.  I'll strike
7   my question and ask a better one.
8        A.   Okay.  Please with your question.
9        Q.   Sure.  So we've been talking in this
10  deposition about how the figures in the '400
11  patent provide a guide to someone who wants to
12  design a graphical user interface that looks like
13  what's disclosed in the '400 patent.
14       Is that what you're intending to get at
15  with the final sentence of paragraph 31?
16       A.   Yes.
17       Q.   Paragraph 32 is the same as your
18  analysis in paragraph 24; is that right?
19       A.   Yes, it is.
20       Q.   So if I were to ask you the same
21  questions that I asked in connection with
22  paragraph 24, would your testimony be the same?
23       A.   Yes.
24       Q.   Let's move to the next element of
25  Claim 16 of the '400 patent, which is in paragraph

74

1    33 of your declaration.
2        A.  Um-hum.
3        Q.  And it says "means for configuring said
4    at least one partition of said at least one
5    secondary storage device through said secondary
6    storage partitions window."
7        A.  Um-hum.
8        Q.  So in paragraph 35 you identify that you
9    relied on the '400 patent specification, the '677
10   patent specification, and the '183 patent
11   specification, as well as your knowledge of one of
12   ordinary skill in the art.
13       Is that the sum total of what you relied
14   on in formulating your opinions with respect to
15   this claim element?
16       A.  Yes.  But as I said before, in response
17   to Mr. Goodin's declaration.  But yes, I think the
18   answer is yes.
19       Q.  Thank you.
20       A.  Um-hum.
21       Q.  Now, in paragraph 36 the first sentence
22   says, "In my opinion, one of ordinary skill in the
23   art would look for the word configure (or
24   configuring) in the patent specification to find
25   structure associated with a 'mean for

75

1    configuring.'"
2        Means for configuring.
3        A.  Yeah.  It probably should say means for
4    configuring.
5        Q.  So did you go to the specification and
6    look for the words configure or configuring?
7        A.  Yes.
8        Q.  And in footnote 26 is where you found
9    them, those are the places where you found the
10   words configure or configuring; correct?
11       A.  Yes, that's correct.
12       Q.  And did you draft this part of this
13   paragraph, paragraph 36, yourself?
14       A.  These represent my opinions completely.
15   And I took the final edit of this declaration, so
16   it was likely modified to express my opinion.  I
17   can't recall if I was the one that drafted this
18   first or not, if that's what your question is.
19       Q.  In footnote 26 it refers to Column 5,
20   lines 53-59 of the '400 patent.
21       A.  Um-hum.
22       Q.  Where in that excerpt is the word
23   configure or configuring?
24       A.  Perhaps there is a typo in the line
25   numbers then, if it's not there.

76

1        Q.  And then footnote 26 also refers to
2    Column 8, lines 56-60.
3        A.  Eight, 56-60, okay.
4        Q.  And is the word configure there?
5        A.  No, it's not.
6        Q.  So is it fair to say that Column 5,
7    lines 53-59 do not form part of your opinion for
8    the construction of means for configuring?
9        MR. RAMEY:  Objection; form.
10       A.  You said Column 5; and the line numbers
11   again, please.
12       Q.  (By Mr. Angelis)  53-59.  That's where
13   we were looking earlier.  And then Column 8,
14   56-60.
15       A.  Column 8, 56-60.
16       MR. RAMEY:  For clarity, objection;
17   form.
18       A.  Again, let me just go back to the means
19   for configuring.  Well, I wouldn't say it's fair
20   to say that they don't form -- you know, that
21   they're not part of my opinion.  It is true that
22   they don't have the word configure there, but at
23   least Column 8, 56-60 is talking about various
24   elements that are used for configuring.
25       Let's look at Column 5, 53-59.  Pull

77

1    down menu, main toolbar.  These are all elements
2    that are used for configuring as well.
3        So there does appear to be a typo
4    associated with which line numbers.  And looking
5    for the word configure, you know, is not
6    contained.  But I think the content in those
7    passages do relay the notion of tools or elements
8    for configuring.
9        Q.  (By Mr. Angelis)  So you're relying on
10   those disclosures because they are tools or
11   elements for configuring.
12       A.  Yes.
13       Q.  In paragraph 36, as it goes on, there is
14   a block quotation from Column 7, lines 13-30 of
15   the '400 patent.
16       Do you see that?
17       A.  I do, yes.
18       Q.  And the claim element we're talking
19   about is the means for configuring a partition;
20   correct?
21       A.  Yes.
22       Q.  And you're not opining that this block
23   quotation talks about the means for configuring a
24   partition, are you?
25       MR. RAMEY:  Objection; form.

78

A.   Let me just finish reading the block quotation.

Q.   (By Mr. Angelis)  Sure.

A.   Yes, I am opining that this describes the mean for configuring the partition.

Q.   Well, I see here, for example on Column 7, lines 13-22, there is the discussion of copying a partition into a cabinet.

A.   Yeah.

Q.   And then on Column 7, lines 22-25, there is a discussion of removing a partition from a cabinet.

A.   Yes.

Q.   But that's not the same thing as configuring a partition, is it?

A.   Well, removing would, I think would be one form of configuring.

Q.   Well, you're not changing the partition at all, are you?  You're just moving it or copying it.  You're not changing the way the partition looks; are you?

MR. RAMEY:  Objection; form.

A.   You're just removing it.  I mean in Column 8, certainly 22-29 is talking about configuring a partition.

79

Q.   (By Mr. Angelis)  And Column 5 has the same thing, right, Column 5, line 34 for example?

A.   Column 5, 34?

Q.   Yes.  Column 5, line 34 -- I'm sorry, 33.

A.   Okay.

Q.   It says "configuring partitions in the cabinet."

A.   Yes.

Q.   So that's configuring, right?

A.   Um-hum.

Q.   So then this excerpt refers to --

A.   Copying and deleting.

Q.   -- copying and deleting, correct?

A.   Yes.

Q.   So this excerpt doesn't actually have anything to do with configuring a partition.

MR. RAMEY:  Objection; form.

A.   Well, if you have a set of partitions, deleting one of many I think would be a form of configuring.

Q.   (By Mr. Angelis)  Configuring the cabinet or configuring the partition?

A.   Configuring the cabinet, yeah.

Q.   So you're really relying on other

80

disclosures for configuring the partition --

A.   Yeah.

Q.   -- you're not relying on this --

MR. RAMEY:  Objection; form.

Q.   (By Mr. Angelis)  -- disclosure.

MR. RAMEY:  Objection; form.

A.   Yes.

Q.   (By Mr. Angelis)  We talked earlier about some of the figures in the '400 patent and what they show.  So Figure 13, for example, I think is one we both talked about.  Actually Figure 16 is probably a little bit better.

A.   Okay.

Q.   Figure 16 shows, would you agree, a dialogue box that allows a user to configure a partition?

A.   Yes.

Q.   And you've already testified that this GUI would allow the user to, for example, express an intention to the system to shrink the partition, but that this patent doesn't disclose how the downstream operations occur that actually perform the shrinking of the partition.

MR. RAMEY:  Objection; form.

Q.   (By Mr. Angelis)  Is that correct?

81

MR. RAMEY:  Objection; form.

A.   When you say it doesn't, did you say it doesn't disclose how it's done?  Is that how you characterized your question?

Q.   (By Mr. Angelis)  I believe so.  That's what I meant to see if I didn't say it.

MR. RAMEY:  Objection; form.

A.   I agree.

Q.   (By Mr. Angelis)  So the claim language here says "means for configuring said at least one partition."  And it says the configuration occurs, and now I'm quoting, "through said secondary storage partitions window;" is that right?

Did I read the claim correctly?

A.   Yes.

Q.   So doesn't the through or use of the word "through" there indicate that the GUI itself isn't the means for configuring, it's just the vehicle by which the configuring occurs?

A.   Wait -- please finish your question.

Q.   I can clarify that, if you'd like.

A.   Um-hum.

Q.   That the through part of that claim element encompasses the GUI, but that the claim itself actually requires the modifying of the

82

1  partition.
2        MR. RAMEY:  Objection; form.
3     Q.  (By Mr. Angelis)  The configuring of the
4  partition.
5        MR. RAMEY:  Objection; form.
6     A.  That's not my read of the claim element.
7     My read would be to substitute the word
8  using, like through the use of, or basically using
9  the secondary storage partition window, and
10  anything that's a window is a GUI.
11     So this is describing a way that a user
12  can configure one or more secondary storage
13  devices using a GUI, using a secondary storage
14  partition window.
15     My read is very -- the way I'm reading
16  it is very clear to me that this is talking about
17  how the user uses a GUI to indicate how they want
18  the secondary storage partition, you know, in a
19  GUI, similar to Figure 16 of the '400 patent, or
20  17.
21     Q.  (By Mr. Angelis)  After the block
22  quotation in paragraph 36 there is a sentence that
23  I'm having a little trouble understanding.
24     A.  Okay.
25     Q.  And it says -- I'm just going to read

83

1  the portions of it that are giving me trouble.
2     A.  Well, can you read the full sentence?
3     Q.  Sure.  It says, "Further, the '400
4  patent specification specifically provides, in
5  Column 5, lines 17-22" -- and here's where we
6  start -- "that the resources of a computer system,
7  such as defining one or more cabinets containing
8  one or more partitions of software and/or other
9  data, is performed graphically with a keyboard
10  and/or mouse."
11     Do you see that?
12     A.  I do.
13     Q.  What does it -- if you drop out the
14  intervening dependent clause there, it would read
15  the resources of a computer system is performed
16  graphically with a keyboard and/or mouse; and
17  that's where I'm having a little trouble
18  understanding how this sentence fits together.
19     A.  Um-hum.
20     Q.  The resources of the computer system are
21  just things like memory, processing power, those
22  sorts of things; correct?
23     A.  Yes.
24     Q.  How are those resources performed
25  graphically?

84

1     A.  The resources are performed --
2  configured, maybe would be the better way.  The
3  intention I'm trying to express to the reader is
4  that the resources are configured, they're
5  modified, they're added, they're deleted, they're
6  manipulated graphically.
7     That's really I think what we've been
8  talking about during the entire deposition, is how
9  the inventor seems to have -- not seems to have,
10  has provided a graphical user interface for
11  configuring resources for virtualized systems
12  using graphical user interfaces.
13     And I guess I'm just saying that yet
14  again and pointing to Column 5, 17-22, as further
15  evidence of that.
16     Q.  And I think you already alluded to this
17  when you were talking about what we've already
18  been talking about, but the idea is that the
19  actual configuration is performed by the back end,
20  and that it's the user's intention that's being
21  expressed through the GUI; is that correct?
22     A.  Well, they're both necessary, they're
23  both parts of the system, but the GUI handles the
24  front end in providing easy to use, highly usable
25  system that would be -- invoke low errors, you

85

1  know.  It's just a more convenient and intuitive
2  way to configure the system.
3     And then in the back end there would
4  need to be a program code for, let's say talking
5  to the disk controllers or talking to memory.
6     Q.  And here in this sentence that begins
7  "Further," you're talking just about the front
8  end; correct?
9     A.  Correct.
10     Q.  So this claim limitation is directed
11  just to the front end, in your opinion.
12        MR. RAMEY:  Objection; form.
13     A.  I think I've answered it in the past
14  with the same way I'll answer it now, which is to
15  the extent that this is talking about the
16  graphical user interface, I think that's fully
17  disclosed in the '400 patent.  And the claim
18  limitation, it's talking about the '400 patent and
19  the graphical user interface.
20     To the extent one wants to expand the
21  conversation in what would be needed to implement
22  the back end, one would have to and would want to
23  bring in the '677 patent and the '183 patent.
24     Q.  (By Mr. Angelis)  So your opinion is
25  that a keyboard and/or a mouse could be used to

86

1    instruct the system to configure a partition.
2         MR. RAMEY:  Objection; form.
3    **A.   A keyboard and a mouse would certainly**
4    **be used, but there is more than that as well;**
5    **there is the whole graphical user interface as**
6    **well.  The keyboard and the mouse would be**
7    **hardware that would be used to interact with the**
8    **graphical user interface.**
9         Q.   (By Mr. Angelis)  So then in paragraph
10   36 we have this language "Further various Figures,
11   including, but not limited to Figures 11-14 of the
12   '183 patent."
13        Do you see that?
14   **A.   I do, yes.**
15        Q.   And that continues on to the end of that
16   paragraph.
17        This is the same text that was in
18   paragraph 31 of your declaration --
19   **A.   Okay.**
20        Q.   -- is that right?
21   **A.   Yes.**
22        Q.   And so for purposes of your opinion, is
23   it fair to say that the identified means for
24   allocating and the identified means for
25   configuring are the same thing?

87

1    **A.   Yes.**
2         Q.   And regarding my questions earlier, in
3    connection with paragraph 31 related to your
4    reliance on the '183 patent and the '677 patent,
5    if I were to ask those same questions with respect
6    to paragraph 36, would you give the same answers?
7    **A.   I would.**
8         Q.   Paragraph 37 and paragraph 38 are the
9    same as paragraphs 31 and 32; is that right?
10   **A.   Well, 37 maps to 31, you say?  Because**
11   **31 is a much longer paragraph.**
12        Q.   I'm sorry.  I was looking at the wrong
13   part of my outline, forgive me.  Strike that.
14        On paragraph 37 you reference, you say,
15   "Therefore, one of ordinary skill in the art would
16   understand that the structure for" -- then you
17   reproduce the claim element -- "is a pointing
18   device such as a mouse, keyboard, program code or
19   the like."
20   **A.   Yeah.  And I would add on to that the**
21   **GUI itself, the graphical user interface that are**
22   **explained in the figures of the '400 patent.**
23        Q.   Where would you add that in paragraph
24   37?
25   **A.   Well, just along the list; pointing**

88

1    **device such as a mouse, a keyboard, program code,**
2    **the graphical user interface.  You can add that**
3    **anywhere, it's just a list of elements that are**
4    **needed.**
5         Q.   So how is program code a pointing
6    device?
7    **A.   I'm not saying program code is a**
8    **pointing device.**
9         Q.   So what are you trying -- maybe you can
10   sort of back up a level of extraction and help me
11   understand what you're trying to say here.
12   **A.   Yes.  Well, everything is implemented in**
13   **code.  So when you implement a GUI, you implement**
14   **it in code.  We spoke about the graphical**
15   **frameworks.  So to implement a GUI you need to**
16   **write some software to -- and that's program**
17   **code -- to utilize your mouse, you need -- well,**
18   **every developer usually doesn't write the code for**
19   **their mouse; that typically comes with the**
20   **operating system or comes with the mouse driver**
21   **that's been installed.**
22        **But program code is pervasive and**
23   **throughout.  Nothing happens on a computer without**
24   **program code.  So in a way it's just assumed and**
25   **inferred that there is program code everywhere.**

89

1         We're not talking about an artist
2    drawing pictures, we're talking about implementing
3    working, functioning software.
4         Q.   So what you're getting at here is that
5    the mouse or the keyboard interact with the GUI,
6    and there is program code to more or less create
7    or to support that interact -- to allow a user to
8    use a mouse or a keyboard to interact with the
9    GUI.
10   **A.   Yes.**
11        Q.   But the mouse, for example, is not part
12   of the graphic user interface.
13   **A.   No, not -- I mean the physical mouse**
14   **itself isn't part of the UI, but there is the**
15   **representation of where the mouse is pointing,**
16   **which is a pointer on the screen, that could be**
17   **considered part of the graphical user interface.**
18        **And to go back to the question, there is**
19   **program code that not only interprets the movement**
20   **of the mouse to the movement of the screen -- of**
21   **the pointer on the screen, there is program code**
22   **that when the mouse button is pressed there is an**
23   **event that flows through the operating system that**
24   **essentially gets trapped by your application that**
25   **has to handle that event.**

90

1    So there is various sets of -- there is
2    program code to implement the GUI, and to actually
3    draw the elements on the screen, and to know what
4    various hot spots, if you are, you know, what
5    elements are interactive on the screen and what
6    aren't.  All of that represents program code for
7    various purposes.
8       Q.  And your answer would be the same for
9    the keyboard itself; the physical device is not
10   part of the GUI, but somehow the keyboard
11   manipulates the pointer on the screen?  Or what
12   would your testimony be about the keyboard?
13      A.  Yeah.  Keyboard is another input device
14   that I think we're all familiar with.  Many of the
15   GUI elements would require, let's say a text entry
16   box.  If you want to rename a cabinet, you would
17   utilize the keyboard to type in the new name of
18   the cabinet.  So to interact with text entry boxes
19   would be one example.
20      You might use other keys, such as the
21   delete key.  You might use the tab key to move
22   between active fields.  There is lots of options
23   for developers.
24      I'm looking at Figure 16, the menu bar,
25   see File, View, Cabinet, Partition, et cetera, on

91

1    the menu bar, Figure 16?  Do you see how one of
2    the letters is underlined?  If the user hits Alt F
3    they can, some control key, whether it's control
4    or Alt, typically Alt, they can expand that option
5    without using the mouse.  So there is ways that a
6    keyboard can be used for interaction with a GUI
7    that are similar, but different, than the way a
8    mouse can be used for interaction with a GUI.
9       MR. ANGELIS:  So it's about noon.  Let's
10   just go off the record for a minute.
11      (Recess 12:00 noon to 12:24 p.m.)
12      Q.  (By Mr. Angelis)  Dr. Rosenberg, let me
13   direct you to paragraph 39 of your declaration,
14   which discusses Claim 16 of the '400 patent.
15      And in particular the claim element is
16   "means for manipulating said at least one cabinet
17   record through said cabinet visible partition
18   window."
19      Do you see that?
20      A.  I do.
21      Q.  And in paragraph 41 you discuss what you
22   relied on in forming your opinions.  I previously
23   asked you about the corresponding paragraph in all
24   of your other opinions.  If I were to ask you the
25   same questions, would your testimony be the same?

92

1       A.  Yes, it would.
2       Q.  Now, in paragraph 42 you opine that the
3    means for manipulating a cabinet record should be
4    interpreted as -- and this is four lines down --
5    "to configure, or change, memory partitions or
6    data."
7       Do you see that?
8       A.  Yes, I do.
9       Q.  And that's the same definition you had
10   for the prior claim term, which is means for
11   configuring at least one partition.  Is that
12   right?
13      A.  Correct.  Yes.
14      Q.  So you've identified the same when
15   you've assigned the same meaning to both claim
16   terms essentially.
17      MR. RAMEY:  Objection; form.
18      A.  I don't know if I would say that.  I
19   mean they're two different claim terms.
20      Are we talking about means for
21   configuring said at least one partition of said
22   one -- of said at least one secondary storage
23   device through said secondary storage device
24   window versus means for manipulating said at least
25   one cabinet record?  So a cabinet record versus a

93

1    secondary storage device -- partition, so second
2    storage devices?
3       Are those the two claims term that
4    you're saying are the same?
5       Q.  (By Mr. Angelis)  Well, I'm just asking
6    if for both of those claim terms what you have
7    said is that the means -- you've said they're both
8    "to configure, or change, memory partitions or
9    data," and that's in paragraph 42 --
10      A.  Okay.
11      Q.  -- and in paragraph 36?
12      A.  Yes, I agree.
13      Q.  And in both cases you have identified
14   the same structure to perform the function,
15   correct?
16      A.  Correct.  There may be typos too, as you
17   pointed out before, though it seems to be copy and
18   paste.
19      Q.  You're referring, for example, to
20   footnote 33.
21      A.  33 versus 26, yes.
22      Q.  In both instances the words for
23   manipulating might not appear, for example, in all
24   of those.
25      A.  I think earlier we were looking for

---

**94**

configuring, means for configuring versus means for manipulating, so perhaps this was for the manipulating one. We'd have to go back and check.

Q. Do you recall I asked you earlier about the portion of the claim term that began with the word through, and in this case it would be "through said cabinet visible partition window"?

A. Um-hum.

Q. If I asked you the same set of questions I asked with respect to the prior claim term regarding partitioning, would it be the same, that you would construe the word "through" as essentially meaning using?

A. I would, yes, that's correct.

Q. And where there is text in paragraph 42, for example, that is the same as text in earlier paragraphs, like paragraphs 31 and 36, if I were to ask you about that text, ask you questions about that text, would your answers be the same as they were for the corresponding text in the earlier paragraphs?

MR. RAMEY: Objection; form.

A. Generally yes, I mean if they're complete sentences that are the same. Text can be shorter than complete

---

**95**

sentences, so I'd hesitate to give a blanket it's the same if it was just portions of sentences that were differing. But I would say in general, if I repeat the same sentence as my opinion, it's fair to say that it applies in both places.

Q. (By Mr. Angelis) In paragraph 44, the first sentence refers to -- well, let me ask it this way -- strike that. Let's start again. I think your last answer actually covers it; I was going to ask you about paragraphs 43 and 44.

Let's move on to the claim element "means for modifying said at least one cabinet record through said cabinet visible partition window," which is discussed in paragraph 45 of your declaration.

A. Yes.

Q. Now, in paragraph 47, you once again address the materials you considered in formulating your opinions with respect to this claim element. If I were to ask you the same questions I've been asking throughout this deposition beginning with paragraph 19, would your testimony be the same in response?

A. It would, yes.

Q. And with respect to footnote 39, you've

---

**96**

already testified, so I can just represent for example that the word manipulate or manipulating doesn't appear in any of those excerpts.

A. Well, we were look for configuring before, when we first looked through those.

Q. That's right. And so here where it says "modify or modifying" and it says -- I look for where the word modify or modifying appears in the patent specification, it wouldn't surprise you that the word modify or modifying doesn't appear anywhere in those excerpts in footnote 39.

MR. RAMEY: Objection; form.

A. If it doesn't then that was a typo and a mistake. And modifying does appear in the '400 patent, so I guess I would just be relying on other sections than are listed here.

Q. (By Mr. Angelis) So in paragraph 48, once again you indicate that this claim term is defined as "to configure, or change, memory partitions or data." And that's from the fourth line to the fifth line of paragraph 48.

Do you see that?

A. I do, yes.

Q. And that's, again, the same disclosure of structure that we talked about with respect to

---

**97**

the prior claim terms, the means for partitioning and the means for manipulating -- means for configuring and the means for manipulating.

A. That's correct.

Q. So again, you're identifying the same structure as performing for this function as you did for the prior functions; is that correct?

A. That's correct, yes. And I go on to say Column 5, lines 17-22, in the next sentence too -- or two sentences down.

Q. And there you're talking, again, about things being "performed graphically with a keyboard and/or mouse."

A. Correct.

Q. Your prior testimony about the graphical user interface and the pointer is applicable to this set of opinions as well, isn't it?

A. Yes.

Q. And this claim element likewise uses the word through, "through said cabinet visible partition window;" is that right?

A. Yes, that's correct.

Q. And again, your testimony would be that that's essentially -- you construe that as meaning essentially using.

98

1  A.  Yes.
2     Q.  And then the reference to certain
3  figures of the '183 patent and the '677 patent,
4  the statements, for example in paragraph 48, are
5  the same as in the prior paragraphs we discussed.
6  So if I were to ask the same questions, would your
7  testimony be the same with respect to those
8  disclosures?
9     A.  They would.
10    MR. RAMEY:  Objection.
11    THE WITNESS:  Sorry, go ahead.
12    MR. RAMEY:  Objection; form.
13    A.  It would be, yes.
14    Q.  (By Mr. Angelis)  In paragraph 49 you
15  refer to "configuring said at least one
16  partition."
17    Do you see that?
18    A.  I do.
19    Q.  And obviously this claim element doesn't
20  involve configuring a partition.
21    Do you have that in there just to
22  emphasize that the structure that you've
23  identified for all these claim elements is the
24  same?
25    A.  I think that's a fair statement, and

99

1  that's my opinion, that -- so the answer is yes.
2     Q.  And paragraph 50 is very similar to
3  prior paragraphs we've discussed, for example
4  paragraph 24 -- I'm sorry, not paragraph 24 -- 44.
5     A.  Yes.
6     Q.  And the statements that are at issue
7  there are the disclosures that you're relying on
8  in the '677 patent, the '400 patent, and the '183
9  patent.  So if I were to ask you again the same
10  questions that I asked with respect to those
11  disclosures in the past, would you provide the
12  same testimony?
13    A.  I would, yes.
14    Q.  Let's move on to Claim 28 of the '400
15  patent, which is discussed in paragraph 51 of your
16  declaration.
17    A.  Um-hum.
18    Q.  The first claim element we're talking
19  about reads "program code for accessing and
20  displaying each of at least one partition of at
21  least one secondary storage device."
22    Do you see that?
23    A.  I do, yes.
24    Q.  Now, we talked a little about program
25  code before, and you mentioned, for example, there

100

1  is program code that allows the interface between
2  a peripheral and a pointing device to occur.  And
3  there is program code, for example, that allows
4  files to be copied from one location to another.
5  Is that correct?
6     A.  That's correct, yes.
7     Q.  And you would agree, would you not, that
8  there is no program code disclosed in the '400
9  patent?
10    MR. RAMEY:  Objection; form.
11    A.  Well, I guess I don't know if it's right
12  in this section of my declaration.  So I mean we
13  don't see source code listed in the '400 patent,
14  if that's your question.  I'll just answer it
15  succinctly.  There is no source code that's
16  listed.
17    But my understanding, I guess I've been
18  informed that the disclosure of program code may
19  have additional legal implications, of which I'm
20  not fully knowledgeable of; if a patentee
21  discloses program code that that may be a full
22  disclosure in itself.  Again, I'm not a lawyer.
23    To answer your question very succinctly
24  and directly, I don't see any instances of source
25  code listed in the '400 patent.

101

1     Program code potentially could take many
2  forms, too.  We talk about algorithms that could
3  be displayed in flow charts or natural language,
4  in prose.  I think the USPTO says that structure
5  can be defined in terms of an algorithm that can
6  be expressed in either a flow chart or prose.
7     Anyway, please let me know if that
8  doesn't answer your question.
9     Q.  (By Mr. Angelis)  Let me ask you this.
10    A.  Um-hum.
11    Q.  Other than the natural language
12  algorithm you identified in paragraph 21 --
13    A.  Um-hum.
14    Q.  -- what other algorithms, flow charts,
15  or the like are you relying on as examples of
16  program code?
17    A.  Well, the '400 patent references the
18  '183 patent, and there is a whole set of flow
19  charts.  And essentially structure diagrams or
20  class diagrams that are in the '183 patent that
21  someone -- you know, anyone reading the '400
22  patent would be directed to and would be able to
23  reference.
24    Q.  Can you point me to the portions of the
25  '183 patent you're relying on as structure for the

102

1  program code limitation in Claim 28?
2      A. Yeah. Will you hand me the '183 patent?
3      Q. Of course.
4      A. I actually say it here in 53, on the top
5  of the first page of 53, "Further various Figures,
6  including, but not limited to Figures 11-14 of the
7  '183 patent disclose program code or algorithms in
8  the way of flowcharts and Figures 3-10 and 15-19
9  contain block diagrams of data structure(s)."
10     Q. And that's what you're relying on as the
11 structure for the program code referred to in this
12 element Claim 28 discussed in paragraph 51.
13     A. I think that's part of it, but not the
14 entirety of it. I kind of consider it all
15 together.
16         There is disclosure. And for the
17 displaying piece of it, program code for accessing
18 and displaying, we talked about the various
19 graphical APIs, application program or interfaces,
20 and frameworks, that could be utilized, such as
21 Xwindows and MFC and the like. Those all
22 represent program code for creating GUIs.
23     Q. I'm sorry, you are saying those are in
24 the '400 patent or are you referring to the --
25     A. Those are in --

103

1      Q. -- '183 patent?
2      A. -- the '400 patent. That was --
3  remember the VGA and the Xwindows? You remember
4  that paragraph? I can point you to it. It's
5  right here, Column 3, lines 13-17.
6      Q. So that's the program code you are
7  relying on -- that's the structure you are relying
8  on for the displaying portion of this claim
9  element.
10     A. Well, that's part of it. I mean there
11 is other areas too. Talking about, was it five --
12 where they talk about the mouse and the keyboard.
13 But these are different examples of graphical user
14 interface frameworks that all consist of program
15 code, that one of skill in the art would utilize
16 and incorporate into their projects to create
17 GUIs.
18        MR. ANGELIS: Let me mark the '183
19 patent here.
20        (Exhibit 53 marked for
21        identification.)
22     Q. (By Mr. Angelis) If you could just show
23 me which parts of the '183 patent you're relying
24 on for your opinion with respect to this element
25 of Claim 28 of the '400 patent.

104

1      A. Figures 11-14. And it's the -- so these
2  are various flow charts that describe the various
3  steps and decisions that the software needs to do
4  in order to access and display information related
5  to partitions. Those are the flow charts in
6  11-14.
7          And then also there were some block
8  diagrams that give more example of structure.
9      Q. That's Figures 3-10 and 15-19 of the
10 '183 patent?
11     A. Yeah. I'm just verifying that. I
12 believe so.
13     Q. And I believe you testified that you
14 relied on the fact that the '400 patent references
15 the '183 patent; is that right?
16     A. I believe so. Toward the beginning I
17 recall seeing that.
18     Q. You're referring there to Column 1?
19     A. Yeah. Which line number?
20     Q. I'm sorry, Column 1 line eight at the
21 very top to about eleven. It doesn't actually
22 reference the patent number, and I believe the
23 application number has a typo in it. But I
24 believe that's what you're referring to.
25     A. Okay. Yes.

105

1      Q. Is that right?
2      A. Yes. I was informed that the '400
3  patent references '183, and that I should review
4  the '183 as well. So if you're telling me that
5  it's tied through the application number that has
6  a typo, then that's how it would be tied together.
7      Q. And you were told by counsel?
8      A. That's correct.
9      Q. What were you led to understand about
10 the impact of this reference on your work for
11 purposes of claim construction?
12     A. I wasn't told anything about, you
13 know -- I wasn't told anything, just that the '400
14 patent references the '183 patent, so you may want
15 to consider the '183 patent as well.
16     Q. Were you told you could rely on the '183
17 patent?
18     A. I don't think it was put in that -- I
19 don't recall the actual words, but just, you know,
20 will you please consider or you may want to
21 consider, I forgot how it was positioned.
22        Just like I said, the '400 patent
23 references the '183 patent that I think came
24 before it, I believe. I didn't trace any patents
25 or look at the validity issues of any patent, so I

**106**

1  just took that at face value that there was a
2  reference from the -- of the '183 patent in the
3  '400 patent.  And if you're saying that this
4  application number, that perhaps has a typo, is
5  what ties it together, then that would be the
6  connection.
7      Q.   As we discussed you then relied on the
8  '183 patent to provide some structure for this
9  claim element.
10     A.   Yes.
11     Q.   In paragraph 56 -- let me back up to 55,
12 if you don't mind.  Now, this text, at least the
13 first sentence here, is very similar to our
14 discussion we had before about the interaction
15 between program code and a pointer device.
16         Let me ask this a slightly different
17 way.
18         The excerpt here referenced in footnote
19 45, the block quotation in paragraph 55, talks
20 about using a mouse to copy partitions to a
21 cabinet.
22         We've already talked about this;
23 correct?
24     A.   Yes.
25     Q.   How does this relate to the claim

**107**

1  element of program code for accessing and
2  displaying?
3      A.   Yeah, I think as before, it's perhaps
4  not as applicable a disclosure or references as
5  other places in the '400 patent.  The figures --
6  well, certainly I mean they point to Figure 10,
7  let me go to that.  Almost every figure in the
8  '400 patent is dealing with displaying, and there
9  is inferred accessing too because it's showing
10 parameters associated with it.
11         Like for example Figure 10, we see
12 Disk 0 is 2.46 megabytes, and it's formatted
13 FAT-16.  And this is a display using the GUI.
14         So I think there is elements within this
15 block quote that do talk about the accessing --
16 that, you know, show one of skill in the art that
17 there is necessarily accessing going on and
18 displaying going on.
19     Q.   Below the block quotation is the same
20 sentence we talked about before, about the
21 resources of a computer system.  If I were to ask
22 you the same questions I asked before regarding
23 this sentence, would you provide the same
24 testimony?
25     A.   I would, yes.

**108**

1      Q.   Then below that is the language again
2  "Further various Figures," and it refers to these
3  various figures in the '183 and the '400 patents.
4      A.   Yes.
5      Q.   And I've asked you about those before.
6  If I were to ask you the same questions I asked
7  before regarding this part of your opinion, would
8  your responses be the same?
9      A.   Yes.
10     Q.   Now, in paragraph 55 there is a sentence
11 that says, the top of the page, "One of ordinary
12 skill in the art would be able to create the
13 program code necessary for creating and
14 manipulating the disclosed graphics."
15         Do you see that?
16     A.   I do.
17     Q.   What program code are you referring to?
18     A.   This would be using program code such as
19 the various GUI frameworks.  Such as Xwindows or
20 MSC or Java AWT, the many different frameworks
21 that would be incorporated into the project, and
22 then calls would be made against that framework
23 against that API to initiate -- to create graphics
24 to create a GUI.
25         THE REPORTER:  I have one question.

**109**

1          And then -- would be made against that
2  framework.
3          THE WITNESS:  Calls.
4      A.   So sometimes they're called methods or
5  calls or functions.
6      Q.   (By Mr. Angelis)  So your opinion here
7  is that one of ordinary skill in the art would
8  basically be able to use the disclosed programs in
9  Column 3 of the '400 patent to design this
10 particular graphic user interface.
11     A.   Yeah, I think that's one disclosure.
12 Yes.
13     Q.   What else did you mean, if anything, by
14 the statement "One of ordinary skill in the art
15 would be able to create the program code necessary
16 for creating and manipulating the disclosed
17 graphics"?
18     A.   I think that's largely what I meant.
19 Most developers will not try to re-create the
20 wheel.  When it comes to 2D computer graphics,
21 there is lots of libraries out there.  So
22 utilizing one of the several that were mentioned
23 in the '400 patent would be a good choice.
24         One could re-create the wheel and
25 program their own graphics library, actually have

Rosenberg, Craig                                          September 30, 2016

29 (Pages 110 to 113)

110

to interface with the display card.  There is a
frame buffer associated with the graphics card.
And you can, at a very low level, you can draw
lines from one pixel to another and you can start
creating widgets, you can create your own buttons
and all the various elements that we all take for
granted in 2D computer graphics.

So it's not a necessity that one utilize
a third-party framework for computer graphics, but
it's almost always done because it's relatively
easy to incorporate these open source libraries,
if you will, for doing that.

Q.   And is there anything in the '400
patent, other than what's in Column 3 that we
talked about before, that would provide one of
ordinary skill in the art with the ability to
create the program code necessary?

MR. RAMEY:  Objection; form.

A.   Well, I mean there is a couple different
places we've been talking about.  I think in
Column 3, those were the disclosure of various
graphic systems such as Xwindows, I recall being
one, and VPA and SVPA.  Yeah, that's in Column 3
starting around line 13.

Q.   (By Mr. Angelis)  Let me be a little

111

more precise.

MR. RAMEY:  Were you done with your
answer?

A.   I was going to say that there were other
areas that we've been talking about, I think it
was in Column 5.  Let's see.  We were talking
about another area that talks about using the
mouse and the keyboard, which is kind of a
different section.

So I think your question was was this
Column 3 reference the only place that you think
there is disclosure around using, you know -- my
statement, "One of ordinary skill in the art would
be able to create the program code necessary for
creating and manipulating the disclosed graphics."

Well, manipulating the disclosed
graphics would probably require a mouse and/or a
keyboard.  So I think that other passage that I
referred to would be good to bring in as well,
that talks about the mouse and the keyboard.

Q.   But how is that program code?

A.   Well, like I said, a mouse and a
keyboard won't do anything without program code.
Every device needs a driver, at the very least, to
interface with the operating system to be able to

112

pass events to the operating system.  And then the
application developer needs to write additional
program code to handle those events, and to call
various functions or to write your own functions
to describe what happens when that event happens.
You know, when Alt F is pressed on the keyboard,
what should happen in your program?

Q.   So I just want to make sure I understand
here.  Your testimony is that one of ordinary
skill in the art would sort of inherently know how
to write this program code.  Other than what we
talked about in Column 3, where there is
disclosure of particular software products, for
example, I'm not seeing any disclosure of code or
products or anything that a person of ordinary
skill in the art would rely on, unless I'm missing
something.

Is there something you can point me to?

MR. RAMEY:  Objection; form.

A.   I think that one of ordinary skill in
the art, computer science, human factors, would be
well versed in designing and implementing user
interfaces.  And this is part and parcel of
designing and implementing interfaces, is
creating the program code.

113

Like I'd said earlier, it's not just
pictures, it's not just static pictures, this is
actual working code that has behavior and
interaction.  So you won't get any of that
interaction without program code.

Q.   (By Mr. Angelis)  And I just need to
button this up.  So there is a disclosure in
Column 3 that we talked about, then there is some
disclosures we talked about where the
specification refers, for example, to using the
keyboard or mouse --

A.   Yes.

Q.   -- as a pointing device.

Other than those, you're relying on the
inherent knowledge of one of ordinary skill in the
art as to how to create the program code necessary
for creating and manipulating the disclosed
graphics; is that fair?

MR. RAMEY:  Objection; form.

A.   Yes.

Q.   (By Mr. Angelis)  Thank you.  In
paragraph 56 of your declaration you refer to the
natural algorithm.

Are you relying on the natural algorithm
as program code only to the extent that it

114

1   discloses, again, the use of the mouse, for
2   example, or the keyboard as a pointing device?
3       **A.   That would be part of it.  And the other**
4   **part is the disclosure of various graphical**
5   **frameworks that can be used as well.**
6       Q.   Let's move on to Claim 28, paragraph 57,
7   the element that says "program code for
8   configuring said at least one partition of said at
9   least one secondary storage device through a
10  secondary storage partitions window."
11      Do you see that?
12      **A.   I do.**
13      Q.   Now, in paragraph 58 you refer to
14  Claim 16.
15      Do you see that?
16      **A.   I do, yes.**
17      Q.   So that's just a typo?
18      **A.   That is a typo, yes.**
19      Q.   And in paragraph 59, the first part
20  before the word Further, it's just the same
21  paragraph we've been talking about for a while.
22  So if I were to ask you the same questions I have
23  asked you about the basis for your opinions, would
24  you provide the same testimony?
25      **A.   In general, yes.  But where do you see**

115

1   **"Further"?**
2       Q.   I'm sorry, at the bottom of page 59.
3       **A.   Of paragraph 59.**
4       Q.   Excuse me, at the bottom of paragraph
5   59.
6       **A.   Yes.**
7       Q.   Before that the text we've been seeing
8   before usually didn't have that sentence Further.
9       **A.   Right.**
10      Q.   This is the first instance in which that
11  sentence appears.
12      **A.   Um-hum.**
13      Q.   So let's talk about that for a minute.
14  It says, "Further, I am informed by counsel that
15  phrases like 'program code' have been found by the
16  Courts to connote sufficient structure such that
17  the phrase 'program code' is not a means plus
18  function limitation."
19      Do you see that?
20      **A.   I do see that.**
21      Q.   And you briefly talked about this
22  earlier, but what exactly were you told by
23  counsel?
24      **A.   Just that there is sufficient that**
25  **one -- really not much more than this, just that**

116

1   **the courts have interpreted that if a patentee**
2   **discloses the word "program code" that that's**
3   **sufficient.**
4       **And I guess what I inferred from this,**
5   **although I wasn't told, is that there wasn't the**
6   **need to go forth and to put various examples or to**
7   **write source code in the patent to show, you know,**
8   **that the inventor was in possession of the**
9   **invention, or that a third party could re-create**
10  **the invention without undue experimentation.**
11      **I was really told not much more, nothing**
12  **more that I can recall, than there is some case**
13  **law that the term "program code" has some**
14  **additional legal meaning, of which I'm not really**
15  **privy to.**
16      Q.   Were you provided copies of the case
17  law?
18      **A.   No, I wasn't.**
19      Q.   Did you do any research on your own to
20  look at cases and find out whether this is
21  correct?
22      **A.   I did not, no.**
23      Q.   Does your opinion regarding Claim 28
24  depend upon the correctness of what you were
25  told -- let me be more specific -- that "program

117

1   code" has been found by courts to connote
2   sufficient structure?
3       **A.   It does not depend on that, no.**
4       Q.   So you were providing an opinion that
5   even if these are means plus function claim
6   elements, that there is sufficient structure in
7   the '400 patent specification.
8       **A.   That's correct, yes.**
9       Q.   And we've established before that you're
10  also relying on the '183 patent specification; is
11  that right?
12      **A.   That's correct, yes.**
13      Q.   And for this claim element you're
14  relying on the '183 patent specification and the
15  '400 patent specification in the same way that you
16  were for the prior claim element in Claim 28;
17  correct?
18      **A.   In Claim 16?  Isn't this the first one**
19  **in 28?**
20      Q.   I don't believe so.  I believe paragraph
21  51 that we've already talked about also --
22      **A.   The answer to your question is yes,**
23  **you're right.  Yes.**
24      Q.   Now, paragraphs 60 to 62 are essentially
25  identical to paragraphs 54 to 56 that we already

118

1  talked about; is that right?
2      A.  They're essentially identical to which
3  paragraphs?
4      Q.  54 to 56.
5      A.  Yes.
6      Q.  So if I asked you the same questions for
7  those paragraphs as I had about 54 to 56, would
8  your testimony be the same?
9      A.  Yes.
10     Q.  Let's move on to paragraph 63.  What I'm
11 going to do is do this all at once, if we can, to
12 be very efficient.
13         In paragraph 64 you have a reference to
14 Claim 16 again.
15         Do you see that?
16     A.  I do.
17     Q.  So that's the same typo as before,
18 correct?
19     A.  Correct.
20     Q.  So everywhere that appears, Claim 16, in
21 connection with a discussion of Claim 28, you
22 meant to put Claim 28; is that right?
23     A.  That's right, yes.
24     Q.  So I won't ask you that again.
25         Paragraph 65.  I don't know if you have

119

1  somewhere to write this down, but I'm going to try
2  to do this efficiently.
3         Paragraphs 65, 71, 77, and 83 are all
4  essentially the same.  And what I'm going to ask
5  you, after you have a chance to confirm that fact,
6  is whether if I asked you the same questions that
7  I previously asked regarding the sentences in that
8  paragraph, if your testimony would be the same.
9      A.  And you're comparing these to earlier
10 paragraphs for earlier claim elements?
11     Q.  That's right.
12     A.  Yes.
13         And again, as I testified earlier, if
14 this complete sentence is the same, and even if
15 the complete paragraph is the same as the previous
16 paragraph, only referring to a different but
17 similar claim element, the answers to questions
18 would be the same as the previous claim element.
19     Q.  And that answer may also resolve my next
20 question, but I'm going to give you another series
21 of paragraphs.
22     A.  Okay.
23     Q.  54 to 56, 60 to 62, 66 to 68, 72 to 74,
24 and 78 to 80 are all essentially the same.
25     A.  So this is -- you're dropping back to

120

1  previous claim elements when you going 54 to --
2  oh, are these pairwise?  54 to 56 you're saying is
3  the same as 60 to 62?
4      Q.  Correct.  Yes.
5      A.  And then 66 through 68 is the same as 72
6  to 74; is that the second pairing?
7      Q.  That's right.  So it's a three paragraph
8  block that's repeated in multiple places.
9      A.  And then the last pairing was 78 to
10 80 versus -- I think you gave five total numbers.
11     Q.  Yes.  So 78 to 80, 72 to 74, 66 to 68,
12 60 to 62, those are all the same as 54 to 56.
13     A.  Oh, okay.  All right.  I'm with you.
14     Q.  My question is if I were to ask
15 questions regarding each of those paragraphs, that
16 they're the same as the questions I previously
17 asked, would your testimony be the same?
18     A.  Yeah, without taking the time to read
19 every word of those paragraphs, if the paragraph
20 is the same as the previous paragraph, only
21 applied to a different but similar claim element,
22 the answers to any question about the newer
23 paragraphs would be the same as -- the answers
24 would be the same as previously answered.
25         (Exhibit 54 marked for

121

1      identification.)
2      Q.  (By Mr. Angelis)  Dr. Rosenberg, this is
3  just your CV.  I just have a few questions from
4  your CV.
5      A.  Okay.
6      Q.  So just starting with your educational
7  background here on Exhibit 54, you have a BS in
8  Industrial Engineering from the University of
9  Washington right down the street.  Is that
10 correct?
11     A.  That's correct.
12     Q.  What kind of computer science course
13 work did you take as part of that degree?
14     A.  I took Fortran 77.  Probably I took --
15 I'm trying to think of the year, that was probably
16 about 1985, 1984.  I took a computer graphics
17 class, I forget the number, it was 3D computer
18 graphics class that I took as part of that.  I
19 took several classes in programming robots.
20         This whole degree was about factory
21 automation essentially and factory efficiency, so
22 there was a strong focus on robotics.
23         I've been a software -- I've been a
24 programmer since eighth grade, which for me was, I
25 think 1977.  I taught myself programming and have

122

been programming since 1977, so long before I went to college. I came into this degree knowing how to program.

Q. Have you taught yourself object-oriented languages and a lot of other languages?

A. Yes.

Q. And so you're referring here, for example, in your summary of qualifications you list for example C++, C, JAVA, UML, et cetera. These are all languages that you routinely program in?

A. Yes.

Q. What kind of experience do you have with virtualized computer systems?

A. I have used virtualized computer systems on many of the projects that I work on. Starting -- well, starting with projects at Boeing, for much of my career I was a contractor at Boeing from about 1990 -- let's see. When did I start? About 1997 I started as a contractor with Boeing, and worked on Boeing projects through 2012, and there were several projects.

There is a big project on Army communications that used VMware to running various Linux operating systems to capture Army

123

communications, digital communications of software defined radios. This was starting probably in 2004 time frame, 2005, right in there. And that continued on through 2010.

I worked on a big project for the Department of Homeland Security through Boeing, that we used virtualized systems to also running Linux on top of Windows using VMware.

Q. And for those projects were there multiple instances running on a single server, for example?

A. There were, yes.

Q. Did you use any BIOS functionality of the servers to choose between those different instances?

A. Not that I recall, no.

There is others too, other projects that I've used virtualization on.

Q. Have you, as part of your work, been involved in designing the virtual systems that were used?

A. No. I haven't been involved with designing hypervisors, if that's what you're asking.

Q. That's part of my question, but that's

124

helpful. Thank you.

What about being involved in configuring any of the virtual instances?

A. Oh, yes, definitely. That was my responsibility, I mean one of my responsibilities.

Q. And you testified that you used VMware to do that?

A. Yes, I've used VMware, but I've also used Oracle VirtualBox. I used Oracle VirtualBox on a Boeing project, big cyber security project for Boeing. At home for my own development projects I've used Fusion and Parallels running on Mac. I've used VirtualBox at home.

Q. What experience do you have, if any, with advanced power management tools that are part of the BIOS for a particular computer system?

A. Well, just setting up computer system. I've been building all my own computer systems since about 1985 when the PCAT came out. So I'm very familiar with buying components, installing everything, installing software, configuring BIOS. So I have experience in using various BIOSes to configure computer systems and set them up to be operable and optimal.

Q. Have you testified in a case involving

125

virtualization?

A. I don't believe so. I don't think so. I've used virtualization in cases before in order to install older versions of operating systems. Like for example, there is a case Edulog versus DML where the company Edulog was creating school bus routing software that would route school buses. And they were creating this in the early 90s, mid 90s, and I needed to install a version of Windows that was compatible with their software in order to analyze it. So I would use VirtualBox and install the proper version of Windows, and install the software that wouldn't run on modern versions of Windows.

Q. And have you testified in a case involving BIOS management or advanced power management?

A. Not about those issues, no.

Q. In your declaration in paragraphs 13 and 14 you opine about the level of skill of ordinary skill in the art.

A. Yes.

Q. In paragraph 13 you say, "In my opinion, a person of ordinary skill in the art as of September 29, 1999 would have had a bachelor's

Rosenberg, Craig

September 30, 2016

33 (Pages 126 to 129)

126

1  degree in computer science, computer engineering,
2  human factors, or highly related field, and would
3  have had at least four years' experience in
4  software development, especially user interfaces."
5  A. Um-hum.
6  Q. Correct?
7  A. Yes.
8  Q. What is the art that you're referring to
9  in that paragraph?
10  A. Well, I guess this one would relate --
11  so is this a September 29, 1999 one you're
12  referring to?
13  Q. Yes, paragraph 13. That's right.
14  A. Paragraph 13. So the art would be what
15  would someone -- what would the qualifications and
16  experience that someone would want to have in
17  order to be able to understand and practice the
18  invention of the '400 patent. I guess maybe that
19  answers your question.
20  As far as what was disclosed in the '400
21  patent, kind of what background would someone need
22  to have to really understand that and be able to
23  capitalize on it in some way.
24  Q. And then I have the same question for
25  paragraph 14.

127

1  A. Okay.
2  Q. Is it the same art that you're talking
3  about there, the skill in the art? Is it the same
4  art you're talking about?
5  A. Well, the art would be it's related to
6  the '677 patent.
7  Q. So for the '400 patent involving user
8  interfaces, a person of ordinary skill in the art
9  could have a degree in human factors, for example;
10  which is what you say in paragraph 13, is that
11  right?
12  A. Yes.
13  Q. And in paragraph 14, related to the '677
14  patent, in the art of -- they're all in the art
15  that's disclosed in the '677 patent, there the
16  degree would have to be in computer science,
17  computer engineering, or highly related field.
18  A. Which I consider human factors to be a
19  highly related field, or the equivalent I'd say,
20  or highly related. I guess highly related or the
21  equivalent. I guess you could group it under
22  either one.
23  Human factors is the intersection
24  between computer science and cognitive psychology
25  really. It's computer science focused on

128

1  interfaces.
2  Q. And in paragraph 14 you refer to two
3  different bachelor's degrees.
4  A. Paragraph 14?
5  Q. Paragraph 14. I'm trying to understand
6  what you meant by that.
7  A. Oh, yeah. I'm sorry about the typos
8  through this declaration.
9  Would have a bachelor's degree in
10  computer science, computer engineering, or the
11  equivalent, and would have a bachelor's degree in
12  computer science, computer engineering. It's
13  repeated. It's a copy and paste past error.
14  I also see another error too. That
15  should be or would have at least four years' of
16  experience in designing computer.
17  I don't think that one would necessarily
18  need to have experience in designing computer
19  operating systems in order to implement a
20  hypervisor. I think it could be helpful.
21  But in general just knowing how to
22  program is what's needed. Being a good software
23  engineer, a good software architect, is what's
24  needed to implement a hypervisor; and that seems
25  to be largely what '677 is.

129

1  Well, I won't fully opine on that. I
2  had a very limited scope in what I was asked to
3  do.
4  Q. So are you saying that the level of
5  ordinary skill in the art is different for the
6  '677 patent and the '400 patent?
7  A. Maybe slightly. I think that I could
8  easily come up with one definition of skill in the
9  art that would cover both, but I was trying to
10  give a nod toward that the patents are teaching
11  different parts of the system, like I said, the
12  front end versus the back end. I was just trying
13  to be more explicit, when perhaps that wasn't
14  required or necessary.
15  But I could come up with -- I could
16  combine these two. I think paragraph 13 would
17  cover the '677 patent as well. And I think with
18  the corrections, the typos that I spoke about,
19  paragraph 14 would cover the '400 as well.
20  Again, perhaps I was being overly
21  analytical in thinking it would be helpful to the
22  court to have two different sets of skill in the
23  art, because I think one could easily come up with
24  one definition of skill in the art that would
25  cover both. There is a lot of overlap already

Rosenberg, Craig

September 30, 2016

34 (Pages 130 to 133)

---

130

between these, as you can tell.

Q.   So let me make sure I understand this. For paragraph 14 you're saying that it's obviously one bachelor's degree that was --

A.   Yes.

Q.   It's not two, that was a typo.

A.   Correct.

Q.   And instead of being "and" it's "or." That four years' experience in designing computer operating systems would substitute for the educational requirement.

A.   I think so.  There is a lot of amazing programmers out there that don't have any computer science degrees, that are people that have taught themselves to program from a young age.

So I think -- I mean look at Bill Gates, right, why don't we consider him an expert computer programmer, he did a tremendous amount for the field.  He does not have a computer science degree.

So I didn't want to say that it's a requirement to have a computer science degree to be a good programmer.  There is plenty examples that we all know that that's not the case.  Is it helpful?  Sure.  I don't think degrees are ever

---

131

hurtful to have the opportunity to have knowledge in the field.

I think if you have experience designing computer operating systems that's not a trivial problem.  So if you were proficient in your job for four years of designing and implementing computer operating systems, that to me is a proxy of being a good software developer.  You're likely a competent software developer.

Q.   And you earlier I think said that you thought that as revised, statement of the skill in the art for paragraph 14 would also cover the '400 patent as well, paragraph 13; is that correct? Did I understand you?

A.   As revised, as long as it's understood that when I say or the equivalent or highly related field, that that covers human factors as well.  Because, like I said, it's computer science of user interfaces, also taking into account human information processing and how we process information.

Q.   So for paragraph 14, one could be a person of ordinary skill in the art based on experience alone, and that experience alone would be basically in designing operating systems.

---

132

Would that experience alone be sufficient to make someone a person of ordinary skill in the art for the '400 patent?

A.   I guess I'll just go back to my previous answer.  I think that one finds in the world exceptionally talented programmers that don't have educational degrees, they don't have bachelors of sciences -- bachelor of science degrees and computer engineering, computer science, human factors, what have you.

So there are people that have taught themselves to program and could implement what's taught in the '400 patent or the '677 patent without a degree.  Those people do exist.

I don't mean to, and perhaps it's come out that way through this declaration, have two different sets of skill in the art, because I think it's fungible in a way; you can find people with no degrees that are exceptionally talented and could implement either the invention in either parent.  You can find people with no experience that just didn't have a summer job from day one, graduate with a bachelor of science in one of these fields, and could implement these as well. So that's why I say it's fungible.

---

133

Sometimes the experience helps, the degrees help, but it's not a requirement in my mind, in my opinion, that one have to have a combination of both to be an effective programmer.

Q.   Let's turn now to the '677 patent.

(Exhibit 55 marked for identification.)

Q.   (By Mr. Angelis) We're going to turn to paragraph 83 of your declaration.  And now we're talking about Claim 1 of the '677 patent.  And in particular, a single element that's in bold face in paragraph 83, "means for selecting one of said virtual computer systems to become next operable before suspending a currently operational virtual computer system."

In paragraph 85 you refer to the documents that you relied on in formulating your opinion.  Is this a complete list of what you based your opinions on regarding this claim element?

A.   It is, yes, as well as the knowledge of one of ordinary skill in the art, I guess.

Q.   Right.  And that's in paragraph 85 as well, correct?

A.   Yes.

---

134

Q.   Paragraph 86, which has the basis for your opinion, refers only to the '677 patent; is that right?

A.   It does, yes.

Q.   So did you rely on the '400 patent in identifying structure that corresponds to the function set forth in this claim element?

A.   No, I did not.

Q.   Did you rely on the '183 patent to identify structure that corresponds to the function set forth in this claim element?

A.   I certainly reviewed the '183 patent and the structure that's in there.  And I can't recall if I found specific items in the '183 patent that led additional support for what I mostly found in the '677.

Q.   Would it help you to look at the '183 patent to see if you relied on it for any of the structure that corresponds to the function we've been talking about?

A.   Yeah.  I'm sure -- I'm certainly happy to page through it and see if something refreshes my memory.

Q.   That would be great.

MR. RAMEY:  It seems like we've been

135

going over an hour, when we get done with this pending question, can we take a short break?

MR. ANGELIS:  Yes.

A.   Just seeing if anything jumps out at me.  Yeah, not that I see right now.  I think that most of the disclosure, if not all of it, is found in the '677 specification.

Q.   (By Mr. Angelis)  But you might have relied on those figures we talked about from the '183 patent, the flow charts for example?

A.   Yes.

Q.   In paragraph 86 you refer --

MR. RAMEY:  Can we take that short break?

MR. ANGELIS:  Oh, I'm sorry.  Forgive me.

(Recess 1:41 p.m. to 1:57 p.m.)

Q.   (By Mr. Angelis)  In paragraph 86 you refer to the disclosed mechanism for switching from one virtual computing system to another.  And the claim part of our platform does it by using, and I'm going to quote here, "BIOS ACPI enhancements/solutions with a switch flag and VTOC Data Structure."

A.   Um-hum.

136

Q.   Is that right?

A.   That's correct.

Q.   I want to try to conceptualize this for myself in layperson's terms.

A.   Yes.

Q.   And feel free to read all of paragraph 86 first, to familiarize yourself with it.

A.   Okay.

Q.   And just to remind us, we're talking here about the claim element is "means for selecting one of said virtual computer systems to become next operable before suspending a currently operational virtual computer system."

So here is my question.

Assume there are three virtual operating computer systems on a hardware platform, and the hardware platform is about to suspend a currently operational virtual computer system.

So where does the '677 specification explain how the hardware platform selects which virtual computer system will be next operable before it suspends the currently operable one?

MR. RAMEY:  Objection; form.

A.   So so far I've just identified the mechanism that's used to suspend one operating

137

system and position the next operable operating system to take its place.

I don't recall, I didn't look through -- one second.  Let me just read something real quick here.

So in 86 what I'm talking about here is a mechanism that the computer system would use to switch from one operating system to another without having undue delay, if you will.  But I would need to look more carefully through the '677 to find reference to where that selection is, in your example if there is three of them.

I'm not pointing it out right there, you know, what a user might do or not.  I mean obviously in the '400 patent that's covered very clearly, that you can select a virtual cabinet and the cabinet button bar, I think is the terminology they're using.  So that's where the selection would take place in the '400 patent.

But I'd need to look through the '677 patent to find disclosure of -- if you're asking like what does the user do to indicate to the system where that selection takes place.

Q.   (By Mr. Angelis)  And let me ask it this way.  I am, and the reason I'm asking it is

138

because I read this claim as being directed to not the mechanism for switching between instances, but the means for selecting one of the virtual computer systems to become the next operable.

Do you read this claim element differently than that?

MR. RAMEY:  Objection; form.

A.  I think that's a fair read of the claim, yeah.

Q.  (By Mr. Angelis)  So that's what I'm looking for here.  And let me ask, is it fair to say that there is nothing in paragraph 86 that addresses that issue?  And by that issue I mean the means for selecting the next operable system.

MR. RAMEY:  Objection; form.

A.  I think that's a fair characterization, yes.

Q.  (By Mr. Angelis)  Paragraph 87.  Well, let me just ask one clarification.  So virtual computer operating systems in this claim element, that term can refer to more than two systems, right?  My example was three systems, but you would agree with me that the claim element encompasses systems with more than two virtual computer systems.

139

A.  I don't see anything as being limiting.  It's plural, virtual computer systems.  So in my mind that could be two or more.

Q.  So it could be 10, it could be 15, it could be some number more than two; correct?

A.  Agreed.

Q.  So the beginning of paragraph 87 says "Claim 1 of the '677 patent further provides."

A.  That should be Claim 3.

Q.  That's what I thought.

And then paragraph 89 is just the same as paragraph 85; correct?

A.  Yes, it is.

Q.  So if I were to ask you the same questions I asked with respect to paragraph 85, your testimony would be the same?

A.  Yes.

Q.  And paragraph 90 is essentially the same as paragraph 86, isn't it?

A.  Yes, it is.

Q.  So if I were to ask you the same questions that I asked with respect to paragraph 86, your testimony would be the same; correct?

A.  That's correct, yes.

MR. ANGELIS:  That is the end of my

140

questions.

MR. GERCHICK:  I don't have any questions.

MR. SIEGEL:  I don't have any questions.

MR. RAMEY:  Can we take five minutes?

MR. ANGELIS:  Sure.

(Recess 2:05 p.m. to 2:11 p.m.)

E X A M I N A T I O N

BY MR. RAMEY:

Q.  Dr. Rosenberg, if I may ask a few follow-up questions.

Previously in your testimony did you intend to change your declaration in any way when you were testifying?

A.  No.

Q.  Earlier you testified that you felt it was a reasonable -- it was reasonable that there was no structure to support the italicized portion of paragraph 83.

Do you remember your testimony there?  That's "means for selecting one of said virtual computer systems to become next operable before suspending a currently operational virtual computer system."

A.  83.  And the question was -- say the

141

question again.

Q.  Do you recall your previous testimony on that, that there was no structure in the '677 patent to support that means language?

A.  Well, I don't know if that's exactly what I said, that there was no structure.

I said that -- was it 83 or was it 86?  I think we were talking about 86 and how the ACPI is accomplishing the chain -- is switching from one virtualized OS to another virtualized OS.

Q.  Dr. Rosenberg, have you ever used ACPI functions or ACPI enhancements?

A.  I have, yes.

Q.  Can you please tell the court which ACPI enhancements you have used?

A.  I'm not sure.  Some of the -- I mean oftentimes when you have add-ons or enhancements it's not clear to the user what's native and what's an enhancement.  But I've used advanced configuration, power interface enhancement.  That's an open standard essentially on top of the BIOS.

Q.  Did those ACPI enhancements or solutions you used have the ability to choose an operating system?

142

1    A.  You could choose various disk
2  partitions.  So I guess by that nature you could
3  choose an operating system.  If you had a
4  different OS on different partitions, you could
5  choose which you wanted to suspend and which you
6  wanted to be the master boot record.
7    Q.  So is it your opinion then that those
8  ACPI enhancements or solutions would be a
9  structure for "means for selecting one of said
10 virtual computer systems to become next operable
11 before suspending a currently operational virtual
12 computer system"?
13   MR. GERCHICK:  Objection; form.
14   MR. ANGELIS:  Object to the form.
15   A.  Yes.  Yes.
16   Q.  (By Mr. Ramey)  And your opinion is
17 based upon your experience in using ACPI
18 enhancements or solutions, correct.
19   MR. GERCHICK:  Objection.
20   MR. ANGELIS:  Object to the form.
21   A.  Yes, it's in my direct experience of
22 using BIOS ACPI.
23   Q.  (By Mr. Ramey)  And ACPI enhancements
24 and solutions are mentioned in the '677 patent
25 specification, correct?

143

1    A.  They are, yes.
2    MR. GERCHICK:  Sorry, objection to form.
3    MR. RAMEY:  Pass the witness.
4    MR. ANGELIS:  Give me five minutes.  I
5  just want to see if I want to redirect.
6    (Recess 2:14 p.m. to 2:18 p.m.)
7    E X A M I N A T I O N
8  BY MR. ANGELIS:
9    Q.  Dr. Rosenberg, without telling me the
10 substance of anything that was said, did you talk
11 to your counsel about the substance of your
12 testimony during the last break?  So the break
13 between when I finished my questions, we finished
14 our questions, and when Mr. Ramey started asking
15 his questions.
16   A.  Yeah.  Mr. Ramey asked if I intended to
17 change my testimony.
18   Q.  Hold on, don't tell me about that.
19     You did discuss the substance of what he
20 was going to ask you during that time.
21   A.  What he was going to ask me.  At a high
22 level, high level and general I guess to clarify
23 my opinion, I guess, yes.
24   Q.  And you relayed to him how you would
25 answer his questions if he asked them to you on

144

1  the record?
2    A.  I don't recall that, no.
3    Q.  Did you do that?
4    A.  No, I didn't.  I told him -- I'd like to
5  tell you what was said, but it sounds like you
6  don't want to hear it.
7    MR. RAMEY:  And we'd caution you not to
8  say exact communications between us.
9    A.  It would be easier to just say what I
10 said.  Let me just run it through my mind.  You
11 want me to mask what was said?
12   Q.  (By Mr. Angelis)  That's correct.  I
13 would like just to know whether he asked -- he
14 told you what he was going to ask you.  Did that
15 happen?
16   A.  I -- no, that didn't happen.  I
17 actually -- it became clear that it seems, and
18 this wasn't my intention, that my testimony was
19 changed, you know, written versus oral, which
20 wasn't ever my intention.
21     So I said that, you know, maybe you
22 should ask a clarify question, such as X.  And I
23 actually proposed a question that would I think
24 help the court and you understand my opinion about
25 this.

145

1    Q.  So did you tell Mr. Ramey to ask you a
2  question about using ACPI enhancements?
3    A.  Yes, I did.  I said I thought it would
4  be good if you asked me a question about if I've
5  used it before and what they can accomplish.
6    Q.  Anything else?  Any other areas?
7    A.  No.
8    MR. ANGELIS:  That's all I have.
9    MR. GERCHICK:  I have nothing more.
10   MR. SIEGEL:  Nothing.
11   MR. RAMEY:  We'll reserve the rest for
12 trial.
13     (Discussion off the record.)
14   THE REPORTER:  Is my understanding
15 correct that the three of you wish to order a
16 rough draft and Henderson has a standing order?
17   MR. ANGELIS:  Yes.
18   MR. GERCHICK:  Yes.
19   MR. SIEGEL:  Yes.
20   THE REPORTER:  Mr. Ramey, do you need a
21 rough draft?
22   MR. RAMEY:  No, just the final.
23     (Signature reserved.)
24     (Deposition adjourned at 2:25 p.m.)
25

146

S I G N A T U R E

I declare under penalty of perjury under
the laws of the State of Washington that I have
read my within deposition, and the same is true
and accurate, save and except for changes and/or
corrections, if any, as indicated by me on the
CHANGE SHEET flyleaf page hereof.
        Signed in _____, Washington,
this _____ day of _____, 2016.


        ----------------------------
        CRAIG ROSENBERG
        Taken: September 30, 2016









Re:  GEMSA v Expedia
Cause No.:  2:16-cv-00095-RWS
Brenda Steinman, CCR.

147

C E R T I F I C A T E

STATE OF WASHINGTON  )
                     ) ss.
COUNTY OF KING       )

        I, the undersigned Washington Certified
Court Reporter, hereby certify that the foregoing
deposition upon oral examination of CRAIG
ROSENBERG was taken stenographically by me on
September 30, 2016, and thereafter transcribed
under my direction;

        That the witness, before examination, was
first duly sworn by me pursuant to RCW 5.28.010 to
testify truthfully; that the transcript of the
deposition is a full, true, and correct transcript
to the best of my ability; and that I am neither
attorney for, nor a relative or employee of, any
of the parties to the action, or any attorney or
counsel employed by the parties hereto, nor
financially interested in its outcome.

        I further certify that in accordance with
CR 30(e), the witness was given the opportunity to
examine, read, and sign the deposition, within 30
days, upon its completion and submission, unless
waiver of signature was indicated in the record.

        IN WITNESS WHEREOF, I have hereunto set my
hand this date:  October 5, 2016.


        -------------------------
        Brenda Steinman, CCR #2717
        License expires 10/15/2016

**A**

**a.m** 1:16 5:2
46:17,17
**ability** 110:16
141:24
147:12
**able** 12:14
37:25 101:22
108:12 109:8
109:15
111:14,25
126:17,22
**absence** 9:12
**Abstract** 16:15
**absurd** 60:1
**access** 22:20
27:22 28:22
29:12 44:10
104:4
**accessed**
31:11
**accessible**
31:15
**accessing**
99:19 102:17
107:1,9,15
107:17
**accomplish**
36:1 45:13
46:11 48:12
145:5
**accomplished**
16:22 32:14
**accomplishes**
30:9
**accomplishi...**
47:8,17
141:9
**account**
131:19
**accurate** 146:6
**ACPI** 135:22
141:8,11,12
141:14,23

142:8,17,22
142:23 145:2
**act** 30:13
**action** 1:7 16:9
48:12,15
147:13
**actions** 14:14
14:20,25
**active** 48:7
90:22
**actual** 9:5,15
10:1 22:7
59:6 65:19
84:19 105:19
113:3
**add** 8:16 39:9
87:20,23
88:2
**add-ons**
141:17
**added** 84:5
**adding** 43:21
**additional**
38:16 48:16
100:19 112:2
116:14
134:15
**address** 95:18
**addresses**
138:13
**adjourned**
145:24
**Adobe** 62:19
63:18
**advanced**
63:19 124:15
125:16
141:19
**age** 130:15
**agenda** 45:12
**agree** 6:12
10:20 13:23
16:8 19:4
27:23 35:19
35:23 44:19

44:24 45:14
46:9,13 47:7
50:17 60:10
67:14,20
68:12,24
69:3,5 80:14
81:8 93:12
100:7 138:23
**Agreed** 139:6
**ahead** 73:6
98:11
**aid** 38:17
**aids** 26:1
**air** 29:21
**Alan** 4:11
**algorithm** 45:1
47:5,7,9,18
47:20 49:4
101:5,12
113:23,24
**algorithms**
101:2,14
102:7
**alia** 43:20
**allocate** 16:10
26:10,21
27:20 28:4
43:9 44:1
54:25 55:7
71:25
**allocated** 17:6
24:5
**allocating**
13:16 14:2,4
15:2 16:1,7
19:8 26:20
27:1 30:9
40:17 54:10
54:13,14,22
60:7 66:5
69:25 71:3
86:24
**allocation**
43:14
**allow** 18:11

27:21 34:9
34:18 35:24
48:11 63:11
65:10 80:19
89:7
**allowed** 55:10
**allowing** 31:11
**allows** 20:23
31:17 32:25
53:12,14
71:4 80:15
100:1,3
**alluded** 84:16
**Alt** 91:2,4,4
112:6
**alternate** 7:23
11:8
**amazing**
130:12
**American** 4:12
**amount** 17:20
130:18
**analysis** 73:1
**analytical**
129:21
**analyze** 36:9,9
125:11
**and/or** 21:2
43:16 83:8
83:10,16
85:25 97:13
111:17 146:6
**Angelis** 2:12
4:3,5 5:9,16
6:15 13:8
17:24 28:3
35:11,20
38:19 43:3
46:14,18
50:10 55:13
56:9 59:25
64:8 65:17
65:23 68:6
71:9,24
72:14 73:6

76:12 77:9
78:3 79:1,22
80:5,8,25
81:5,9 82:3
82:21 85:24
86:9 91:9,12
93:5 95:6
96:17 98:14
101:9 103:18
103:22 109:6
110:25 113:6
113:21 121:2
133:8 135:3
135:8,15,18
137:24
138:10,18
139:25 140:6
142:14,20
143:4,8
144:12 145:8
145:17
**answer** 14:24
15:20 28:20
30:24 35:10
41:24 45:23
46:20 51:20
52:7 55:14
71:6 74:18
85:14 90:8
95:9 99:1
100:14,23
101:8 111:3
117:22
119:19 132:5
143:25
**answered**
45:24 60:13
85:13 120:24
**answering**
46:5
**answers** 55:18
72:5 87:6
94:19 119:17
120:22,23
126:19

anticipated
  31:1 50:10
Anybody
  55:19
anymore 34:1
Anyway 101:7
API 108:23
APIs 102:19
appear 77:3
  93:23 96:3
  96:10,14
appears 96:8
  115:11
  118:20
applicable
  97:16 107:4
application
  19:18 20:4
  31:13,14
  32:2,4,7,13
  32:18,20,22
  32:24 33:8
  34:9,19
  35:15 45:20
  46:19 49:22
  50:18 58:9
  89:24 102:19
  104:23 105:5
  106:4 112:2
applications
  24:24 29:3,8
  33:3 35:8
  53:10 63:4
applied 120:21
applies 68:25
  95:5
appreciate
  51:20 69:9
  72:5
appropriate
  27:17
architect
  128:23
area 18:8
  111:7

areas 50:22
  53:8 103:11
  111:5 145:6
Army 122:23
  122:25
art 7:7,10 12:2
  12:3,18
  36:20 37:11
  37:18,21,24
  38:9,16
  39:10 49:7
  51:15 52:20
  61:6 62:1,23
  63:8 66:14
  70:10 72:25
  74:12,23
  87:15 103:15
  107:16
  108:12 109:7
  109:14
  110:16
  111:13
  112:10,16,21
  113:16
  125:21,24
  126:8,14
  127:2,3,4,5,8
  127:14,14
  129:5,9,23
  129:24
  131:12,23
  132:3,17
  133:22
artist 89:1
aside 17:10
asked 67:9,24
  73:21 91:23
  94:4,9,10
  99:10 107:22
  108:5,6
  114:23 118:6
  119:6,7
  120:17 129:2
  139:15,22
  143:16,25

  144:13 145:4
asking 18:21
  30:1,18,22
  32:12 38:6
  51:13 93:5
  95:21 123:24
  137:21,25
  143:14
asks 46:12
assigned
  92:15
associated 8:9
  21:24 41:3
  42:4 44:11
  58:18,21
  59:2 74:25
  77:4 107:10
  110:2
Association
  4:13
Assume
  136:15
assumed 36:2
  88:24
attorney 4:2
  147:13,13
attributes
  22:18 51:1
audible 47:13
automation
  121:21
available
  17:20 29:15
Avenue 1:18
  2:14
AWT 15:9
  62:18 63:19
  108:20

_____
B
b 4:7 5:20,25
  32:1 33:21
B1 4:16,18,22
bachelor
  132:8,23

bachelor's
  125:25 128:3
  128:9,11
  130:4
bachelors
  132:7
back 11:16
  20:10 22:1
  23:21 26:7
  26:12 39:5
  42:20 54:5
  67:13 70:7
  70:13,21,21
  71:20 72:1
  76:18 84:19
  85:3,22
  88:10 89:18
  94:3 106:11
  119:25
  129:12 132:4
background
  19:3 57:11
  121:7 126:21
bad 52:13
bar 39:24
  40:10,13,14
  40:22 41:9
  41:18,20
  42:1,21
  48:22 90:24
  91:1 137:17
bars 19:20,20
  47:23
based 14:5
  20:19 37:17
  37:25 38:9
  60:18 131:23
  133:19
  142:17
basic 20:6,12
basically 8:2
  9:4 23:25
  25:7 45:4
  53:17 64:5
  82:8 109:8

131:25
basis 16:5
  114:23 134:1
began 94:5
beginning
  48:13 95:22
  104:16 139:7
begins 69:11
  72:18 85:6
behavior
  113:3
believe 27:3
  27:10 40:22
  41:19 45:24
  46:1 81:5
  104:12,13,16
  104:22,24
  105:24
  117:20,20
  125:2
believes 10:7
best 27:13,18
  32:5 71:22
  147:12
better 32:4
  73:7 80:12
  84:2
beyond 51:12
big 122:23
  123:5 124:10
Bill 130:16
BIOS 123:13
  124:16,21
  125:16
  135:22
  141:22
  142:22
BIOSes 124:22
bit 10:24 28:8
  50:12 57:24
  80:12
blanket 95:1
block 43:5,8
  77:14,22
  78:1 82:21

102:9 104:7
106:19
107:15,19
120:8
**Boeing** 122:18
122:19,21,21
123:6 124:10
124:11
**bold** 133:11
**boolean** 59:10
**boot** 142:6
**bootable**
24:22
**boots** 7:18
**bottom** 37:10
37:10 43:18
115:2,4
**Boulevard** 2:6
**box** 63:25 65:2
80:15 90:16
**boxes** 19:20
90:18
**break** 46:18
135:2,14
143:12,12
**Brenda** 1:25
146:25
147:22
**briefly** 26:8
31:9 115:21
**bring** 71:14
85:23 111:19
**brings** 70:7
**BS** 121:7
**buffer** 110:2
**building**
124:18
**built** 10:25
**burned** 8:6
**bus** 125:7
**buses** 125:8
**button** 15:14
19:20 47:23
89:22 113:7
137:17

**buttons** 110:5
**buying** 124:20

**———— C ————**

**c** 2:1 3:1 5:20
5:25 6:3
122:9,9
147:1,1
**cabinet** 18:2
21:21,22
22:9,14,18
37:22 39:24
39:25 40:1
41:3 42:7
43:22 44:2
47:22 48:8
49:20 50:2
60:17 61:7
61:13 62:25
63:9 78:8,12
79:8,23,24
90:16,18,25
91:16,17
92:3,25,25
94:7 95:12
95:13 97:20
106:21
137:16,17
**cabinets** 13:18
20:24 21:4,6
21:7,9,12,13
21:18 28:6
43:10,20
48:5 50:6
83:7
**call** 20:5 28:6
31:25 34:12
62:11 112:3
**called** 20:5
21:12,22
109:4
**calls** 108:22
109:3,5
**capable** 49:21
**capitalize**

126:23
**capture**
122:25
**card** 27:2
110:1,2
**career** 122:18
**carefully**
137:10
**carry** 45:16
**case** 1:10
11:25 16:4,4
28:1 31:11
44:4,9 53:5
94:6 116:12
116:16
124:25 125:5
125:15
130:24
**cases** 93:13
116:20 125:3
**catch** 33:7
**Cause** 146:24
**caution** 144:7
**CCR** 1:25
146:25
147:22
**CD-ROM** 29:23
**centers** 21:9
**certain** 33:9
98:2
**certainly** 47:16
50:23 67:18
78:24 86:3
107:6 134:12
134:21
**Certified** 147:7
**certify** 147:7
147:15
**cetera** 90:25
122:9
**chain** 141:9
**chance** 119:5
**change** 46:3
52:3,7 56:5
92:5 93:8

96:19 140:13
143:17 146:8
**changed**
144:19
**changes** 146:6
**changing**
17:19 26:4
44:12,13
49:11,12,12
78:18,20
**characteriza...**
19:5 36:11
138:16
**characterize**
8:18 25:19
38:12 39:19
45:8
**characterized**
81:4
**characterizing**
61:17
**chart** 101:6
**charts** 38:14
101:3,14,19
104:2,5
135:10
**check** 19:20
94:3
**checkbox**
59:10 65:1
**chip** 8:7,8
**choice** 27:13
63:15 109:23
**choices** 63:5
**choose** 123:14
141:24 142:1
142:3,5
**circle** 63:24
**circuits** 11:1,4
**CIVIL** 1:7
**claim** 13:12,13
13:23 15:2
15:25 26:8
27:23,25
36:22,25

37:2 40:15
53:23 54:4,9
56:16 65:24
65:24 66:1
67:2,14,16
67:17,25,25
68:1,2 69:19
69:21,22
70:19,25
71:7,11 72:4
72:9,12
73:25 74:15
77:18 81:9
81:14,23,24
82:6 85:10
85:17 87:17
91:14,15
92:10,15,19
93:6 94:5,10
95:11,20
96:18 97:1
97:19 98:19
98:23 99:14
99:18 102:1
102:12 103:8
103:25
105:11 106:9
106:25 114:6
114:14
116:23 117:5
117:13,16,16
117:18
118:14,20,21
118:22
119:10,17,18
120:1,21
133:10,19
134:7,11
135:21
136:10 138:1
138:5,8,20
138:23 139:8
139:9
**claimed** 20:20
23:9 60:17

62:24 70:22
**claims** 23:14
55:3 67:19
93:3
**clarification**
138:19
**clarify** 81:21
143:22
144:22
**clarity** 8:17
31:21 76:16
**class** 15:9
38:15 56:2
62:18 63:15
101:20
121:17,18
**classes**
121:19
**clause** 83:14
**clear** 18:22
26:9 34:2
35:22 45:9
46:2,6 57:6
82:16 141:18
144:17
**clearly** 137:16
**click** 14:13
19:19 41:1
41:15,16
42:10 48:8
48:21,22
55:12
**clicking** 42:7
46:24 48:14
48:16 55:11
55:11
**clicks** 14:13
15:15 41:1
**code** 14:3,6
16:9 17:18
30:8,19,21
30:22,25
31:7,17 36:1
44:3 71:18
85:4 87:18

88:1,5,7,13
88:14,17,18
88:22,24,25
89:6,19,21
90:2,6 99:19
99:25 100:1
100:3,8,13
100:15,18,21
100:25 101:1
101:16 102:1
102:7,11,17
102:22 103:6
103:15
106:15 107:1
108:13,17,18
109:15
110:17
111:14,21,23
112:3,11,14
112:25 113:3
113:5,16,25
114:7 116:2
116:7,13
117:1
**code'** 115:15
115:17
**cognitive**
127:24
**collection**
21:22
**college** 122:2
**column** 43:5
62:5,6,8,9
64:10 75:19
76:2,6,10,13
76:15,23,25
77:14 78:7
78:10,24
79:1,2,3,4
83:5 84:14
97:9 103:5
104:18,20
109:9 110:14
110:21,23
111:6,11

112:12 113:8
**combination**
14:16 133:4
**combine**
129:16
**come** 42:20,25
129:8,15,23
132:15
**comes** 37:13
56:3 88:19
88:20 109:20
**command**
18:13,14
**common**
42:11 44:16
**communicat...**
122:24 123:1
123:1 144:8
**company**
125:6
**comparing**
119:9
**compatible**
125:10
**competent**
131:9
**complete**
36:15 41:24
66:17 94:24
94:25 119:14
119:15
133:18
**completely**
75:14
**completeness**
10:19
**completion**
147:17
**components**
9:6 20:6
124:20
**comprises**
43:21
**computer** 4:11
6:18,20 7:1

9:22 10:2,4,9
10:13 11:18
12:4,12,14
13:16,19
14:2,5,11,19
14:24 15:2,3
16:2,3,8,9
18:6 20:21
21:10 22:4
26:10,14,15
26:20,23
28:4,9,10
29:14,19
30:8 39:6
44:1,21 45:2
45:15 47:25
53:5 57:14
60:7 66:5,7
69:23,25
70:2 71:16
83:6,15,20
88:23 107:21
109:20 110:7
110:9 112:21
121:12,16,17
122:14,15
124:16,17,18
124:23 126:1
126:1 127:16
127:17,24,25
128:10,10,12
128:12,16,18
130:9,13,18
130:19,22
131:4,7,18
132:9,9
133:13,15
136:11,13,16
136:18,21
137:7 138:4
138:20,25
139:2 140:22
140:24
142:10,12
**computers**

10:25 21:11
**computing**
135:20
**concept** 8:9
**concepts** 57:4
**conceptualize**
136:3
**concerned**
17:5 18:4,19
**concise** 46:7
**concludes**
20:13
**conclusion**
60:24 61:1
**configuration**
9:14,15 11:9
11:9 81:11
84:19 141:20
**configure**
17:13 55:19
74:23 75:6
75:10,23
76:4,22 77:5
80:15 82:12
85:2 86:1
92:5 93:8
96:19 124:23
**configured**
24:15 84:2,4
**configuring**
74:3,24 75:2
75:4,6,10,23
76:8,19,24
77:2,8,11,19
77:23 78:5
78:15,17,25
79:7,10,17
79:21,22,23
79:24 80:1
81:10,18,19
82:3 84:11
86:25 92:11
92:21 94:1,1
96:4 97:3
98:15,20

114:8 124:2
124:21
**configuring.'**
75:1
**confirm** 40:23
68:21 119:5
**confusing**
57:5,24
**connected**
19:2
**connection**
73:21 87:3
106:6 118:21
**connote**
115:16 117:1
**consider** 7:10
12:3,11
31:10 102:14
105:15,20,21
127:18
130:17
**considered**
7:22 12:9
47:17 65:2
89:17 95:18
**considering**
47:15,15
**consist** 103:14
**Consolidated**
1:9
**construction**
36:22 76:8
105:11
**construe**
94:12 97:24
**construing**
36:24
**contain** 22:18
53:9 58:8,14
58:15 59:17
59:20,24
102:9
**contained**
22:22 77:6
**container**

21:23 64:21
**containers**
64:20
**containing**
49:21 83:7
**contains** 20:12
58:17 59:4
**content** 77:6
**contents**
47:23,24
**context** 20:7
66:23
**continued** 3:2
123:4
**continues**
86:15
**contractor**
122:18,20
**control** 91:3,3
**controller** 44:6
71:19
**controllers**
85:5
**controls** 26:3
**convenient**
85:1
**conversation**
85:21
**copied** 29:20
29:24,24
30:2,4,14,15
100:4
**copies** 7:3
116:16
**copy** 18:2,7
30:19 93:17
106:20
128:13
**copying** 18:19
30:13 35:7
35:13,24
48:7 78:8,19
79:13,14
**correct** 8:15
13:13,14

14:4,6 15:22
16:10 20:22
22:7,14 25:3
25:24 35:17
38:5,10 40:2
40:3 42:18
43:6,11 49:5
49:17,18
50:15 51:24
54:3 60:5
65:22 66:16
67:6 68:11
68:20 73:1
75:10,11
77:20 79:14
80:25 83:22
84:21 85:8,9
92:13 93:15
93:16 94:14
97:4,7,8,14
97:22 100:5
100:6 105:8
106:23
116:21 117:8
117:12,17
118:18,19
120:4 121:10
121:11 126:6
130:7 131:13
133:24 136:2
139:5,12,23
139:24
142:18,25
144:12
145:15
147:12
**corrections**
129:18 146:7
**correctly**
81:14
**correctness**
116:24
**correspondi...**
69:19 91:23
94:20

**corresponds**
134:6,10,19
**counsel** 105:7
115:14,23
143:11
147:14
**COUNTY**
147:5
**couple** 110:19
**course** 46:16
68:20 102:3
121:12
**court** 1:1 9:3
60:6 129:22
141:14
144:24 147:7
**courts** 115:16
116:1 117:1
**cover** 129:9,17
129:19,25
131:12
**covered** 35:6
35:16 137:15
**covers** 95:9
131:17
**CPU** 10:1
11:10 26:22
27:2,9
**CR** 147:16
**Craig** 1:14 4:9
4:20 5:4
146:13 147:8
**create** 6:9 9:21
15:11 19:7
20:24 21:2,2
24:3,8,19
26:2,15
37:21,25
55:19 56:12
60:16 61:6
62:12,21,24
63:8 64:5
65:11 70:11
73:1 89:6
103:16

108:12,23,24
109:15 110:5
110:17
111:14
113:16
**created** 22:4
22:11
**creating** 21:4
21:5 25:23
34:17,20
38:17 45:21
61:8,13
65:19 102:22
108:13
109:16 110:5
111:15
112:25
113:17 125:6
125:8
**creation** 19:25
20:1 21:17
**currently**
133:14
136:12,17,22
140:23
142:11
**Curriculum**
4:19
**CV** 121:3,4
**cyber** 124:10

**D**

**D** 4:7
**D.C** 2:23
**data** 9:7 21:9
27:20 28:4
28:22 29:4,5
29:9,12,15
29:24 31:11
31:24,24
32:1 33:10
33:11,12,13
33:16,21,23
33:25 53:11
83:9 92:6

93:9 96:20 102:9 135:24
**databases** 49:22 58:10
**date** 147:19
**day** 12:11 132:22 146:10
**days** 147:17
**dealing** 107:8
**decide** 60:6
**decisions** 104:3
**declaration** 4:9 5:13,17 12:25 13:11 36:14,24 54:7 65:25 66:20,23 68:8 74:1,17 75:15 86:18 91:13 95:15 99:16 100:12 113:22 125:19 128:8 132:16 133:9 140:13
**declare** 146:3
**dedicated** 27:4 27:16
**deeper** 64:16
**Defendant** 1:10
**DEFENDANTS** 2:11,19 3:4
**define** 23:4,10
**defined** 38:25 96:19 101:5 123:2
**defining** 24:4 43:10 83:7
**definitely** 34:13 124:4
**definition** 6:8 6:11,12,22

7:1,7,24 10:10 11:17 11:23 47:9 92:9 129:8 129:24
**definitions** 5:20
**degree** 121:13 121:20 122:2 126:1 127:9 127:16 128:9 128:11 130:4 130:20,22 132:14
**degrees** 56:8 128:3 130:14 130:25 132:7 132:8,19 133:2
**delay** 137:9
**delete** 21:3 90:21
**deleted** 84:5
**deleting** 43:21 45:21 79:13 79:14,20
**Denotes** 3:18
**Department** 123:6
**depend** 116:24 117:3
**dependent** 83:14
**depending** 8:22 24:22
**depends** 38:22 40:12,18
**depicted** 48:1
**deposition** 1:12 62:17 63:22 70:4 73:10 84:8 95:22 145:24 146:5 147:8 147:12,16

**describe** 104:2 112:5
**described** 28:18 31:23 61:10
**describes** 78:4
**describing** 62:10 82:11
**DESCRIPTION** 4:8
**design** 73:12 109:9
**designing** 112:22,24 123:20,23 128:16,18 130:9 131:3 131:6,25
**Desktop** 4:12 6:21
**detail** 17:1
**details** 16:21
**developed** 26:18 27:18
**developer** 63:7 88:18 112:2 131:8 131:9
**developers** 63:4 64:2 90:23 109:19
**development** 124:11 126:4
**device** 13:19 23:5,10 24:16 25:14 25:16 43:15 43:25 45:1,5 48:8 49:21 51:23 53:1,6 53:20,21,25 54:2 56:17 56:24 57:18 58:4,8 59:6 59:14 65:20

66:7 69:23 70:2 74:5 87:18 88:1,6 88:8 90:9,13 92:23,23 93:1 99:21 100:2 106:15 111:24 113:13 114:2 114:9
**device's** 13:16 14:2 15:2 16:2 26:10 26:21 60:7 66:5 70:1 71:3
**devices** 23:6 23:15,19 24:4 25:17 47:24 82:13 93:2
**diagrams** 38:15 101:19 101:20 102:9 104:8
**dialogue** 41:16 42:6,25 80:15
**dialogues** 42:13
**dictionary** 6:18
**differ** 53:1
**different** 9:14 9:15,24,24 9:25 10:1 11:10,10,11 11:11 15:7 15:10 18:15 24:7,20,23 24:24 27:21 28:21 29:7,8 29:11 31:12 31:15,19 32:14 34:14

35:15 44:15 45:3 53:2 59:12,12 63:9,21 65:1 66:1 91:7 92:19 103:13 106:16 108:20 110:19 111:9 119:16 120:21 123:14 128:3 129:5,11,22 132:17 142:4 142:4
**differently** 138:6
**differing** 95:3
**digital** 123:1
**dipoles** 51:7
**direct** 62:16 91:13 142:21
**directed** 53:24 53:24 85:10 101:22 138:1
**direction** 147:9
**directly** 100:24
**DirectX** 15:8 62:19
**disclose** 49:16 62:8 80:21 81:3 102:7
**disclosed** 18:10 58:2 67:2 71:18 73:13 85:17 100:8 108:14 109:8,16 111:15,16 113:17 126:20 127:15 135:19
**discloses**

47:21 60:12 100:21 114:1 116:2
**disclosure** 14:12 16:18 38:13 41:6 42:14 45:4 48:15 80:5 96:24 100:18 100:22 102:16 107:4 109:11 110:21 111:12 112:13,14 113:7 114:4 135:6 137:21
**disclosures** 37:17 38:10 62:22 72:10 77:10 80:1 98:8 99:7,11 113:9
**discordant** 57:4
**discount** 36:3
**discreet** 40:1
**discuss** 91:21 143:19
**discussed** 17:21 34:25 37:7 63:10 65:12,24 95:14 98:5 99:3,15 102:12 106:7
**discusses** 91:14
**discussing** 50:3,9
**discussion** 23:21 44:12 71:13 78:7 78:11 106:14 118:21

145:13
**disk** 24:1,1,4,6 24:7,7,9,10 24:11,15 25:9,23 26:2 26:22 27:1,9 29:22,23 30:3 39:8 42:4,16 44:5 44:6 50:23 50:23 51:1 52:11 53:7 53:13,16 57:1,19 71:19 85:5 107:12 142:1
**disks** 51:7
**display** 60:17 61:7 62:25 104:4 107:13 110:1
**displayed** 17:14 58:8 101:3
**displaying** 18:5 23:15 37:24 47:22 47:23 48:3 48:23 54:11 54:15,20,22 61:9,14 99:20 102:17 102:18 103:8 107:2,8,18
**displays** 57:15
**disrespectful** 69:7
**distinction** 53:19
**DISTRICT** 1:1 1:2
**DIVISION** 1:3
**DML** 125:6
**document** 6:17 13:3

**documents** 133:17
**doing** 15:3 19:1 44:3 45:10 110:12
**domain** 56:3
**double** 41:15 42:6 48:14 48:22 55:11
**downs** 15:14 19:20
**downstream** 36:2 49:8,17 54:24 60:12 61:16 80:22
**Dr** 5:10 13:8 46:19 91:12 121:2 140:10 141:11 143:9
**draft** 36:22 75:12 145:16 145:21
**drafted** 66:4,4 75:17
**drag** 15:21 18:1,4,5 19:11,16,20 48:9,22 55:12
**dragging** 46:25
**drags** 14:14 15:15
**draw** 63:24,24 63:24 90:3 110:3
**drawing** 22:24 65:18 89:2
**drill** 50:11
**drive** 9:8
**driver** 88:20 111:24
**drives** 52:6
**drop** 15:21 18:1,5,5

19:11,16,19 19:21 41:2 83:13
**drop-down** 63:25 65:2
**dropping** 46:25 119:25
**duly** 5:5 147:11
**duplicate** 70:10

─────────
      **E**
**E** 2:1,1 3:1,1 4:1,7,7 5:8 140:8 143:7 146:1 147:1 147:1
**e.g** 56:17 57:8
**earlier** 12:1 23:22 26:13 33:19 48:20 49:10 50:9 52:3 53:7 55:5 62:17 70:18 71:1 76:13 80:8 87:2 93:25 94:4,16,21 113:1 115:22 119:9,10,13 131:10 140:16
**early** 19:13 36:21 43:8 63:22 125:8
**easier** 144:9
**easily** 129:8 129:23
**EASTERN** 1:2
**easy** 84:24 110:11
**edit** 75:15
**edited** 33:24
**editing** 45:21

**education** 37:14
**educational** 121:6 130:11 132:7
**Edulog** 125:5 125:6
**EEPROM** 8:6
**effective** 133:4
**effects** 45:11
**efficiencies** 8:8
**efficiency** 121:21
**efficient** 69:8 118:12
**efficiently** 119:2
**effort** 70:13
**eight** 76:3 104:20
**eighth** 121:24
**either** 33:22 101:6 127:22 132:20,20
**element** 13:12 17:1,2 27:23 28:1 45:19 56:16 67:25 68:2 69:20 69:21,23 70:20 71:7 71:11 72:4,9 72:12 73:24 74:15 77:18 81:24 82:6 87:17 91:15 95:11,20 97:19 98:19 99:18 102:12 103:9,24 106:9 107:1 114:7 117:13 117:16 119:17,18

133:11,20
134:7,11
136:10 138:5
138:20,23
**elements**
19:19 39:19
70:7 76:24
77:1,7,11
88:3 90:3,5
90:15 98:23
107:14 110:6
117:6 119:10
120:1
**eleven** 104:21
**Emanuel** 2:21
**embed** 11:3
**emphasize**
98:22
**employed**
147:14
**employee**
147:13
**emulating**
34:7
**emulation**
5:21 6:1
34:12,13
**enable** 23:9
**enabled** 39:1
**enables** 16:17
20:21
**enabling** 23:4
**encapsulate**
72:23
**encompasses**
81:24 138:24
**encryption**
44:11
**Encyclopedia**
4:12 6:21
**engaging**
55:24
**engineer**
128:23
**engineering**

121:8 126:1
127:17
128:10,12
132:9
**enhancement**
141:19,20
**enhanceme...**
141:12,15,17
141:23 142:8
142:18,23
145:2
**enhanceme...**
135:23
**entire** 24:17,18
84:8
**entirety** 17:11
102:14
**entry** 90:15,18
**environment**
8:15 18:13
29:7 32:3
51:18 55:20
**environments**
6:4 13:17
19:10,10
26:11 27:1
28:5 30:10
31:12,16
32:20 45:22
**EQUITY** 1:5
**equivalent**
127:19,21
128:11
131:16
**error** 128:13
128:14
**errors** 84:25
**especially**
126:4
**ESQ** 2:4,12,20
3:5
**essentially**
16:19 18:4
20:4 22:14
24:16 34:7,9

34:17 56:5
65:11 67:15
68:7 89:24
92:16 94:13
97:24,25
101:19
117:24 118:2
119:4,24
121:21
139:18
141:21
**established**
117:9
**et** 90:25 122:9
**event** 89:23,25
112:5
**events** 112:1,3
**evidence**
84:15
**EX** 4:8
**exact** 144:8
**exactly** 10:24
20:23 40:18
115:22 141:5
**examination**
1:12 147:8
147:10
**examine**
147:16
**examined** 5:6
**example** 6:5
9:7,8,17,18
10:12 12:8
15:19,21
17:25 18:1
24:11 25:11
26:13,23,25
27:19,19
31:24 41:4
42:2 44:1,22
46:24 52:5
55:22 56:25
57:8,25
58:22,25
59:8,12,18

60:1 78:6
79:2 80:10
80:19 89:11
90:19 93:19
93:23 94:16
96:2 98:4
99:3,25
100:3 104:8
107:11
112:14
113:10 114:2
122:8,9
123:11 125:5
127:9 135:10
137:12
138:22
**examples** 6:1
6:1 63:1
101:15
103:13 116:6
130:23
**exceptionally**
132:6,19
**excerpt** 75:22
79:12,16
106:18
**excerpts** 96:3
96:11
**Excuse** 69:4
115:4
**execute** 44:3
**executes**
44:21
**Exhibit** 4:9,11
4:15,15,17
4:17,19,19
4:21,21 5:14
6:13,16
10:11 11:18
12:24 13:6,9
40:21 41:10
103:20
120:25 121:7
133:6
**exhibits** 12:25

13:1,2
**exist** 8:24 9:6
29:21 132:14
**existed** 30:5
**existing** 20:3
**exists** 57:1
**expand** 85:20
91:4
**expanded**
41:20
**expect** 32:10
**Expedia** 1:9
146:24
**experience**
122:13
124:14,22
126:3,16
128:16,18
130:9 131:3
131:24,24
132:1,21
133:1 142:17
142:21
**experimenta...**
116:10
**expert** 130:17
**expires** 147:22
**explain** 7:14
136:20
**explained**
87:22
**explicit** 129:13
**express** 36:5
47:1 48:18
49:2,4,13
75:16 80:19
84:3
**expressed**
69:1 84:21
101:6
**extent** 50:11
59:5 70:9
85:15,20
113:25
**extraction**

88:10

**F**

**F** 91:2 112:6
147:1
**face** 106:1
133:11
**fact** 21:21 59:5
71:14,14
104:14 119:5
**factors** 18:16
112:21 126:2
127:9,18,23
131:17
132:10
**factory** 121:20
121:21
**fair** 10:10
11:23 14:21
16:23 18:18
20:8,19
22:25 26:6
28:11 36:11
37:4,15
44:25 47:9
52:2 58:1,24
65:8 66:21
72:14 76:6
76:19 86:23
95:4 98:25
113:18 138:8
138:11,16
**familiar** 7:12
90:14 124:20
**familiarize**
136:7
**far** 17:10 18:15
51:12 63:5
126:20
136:24
**FAT-16** 107:13
**feel** 47:10
70:12 136:6
**felt** 140:16
**field** 37:14

126:2 127:17
127:19
130:19 131:2
131:17
**fields** 90:22
132:24
**fifth** 96:21
**figure** 15:12
40:13,20
41:9,19 42:3
42:17 44:18
58:23 80:10
80:12,14
82:19 90:24
91:1 107:6,7
107:11
**figures** 41:19
41:22 50:7
61:11,12
69:12,16,18
72:18,19
73:10 80:9
86:10,11
87:22 98:3
102:5,6,8
104:1,9
107:5 108:2
108:3 135:9
**file** 27:20 28:5
28:22 29:5,9
29:12,15,18
29:21,24
30:2,9,14
31:11,24,24
32:1 33:10
33:12,13,16
33:21,23,25
53:9 90:25
**files** 29:4
30:20 33:11
35:7,13
100:4
**final** 72:17
73:15 75:15
145:22

**financially**
147:14
**find** 74:24
116:20
132:18,21
137:11,21
**finding** 36:25
37:2 64:9
**finds** 132:5
**fine** 13:5
**finish** 73:4
78:1 81:20
**finished** 55:13
143:13,13
**first** 5:5 6:25
7:1,18 11:16
16:14 30:3
30:11 31:3
37:3,20 48:3
56:15 61:20
61:23 68:17
69:1,15
74:21 75:18
95:7 96:5
99:18 102:5
106:13
114:19
115:10
117:18 136:7
147:11
**fits** 83:18
**five** 46:15
103:11
120:10 140:5
143:4
**flag** 135:23
**Flash** 31:4
62:19 63:18
**flipping** 41:18
41:22
**Floor** 2:22
**floppy** 29:23
**flow** 38:14
101:3,6,14
101:18 104:2

104:5 135:10
**flowcharts**
102:8
**flows** 89:23
**flyleaf** 146:8
**focus** 121:22
**focused** 45:17
127:25
**focusing** 70:5
**follow** 68:22
**follow-up** 31:1
51:19 52:15
140:11
**following**
48:13
**follows** 5:7
**footnote** 75:8
75:19 76:1
93:20 95:25
96:11 106:18
**foregoing**
147:7
**forget** 121:17
**forgive** 72:4
87:13 135:15
**forgot** 105:21
**form** 17:7
27:24 35:2
35:18 38:11
42:23 50:4
54:16 55:25
59:19 64:7
65:14,21
66:14,18
68:4 70:24
71:12 72:11
73:2 76:7,9
76:17,20
77:25 78:17
78:22 79:18
79:20 80:4,6
80:24 81:1,7
82:2,5 85:12
86:2 92:17
94:22 96:12

98:12 100:10
110:18
112:19
113:19
136:23 138:7
138:15
142:13,14,20
143:2
**format** 21:14
**formatted**
50:24 107:12
**formatting**
44:23
**forming** 91:22
**forms** 101:2
**formulated**
66:22
**formulating**
74:14 95:19
133:17
**forth** 116:6
134:7,11
**Fortran** 121:14
**found** 47:25
47:25 75:8,9
115:15 117:1
134:14,15
135:6
**Foundation**
15:9 62:18
63:15
**four** 39:19
92:4 126:3
128:15 130:9
131:6
**fourth** 1:18
2:14 96:20
**frame** 19:13
110:2 123:3
**framework**
62:15 108:22
109:2 110:9
**frameworks**
15:7,10
62:11 63:2

88:15 102:20
103:14
108:19,20
114:5
**free** 47:10
136:6
**Freedman**
4:11 6:20
**FRIDAY** 5:1
**friendly** 18:12
21:1 59:16
71:16
**front** 18:10
19:6 44:14
45:17 70:5
70:16 84:24
85:7,11
129:12
**fulfill** 70:22
**full** 64:11 83:2
100:21
147:12
**fully** 45:17
85:16 100:20
129:1
**function** 40:5
40:8,9,11,15
41:5 55:8
70:23 93:14
97:6 115:18
117:5 134:7
134:11,19
**functionality**
20:6 123:13
**functioning**
89:3
**functions** 37:1
41:2 64:1
97:7 109:5
112:4,4
141:12
**fungible**
132:18,25
**further** 43:13
69:11 72:18

83:3 84:14
85:7 86:10
102:5 108:2
114:20 115:1
115:8,14
139:8 147:15
**Fusion** 32:23
33:11 124:12

## G

**G** 146:1
**Gates** 2:13
130:16
**GEMSA**
146:24
**general** 6:10
28:15 45:2
48:23 95:3
114:25
128:21
143:22
**Generally**
94:23
**GERCHICK**
2:20 140:2
142:13,19
143:2 145:9
145:18
**getting** 15:17
35:12 42:25
65:9 89:4
**give** 9:17,17
38:15 41:24
70:19 87:6
95:1 104:8
119:20
129:10 143:4
**given** 32:2
147:16
**giving** 83:1
**GL** 15:8 63:16
**GLOBAL** 1:5
**go** 14:22 17:17
18:23 26:1
29:6 33:14

39:13 64:15
73:6 75:5
76:18 89:18
91:10 94:3
97:8 98:11
107:7 116:6
132:4
**goal** 45:12,13
45:16,25
47:8,17
48:19
**goes** 15:10
23:21 62:2
69:12 72:20
77:13
**going** 13:1
14:21 26:12
27:20,21
48:11,24
66:3 82:25
95:10 107:17
107:18 111:4
118:11 119:1
119:4,20
120:1 133:8
135:1,22
143:20,21
144:14
**good** 5:10,11
109:23
111:19
128:22,23
130:23 131:8
145:4
**Goodin's**
36:10,13
66:20,23
74:17
**grade** 121:24
**graduate**
132:23
**granted** 110:7
**graphic** 16:14
16:16 20:20
22:23 23:3,9

23:14 37:21
37:25 54:20
54:21,23
55:2,4 60:16
61:6,8,13
62:24 63:16
70:16 71:2,5
72:13 89:12
109:10
110:22
**graphical**
13:25 14:10
14:19 16:20
18:11 20:7
21:5,8,14,21
25:22 28:18
35:4 36:6
37:12 41:5
45:20 46:20
49:12 52:21
53:3,17,20
56:11,17
57:3,13,18
57:25 58:3
59:15 62:12
62:14,20,21
65:11,18
70:6 71:17
73:12 84:10
84:12 85:16
85:19 86:5,8
87:21 88:2
88:14 89:17
97:15 102:19
103:13 114:4
**graphically**
17:13 39:24
43:15 54:1
58:25 83:9
83:16,25
84:6 97:12
**graphics**
23:23 38:24
39:2,7 45:10
49:11,12

53:5 55:6,7,9
55:9 57:14
64:19 108:14
108:23
109:17,20,25
110:2,7,9
111:15,17
113:18
121:16,18
**great** 63:15
134:24
**greater** 8:8
**group** 127:21
**guess** 6:1 8:16
16:12 27:18
30:20 32:5
40:21 44:4
64:15 71:22
84:13 96:15
100:11,17
116:4 126:10
126:18
127:20,21
132:4 133:22
142:2 143:22
143:23
**guest** 7:11,12
7:20,20 12:6
12:15,19
24:8 27:3,10
27:15,15
29:1,11 30:3
30:5,6 31:25
32:1,12,21
33:20 34:21
49:9
**GUI** 19:2 44:14
45:12 53:17
58:8 60:17
61:7,9,14
62:11 64:5
73:1 80:19
81:17,24
82:10,13,17
82:19 84:21

84:23 87:21
88:13,15
89:5,9 90:2
90:10,15
91:6,8
107:13
108:19,24
**guide** 59:13,16
73:11
**GUIs** 15:11
48:21 102:22
103:17

_____

**H**

**H** 4:7
**hand** 13:1
102:2 147:19
**handle** 89:25
112:3
**handles** 84:23
**hands** 26:2
**happen** 14:17
28:14 31:18
31:22,23
46:3 47:2
48:19 112:7
144:15,16
**happens** 17:18
30:2 36:2,6
88:23 112:5
112:5
**happy** 134:21
**hard** 9:8 24:15
29:22 39:8
44:5 51:14
52:6,11
**hardware** 8:13
8:15,17,19
8:20,22,25
9:1,11,12,16
11:1 22:5
26:19 27:4
27:16 62:14
86:7 136:16
136:17,20

**head** 57:14
**heads** 26:4
**hear** 144:6
**help** 9:3 39:11
88:10 133:2
134:17
144:24
**helped** 52:16
**helpful** 16:23
17:24 23:24
34:3 71:22
72:5,15
124:1 128:20
129:21
130:25
**helps** 133:1
**Henderson**
145:16
**hereof** 146:8
**hereto** 147:14
**hereunto**
147:18
**hesitate** 95:1
**hierarchical**
64:5,18
**hierarchy**
64:23
**high** 6:10
28:15 143:21
143:22
**higher** 44:14
64:23
**highly** 84:24
126:2 127:17
127:19,20,20
131:16
**hits** 91:2
**hitting** 42:8
**Hold** 143:18
**home** 124:11
124:13
**Homeland**
123:6
**host** 7:2,12,16
7:17 8:4

11:19 12:5
12:14 34:21
**hot** 90:4
**hour** 135:1
**Houston** 2:7
**human** 15:6
18:16 112:21
126:2 127:9
127:18,23
131:17,19
132:9
**hurtful** 131:1
**hypervisor**
7:17,19,25
8:3,12 11:3,4
24:2 53:14
128:20,24
**hypervisors**
11:6 30:23
30:25 63:4
123:23

_____

**I**

**icon** 19:20
22:21 44:13
**idea** 84:18
**identical** 67:16
67:20 117:25
118:2
**identification**
5:15 6:14
13:7 103:21
121:1 133:7
**identified**
86:23,24
92:14 93:13
98:23 101:12
136:24
**identify** 74:8
134:10
**identifying**
97:5 134:6
**III** 2:4
**image** 22:13
22:16 54:1

59:4 60:8,10
**impact** 105:10
**implement**
85:21 88:13
88:13,15
90:2 128:19
128:24
132:12,20,24
**implemented**
8:3,5 88:12
**implementing**
89:2 112:22
112:24 131:6
**implications**
100:19
**including** 63:4
72:18 86:11
102:6
**incorporate**
103:16
110:11
**incorporated**
19:25 108:21
**independent**
23:16 25:5,6
25:10
**indicate** 81:17
82:17 96:18
137:22
**indicated**
71:15 146:7
147:17
**individual**
13:18 41:7
**Industrial**
121:8
**inferred** 88:25
107:9 116:4
**information**
37:6 38:16
39:9 54:15
56:25 60:9
104:4 131:20
131:21
**informed**

100:18 105:2
115:14
**inherent**
113:15
**inherently**
112:10
**initiate** 45:5
108:23
**input** 15:5 48:8
90:13
**inside** 64:20
64:22
**inspecting**
51:11
**install** 125:4,9
125:12,13
**installed** 88:21
**installing**
124:20,21
**instance** 12:6
12:9 15:25
26:16,17
34:8,8,18,18
115:10
**instances**
12:19 27:22
29:16 93:22
100:24
123:10,15
124:3 138:2
**instruct** 16:3
45:2 86:1
**instructed**
18:6 29:14
73:1
**instruction**
44:21
**instructions**
14:5 44:5
45:16
**instrumental**
70:1
**intend** 140:13
**intended**
143:16

intending 73:14
intent 40:6
intention
  28:13 36:5
  48:12,18
  49:2,4 55:7
  71:15 80:20
  84:3,20
  144:18,20
intentionality 46:24
inter 43:19
interact 14:18
  86:7 89:5,7,8
  90:18
interaction
  19:24 20:3
  91:6,8
  106:14 113:4
  113:5
interactive 90:5
interested
  5:19 147:14
interface 14:1
  14:10,11,19
  16:15,16,20
  17:12,13
  18:11,14,20
  19:7,8,23
  20:7,21 23:3
  23:9,14
  28:17,19
  33:1 35:5
  39:1 41:5
  45:18,20
  46:2,20
  53:18 54:18
  54:20,22,24
  55:2,4 56:11
  62:20 65:11
  65:12,18
  70:6,16 71:2
  71:5,17

72:13 73:12
84:10 85:16
85:19 86:5,8
87:21 88:2
89:12,17
97:16 100:1
103:14
109:10 110:1
111:25
141:20
interfaces
  41:14 42:12
  62:12,14,21
  84:12 102:19
  112:23,24
  126:4 127:8
  128:1 131:19
Internet 29:23
interpret 14:7
  14:20,25
  15:14
interpreted
  92:4 116:1
interpreting 15:5
interprets 89:19
intersection 127:23
intervening 83:14
intuitive 18:16
  21:1 85:1
invention
  14:18 16:13
  16:16,19
  17:4 18:9,18
  19:5,16
  21:19 38:18
  39:10 43:19
  44:17 55:1
  70:10 116:9
  116:10
  126:18
  132:20

inventive 45:18
inventor 44:16
  84:9 116:8
invoke 14:17
  28:13 84:25
involve 98:20
involved
  123:20,22
  124:2
involving
  124:25
  125:16 127:7
issue 11:14
  17:22 53:24
  67:15,25
  99:6 138:13
  138:13
issues 105:25
  125:18
italicized 140:18
item 41:9
items 41:8
  134:14

___ J ___
J 2:12
Java 15:9,9
  62:18,18
  63:18,19
  108:20 122:9
jeffgerchick...
  2:25
JEFFREY 2:20
job 131:5
  132:22
jumps 135:4

___ K ___
K&L 2:13
key 90:21,21
  91:3
keyboard
  43:16 83:9

83:16 85:25
86:3,6 87:18
88:1 89:5,8
90:9,10,12
90:13,17
91:6 97:13
103:12 111:8
111:18,20,23
112:6 113:11
114:2
keys 90:20
kind 22:18
  25:10 33:19
  38:25 55:22
  102:14 111:8
  121:12
  122:13
  126:21
kinds 34:25
  42:11 55:23
  55:24
KING 147:5
Klarquist 3:6
know 17:8
  24:7,21 35:8
  37:1 39:6,15
  41:23 50:16
  63:10 64:8
  69:21 76:20
  77:5 82:18
  85:1 90:3,4
  92:18 100:11
  101:7,21
  105:13,19
  107:16
  111:12 112:6
  112:10 116:7
  118:25
  130:24
  137:14 141:5
  144:13,19,21
knowing 122:2
  128:21
knowledge
  36:19 66:13

74:11 113:15
131:1 133:21
knowledgea...
  100:20
known 19:12
  56:4 64:5

___ L ___
label 59:23
language
  15:25 26:9
  47:4,20 54:4
  63:16 67:14
  67:16 81:9
  86:10 101:3
  101:11 108:1
  141:4
languages
  15:8 122:5,5
  122:10
largely 109:18
  128:25
launch 33:2
law 116:13,17
laws 146:4
lawyer 100:22
layout 64:18
layperson's
  24:13 136:4
Lead 1:10
leave 17:10
led 105:9
  134:15
legal 100:19
  116:14
lesser 56:8
let's 7:16 8:6
  12:23 13:22
  18:13 26:13
  26:15 27:19
  31:9 32:9,17
  35:20 39:13
  40:9 43:3
  47:4,22
  49:19 56:14

60:15 62:5
64:21 65:23
66:25 67:12
73:24 76:25
85:4 90:15
91:9 95:8,11
99:14 111:6
114:6 115:13
118:10
122:19 133:5
**letters** 91:2
**level** 6:10 14:3
16:9 17:18
28:15 29:13
30:19 34:24
35:7,13,25
44:2,14
45:15 51:5,8
51:11 64:16
64:23 88:10
110:3 125:20
129:4 143:22
143:22
**libraries** 64:1
109:21
110:11
**library** 109:25
**License**
147:22
**lie** 22:20
**likewise** 68:25
97:19
**limitation**
85:10,18
102:1 115:18
**limited** 72:19
86:11 102:6
129:2
**limiting** 139:1
**limits** 28:1,1
**line** 18:14
50:22 63:25
64:10 75:24
76:10 77:4
79:2,4 96:21

96:21 104:19
104:20
110:24
**lines** 62:6
68:17 69:1
75:20 76:2,7
77:14 78:7
78:10 83:5
92:4 97:9
103:5 110:4
**Linux** 25:1,11
32:9 122:25
123:8
**list** 36:16 65:2
66:17 87:25
88:3 122:9
133:18
**listed** 96:16
100:13,16,25
**listing** 39:18
**literally** 66:4
**little** 8:16 28:8
43:13 50:12
57:24 58:20
80:12 82:23
83:17 99:24
110:25
**LLP** 2:5,21 3:6
**load** 29:2,3,4
29:18 32:8
32:18,19
33:20,21
**loaded** 8:7
24:23 31:25
32:1,16
**loading** 35:8
57:21
**location** 100:4
**long** 32:2,5,16
32:19 43:4
122:1 131:15
**longer** 87:11
**look** 13:10
17:17 21:21
38:25 41:11

50:24 51:6
54:6 62:5
66:25 67:12
67:19 74:23
75:6 76:25
96:4,7
105:25
116:20
130:16
134:17 137:3
137:10,20
**looked** 36:8
96:5
**looking** 40:20
41:23 44:18
54:4 58:23
76:13 77:4
87:12 90:24
93:25 138:11
**looks** 33:1
65:12 73:12
78:21
**lot** 55:16 122:5
129:25
130:12
**lots** 63:21
90:22 109:21
**low** 30:18 35:7
35:13,25
44:2 84:25
110:3
**lower** 45:15

---

**M**

**M** 3:5 4:1 5:8
140:8 143:7
**Mac** 25:12
32:25 33:14
124:13
**machine** 6:23
7:8,11,22,24
8:14,22 9:5,9
9:13,21,23
10:3,6,11
11:1,8,17

12:4,6,10
50:2,6,13
**machines**
12:16 50:8
**macOS** 25:2
34:16
**magnetic** 51:6
**magnetically**
9:8
**main** 40:10,13
40:14,21
41:8,9 77:1
**majority** 17:11
**making** 11:5
19:2 53:19
55:23
**manage** 43:9
**management**
1:5 4:13
16:15 43:14
124:15
125:16,17
**managing**
20:8
**manipulate**
36:5 60:9
96:2
**manipulated**
84:6
**manipulates**
90:11
**manipulating**
39:7 43:20
45:21 55:6,6
55:8 91:16
92:3,24
93:23 94:2,3
96:2 97:2,3
108:14
109:16
111:15,16
113:17
**manipulation**
18:12 43:21
53:25

**manner** 21:2
**mapped** 40:12
**maps** 87:10
**mark** 13:2
103:18
**marked** 5:14
6:13,16 13:6
103:20
120:25 133:6
**MARSHALL**
1:3
**mask** 144:11
**master** 142:6
**materials**
95:18
**mean** 6:4,8 8:1
10:25 12:10
14:14 15:6,9
16:13 17:10
19:22 23:22
26:1,10
30:19 33:23
35:23 37:19
44:15 46:3
50:17,20
52:2,7 57:13
57:24 58:21
62:19 64:4
64:13,24,25
66:19 74:25
78:5,23
89:13 92:19
94:23 100:12
103:10 107:6
109:13
110:19 124:5
130:16
132:15
137:14
138:13
141:16
**meaning** 27:14
34:14 92:15
94:13 97:24
116:14

means 8:3
13:15 14:1,4
16:1 26:20
40:16 43:20
54:9,10,13
54:14,14,22
60:7 64:17
66:5 69:25
74:3 75:2,3
76:8,18
77:19,23
81:10,18
86:23,24
91:16 92:3
92:10,20,24
93:7 94:1,1
95:12 97:1,2
97:2,3
115:17 117:5
133:12
136:10 138:3
138:14
140:21 141:4
142:9
meant 23:12
57:9 66:3
81:6 109:18
118:22 128:6
mechanism
30:16 135:19
136:25 137:7
138:2
media 29:20
medium 29:25
29:25
megabytes
59:1 107:12
memory 9:24
11:11 17:20
26:22 27:2
49:23 52:5
58:10 83:21
85:5 92:5
93:8 96:19
134:23

mention 38:2
43:1
mentioned
7:25 46:19
62:16 65:16
99:25 109:22
142:24
menu 40:10,13
40:14,19,22
40:25 41:8,9
41:17,20
42:1,8,21
48:22 77:1
90:24 91:1
menus 19:19
methods
15:14 48:16
63:23 109:4
MFC 63:14
102:21
mice 14:13
microscope
50:25
microscopic
51:5,11
Microsoft 9:20
15:8 33:1
50:18 62:17
63:14
mid 125:9
mind 32:14
45:25 46:11
46:14 55:23
61:4 106:12
133:3 139:3
144:10
minute 20:12
20:16 23:1
68:20 91:10
115:13
minutes 46:15
140:5 143:4
missing
112:16
misspoke 69:4

mistake 96:14
misundersto...
51:22
Mode 10:12
modern 12:11
26:14,22
125:13
modification
19:25 20:1
modified
33:24 37:15
75:16 84:5
modifies 49:8
modify 21:3
28:7 47:10
55:20 56:6
56:12 96:7,8
96:10
modifying
19:9 35:25
49:14 81:25
95:12 96:7,8
96:10,14
Montrose 2:6
morning 5:10
5:11 52:4
mounted
57:14
mouse 48:14
83:10,16
85:25 86:3,6
87:18 88:1
88:17,19,20
89:5,8,11,13
89:15,20,22
91:5,8 97:13
103:12
106:20 111:8
111:17,20,22
113:11 114:1
move 60:15
64:21 65:23
73:24 90:21
95:11 99:14
114:6 118:10

movement
89:19,20
moves 64:22
moving 45:10
78:19
MSC 108:20
multiple 6:4
7:3 12:16,19
13:17 25:9
25:17 26:11
26:23 27:7
28:5 30:10
41:12,15
42:5 48:21
54:25 57:20
57:20 63:3
65:15 120:8
123:10

## N

N 2:1 3:1 4:1,1
4:7 5:8,8
140:8,8
143:7,7
146:1
name 22:21
44:12 46:3
90:17
naming 43:22
narrow 30:23
narrowly
38:24
native 141:18
natural 47:4
47:20 101:3
101:11
113:23,24
nature 142:2
navigate 13:4
necessarily
36:23 42:21
42:24 56:6
107:17
128:17
necessary

28:19 84:22
108:13
109:15
110:17
111:14
113:16
129:14
necessity
110:8
need 17:17
28:4,9 40:23
47:13 70:20
71:8,18 85:4
88:15,17
113:6 116:6
126:21
128:18
137:10,20
145:20
needed 28:21
85:21 88:4
125:9 128:22
128:24
needs 9:11
32:7 33:8
104:3 111:24
112:2
neither 147:12
network 9:25
11:10 27:2
44:11
new 34:17
65:23 69:15
90:17
newer 120:22
nine 5:17
nod 11:5,14
129:10
non-native
34:10
noon 91:9,11
Northwest
2:22
note 39:23
notion 77:7

novel 17:13
number 6:3
    40:13 44:18
    59:1 104:19
    104:22,23
    105:5 106:4
    121:17 139:5
numbers
    75:25 76:10
    77:4 120:10

**O**

O 4:1 5:8 140:8
    143:7
oath 5:5
Object 142:14
    142:20
object-orien...
    122:4
objection 17:7
    27:24 35:2
    35:18 38:11
    42:23 50:4
    54:16 55:25
    59:19 64:7
    65:14,21
    68:4 70:24
    71:12 72:11
    73:2 76:9,16
    77:25 78:22
    79:18 80:4,6
    80:24 81:1,7
    82:2,5 85:12
    86:2 92:17
    94:22 96:12
    98:10,12
    100:10
    110:18
    112:19
    113:19
    136:23 138:7
    138:15
    142:13,19
    143:2
observations

50:25
obviously 35:5
    54:5 98:19
    130:3 137:15
occur 18:21
    22:3 34:24
    80:22 100:2
occurs 18:19
    18:20,23
    81:11,19
October
    147:19
offer 64:16
oftentimes
    24:19 48:20
    57:10 141:17
oh 38:4 120:2
    120:13 124:4
    128:7 135:15
okay 5:18 6:19
    6:24 10:19
    12:22 20:18
    23:21 26:12
    28:7 31:19
    47:6 52:17
    54:8 62:7
    70:3 71:15
    73:8 76:3
    79:6 80:13
    82:24 86:19
    93:10 104:25
    119:22
    120:13 121:5
    127:1 136:8
older 26:17,17
    26:19,24,24
    26:25 125:4
omits 12:25
once 33:23
    42:8 51:10
    67:1 95:17
    96:18 118:11
ones 51:8
oo-OO-oo 5:3
open 41:16

63:17 110:11
    141:21
open-ended
    29:17
OpenGL 15:8
    63:17
operable
    124:24
    133:13
    136:12,21,22
    137:1 138:4
    138:14
    140:22
    142:10
operate 33:13
    33:16 48:11
    48:24
operates 14:3
operating 7:2
    7:2,18,20,21
    8:4 10:5,5
    11:19,19
    12:4,5,7,15
    12:19 13:17
    20:2,25
    22:19 23:16
    24:23 25:4,6
    25:10 26:11
    26:16,18
    27:21 28:5
    28:22 29:1,2
    29:7 30:10
    31:15 32:3,8
    33:2 34:8,10
    34:15 40:2
    49:15,22
    51:17 53:10
    54:25 56:13
    57:22 58:9
    59:18,20,24
    66:6 70:1
    88:20 89:23
    111:25 112:1
    122:25 125:4
    128:19

130:10 131:4
    131:7,25
    136:15,25
    137:1,8
    138:20
    141:24 142:3
operation
    15:21 18:1
    44:3 45:6,7
    47:2 55:10
operational
    133:14
    136:13,18
    140:23
    142:11
operations
    35:24 39:1
    55:24 60:12
    80:22
opine 60:16
    65:5 92:2
    125:20 129:1
opining 40:4
    77:22 78:4
opinion 16:25
    18:3 20:13
    20:20 23:8
    23:13 38:23
    44:25 53:23
    54:12 55:18
    58:1,2 64:16
    69:18 70:5
    71:9 72:3,8
    74:22 75:16
    76:7,21
    85:11,24
    86:22 95:4
    99:1 103:24
    108:7 109:6
    116:23 117:4
    125:23 133:3
    133:18 134:2
    142:7,16
    143:23
    144:24

opinions
    14:22 36:10
    36:23 37:4,6
    38:8,20 65:9
    66:15,18,22
    68:19 69:1
    72:24 74:14
    75:14 91:22
    91:24 95:19
    97:17 114:23
    133:19
opportunity
    131:1 147:16
opposed 18:6
    18:13 54:14
optimal 124:24
option 42:9,9
    91:4
options 18:15
    40:19,25
    41:17 42:4
    44:16 48:25
    49:2 63:3,9
    63:12,21
    64:2 90:22
Oracle 124:9,9
oral 1:12
    144:19 147:8
order 104:4
    125:3,11
    126:17
    128:19
    145:15,16
ordinary 7:6
    36:19 37:10
    37:21 52:20
    61:5 62:23
    63:8 66:13
    72:25 74:12
    74:22 87:15
    108:11 109:7
    109:14
    110:16
    111:13 112:9
    112:15,20

113:15
125:20,24
127:8 129:5
131:23 132:2
133:22
**Oregon** 3:8
**originally** 30:5
**OS** 6:4 7:11,12
   7:13,16,17
   24:8 27:15
   27:15,17
   30:3,7,16
   31:25 32:1
   32:16,21
   33:9,20
   34:21,21,22
   49:9 59:23
   141:10,10
   142:4
**OSes** 27:3,7,9
   27:10 29:11
   32:12
**outcome**
   147:14
**outline** 87:13
**overlap** 129:25
**overly** 129:20
**oversimplify**
   24:14
**overview**
   20:12

———————
**P**
**P** 2:1,1,4 3:1,1
**p.m** 91:11
   135:17,17
   140:7,7
   143:6,6
   145:24
**page** 4:2,8
   6:17 16:25
   48:13 102:5
   108:11 115:2
   134:22 146:8
**pages** 4:13

**pairing** 120:6
   120:9
**pairwise** 120:2
**paragraph**
   5:17 13:10
   20:10,11,16
   20:19 23:2
   26:7 35:21
   36:7,12,15
   39:12,13,14
   39:14,18
   43:4,4 45:4
   47:5,20
   49:19,20
   52:18 54:7
   56:14 58:7
   60:15 65:9
   65:25 66:10
   66:11,25
   67:6,9,12,13
   68:6,7,9,14
   68:14,17,19
   68:25 69:2,4
   69:10 72:17
   73:15,17,18
   73:22,25
   74:8,21
   75:13,13
   77:13 82:22
   86:9,16,18
   87:3,6,8,8,11
   87:14,23
   91:13,21,23
   92:2 93:9,11
   94:15 95:6
   95:14,17,22
   96:17,21
   98:4,14 99:2
   99:4,4,15
   101:12
   102:12 103:4
   106:11,19
   108:10
   113:22 114:6
   114:13,19,21

115:3,4
117:20
118:10,13,25
119:8,15,16
120:7,19,20
125:23 126:9
126:13,14,25
127:10,13
128:2,4,5
129:16,19
130:3 131:12
131:13,22
133:9,12,16
133:23 134:1
135:12,18
136:6 138:12
138:18 139:7
139:11,12,15
139:18,19,22
140:19
**paragraphs**
   37:5,19 38:8
   38:21 87:9
   94:17,17,21
   95:10 98:5
   99:3 117:24
   117:25 118:3
   118:7 119:3
   119:10,21
   120:15,19,23
   125:19
**Parallels**
   124:12
**parameters**
   107:10
**parcel** 112:23
**parent** 132:21
**parentheses**
   5:25
**part** 6:25 9:9
   10:23 14:23
   16:13 21:20
   22:15,15
   25:17,18
   35:5 61:20

61:22,22
62:9 63:6
75:12 76:7
76:21 81:23
87:13 89:11
89:14,17
90:10 102:13
103:10 108:7
112:23 114:3
114:4,19
121:13,18
123:19,25
124:15
135:21
**particular**
   13:12,15
   18:2,7 36:8
   44:20 45:6
   54:15 59:1,7
   91:15 109:10
   112:13
   124:16
   133:11
**parties** 147:13
   147:14
**partition** 18:2
   18:7 25:12
   40:25 42:2,8
   48:2 57:1
   58:24 74:4
   77:19,24
   78:5,8,11,15
   78:18,20,25
   79:17,23
   80:1,16,21
   80:23 81:11
   82:1,4,9,14
   82:18 86:1
   90:25 91:17
   92:11,21
   93:1 94:7
   95:13 97:21
   98:16,20
   99:20 114:8
**partitioned**

13:18 25:9
50:24 53:8
57:20 59:6
**partitioning**
   39:8 41:3
   44:5 53:13
   53:14 94:11
   97:1
**partitions**
   22:20 24:5
   25:23 26:3,5
   33:17 42:4
   43:21,22
   49:23 53:9
   57:21 58:10
   71:19 74:6
   79:7,19
   81:13 83:8
   92:5 93:8
   96:20 104:5
   106:20
   114:10 142:2
   142:4
**parts** 14:22
   84:23 103:23
   129:11
**party** 116:9
**pass** 112:1
   143:3
**passage**
   111:18
**passages** 77:7
**password**
   22:19 56:2,5
   59:9,11
**passwords**
   44:10
**paste** 93:18
   128:13
**patent** 4:15,17
   4:21 13:9,13
   14:12 15:12
   16:12,18
   17:11,21
   18:3,4,25

20:13 21:19
23:14 28:18
31:5 35:1,6
35:17 36:17
36:17,18
37:3,8,18,23
38:5,5,10,14
38:20 39:3
39:16 40:6
41:7 43:6
45:14,17,19
49:16 50:7
54:6,17 55:2
55:21 58:23
60:18,21,21
60:24,25,25
61:10,15,18
61:19 62:1,6
63:10 64:14
64:15 65:4
65:13,24
66:12,12,12
69:16 70:5,7
70:12,17
71:8,10,21
72:10,19
73:11,13,25
74:9,10,10
74:24 75:20
77:15 80:9
80:21 82:19
83:4 85:17
85:18,23,23
86:12 87:4,4
87:22 91:14
96:9,15 98:3
98:3 99:8,8,9
99:15 100:9
100:13,25
101:17,18,20
101:22,25
102:2,7,24
103:1,2,19
103:23,25
104:10,14,15

104:22 105:3
105:14,14,15
105:17,22,23
105:25 106:2
106:3,8
107:5,8
109:9,23
110:14 116:7
117:7,10,14
117:15
126:18,21
127:6,7,14
127:15 129:6
129:6,17
131:13 132:3
132:13,13
133:5,10
134:2,5,9,12
134:14,18
135:10
137:15,19,21
139:8 141:4
142:24
**patentee** 18:24
62:10 65:6
100:20 116:1
**patents** 17:23
105:24 108:3
129:10
**PC** 9:20 10:13
**PCAT** 124:19
**pedestrian**
15:19
**penalty** 146:3
**pending** 46:5
135:2
**people** 51:15
56:10 130:14
132:11,14,18
132:21
**percent** 17:9
57:13
**percent/10**
17:9
**perform** 28:4,9

28:10 40:5,9
40:15 44:22
46:12 80:23
93:14
**performed**
43:15 83:9
83:15,24
84:1,19
97:12
**performing**
40:11 41:5
97:6
**performs**
15:21 18:1
**period** 9:1
**peripheral**
100:2
**perjury** 146:3
**permissions**
56:5,8
**person** 62:23
63:7 112:15
125:24 127:8
131:23 132:2
**personally**
30:8
**persons** 12:2
12:17
**perspective**
18:17
**pervasive**
88:22
**Ph.D** 4:10,20
57:12
**Phonetic** 3:18
**phrase** 115:17
**phrases**
115:15
**physical** 9:6,6
22:2,7,10
23:5,5,10,25
24:1,4,10
25:21 27:8,9
42:15 50:13
50:14,19,21

50:23 51:1,4
51:9,10,16
52:11 53:7
53:13 57:19
89:13 90:9
**physically**
25:23 30:1
**picture** 51:24
58:14 59:17
59:22
**pictures** 50:6
59:20,24
89:2 113:2,2
**piece** 70:14,16
70:21,22
71:20,21
72:1 102:17
**pieces** 25:9
57:20
**pixel** 110:4
**place** 30:15,20
111:11 137:2
137:19,23
**places** 75:9
95:5 107:5
110:20 120:8
**Plaintiff** 1:7
2:3
**platform**
135:21
136:16,17,20
**please** 5:16
6:22 13:10
20:17 47:19
73:8 76:11
81:20 101:7
105:20
141:14
**plenty** 130:23
**plural** 139:2
**plus** 115:17
117:5
**point** 14:13
101:24 103:4
107:6 112:18

**pointed** 24:22
93:17
**pointer** 89:16
89:21 90:11
97:16 106:15
**pointing** 43:15
43:25 45:1,5
84:14 87:17
87:25 88:5,8
89:15 100:2
113:13 114:2
137:13
**portion** 24:9
24:14,18,25
25:1,2 94:5
103:8 140:18
**portions** 24:20
60:25 83:1
95:2 101:24
**Portland** 3:8
**position** 137:1
**positioned**
105:21
**possession**
116:8
**possible** 15:24
43:1
**Possibly** 40:18
**potentially**
27:2 28:17
29:9 101:1
**power** 83:21
124:15
125:16
141:20
**practice** 37:13
39:10 126:17
**preceding**
49:24 58:11
**precise** 51:21
111:1
**predisposed**
57:17
**presented**
57:14

Rosenberg, Craig                                      September 30, 2016

18

| | | | | |
|---|---|---|---|---|
| pressed 51:14 | 71:18 85:4 | 103:16 | purpose 45:2 | 145:2,4 |
| 89:22 112:6 | 87:18 88:1,5 | 122:16,17,21 | 49:3,14 | questions |
| presumably | 88:7,16,22 | 122:22 123:9 | 54:23,24 | 31:2 50:11 |
| 29:4 | 88:24,25 | 123:17 | 71:2 | 51:19 52:15 |
| pretty 18:22 | 89:6,19,21 | 124:12 | purposes 65:8 | 55:17 67:9 |
| 19:12 29:17 | 90:2,6 99:19 | propagate | 72:3,8 86:22 | 67:24 68:1 |
| previous | 99:24 100:1 | 64:24 | 90:7 105:11 | 68:13,15 |
| 119:15,18 | 100:3,8,18 | proper 125:12 | pursuant | 73:21 87:2,5 |
| 120:1,20 | 100:21 101:1 | properly 24:15 | 147:11 | 91:25 94:9 |
| 132:4 141:2 | 101:16 102:1 | properties | put 7:23 17:9 | 94:18 95:21 |
| previously | 102:7,11,17 | 21:24 22:17 | 27:18 63:25 | 98:6 99:10 |
| 50:3 56:23 | 102:19,22 | 22:22 44:11 | 71:23 105:18 | 107:22 108:6 |
| 91:22 119:7 | 103:6,14 | 49:14 50:15 | 116:6 118:22 | 114:22 118:6 |
| 120:16,24 | 106:15 107:1 | 50:19,21 | | 119:6,17 |
| 140:12 | 108:13,17,18 | 51:3,4 58:18 | ——————— | 120:15,16 |
| prior 37:24 | 109:15,25 | 58:21 59:2 | **Q** | 121:3 139:15 |
| 62:1 92:10 | 110:17 | property 59:10 | qualifications | 139:22 140:1 |
| 94:10 97:1,7 | 111:14,21,23 | 59:12 64:22 | 122:8 126:15 | 140:3,4,11 |
| 97:15 98:5 | 112:3,7,11 | proposed | question | 143:13,14,15 |
| 99:3 117:16 | 112:25 113:5 | 144:23 | 21:15,16 | 143:25 |
| privy 116:15 | 113:16,25 | prose 101:4,6 | 28:8,20,23 | quick 137:4 |
| probably 17:9 | 114:7 115:15 | protected | 28:24 29:17 | quickly 37:9 |
| 27:12 40:22 | 115:17 116:2 | 22:19 59:9 | 30:13,24 | Quinn 2:21 |
| 40:24 41:12 | 116:13,25 | 59:11 | 33:5,6 35:9 | quite 38:13 |
| 75:3 80:12 | 122:3,10 | provide 69:19 | 37:16 41:20 | 45:8 |
| 111:17 | 128:22 | 73:11 99:11 | 41:21 45:23 | quotation 43:5 |
| 121:14,15 | 130:15 | 106:8 107:23 | 46:5,6 51:12 | 43:8,19 |
| 123:2 | 132:12 | 110:15 | 51:22 52:1 | 77:14,23 |
| problem 131:5 | programmed | 114:24 | 52:10,13 | 78:2 82:22 |
| process 10:21 | 27:12 | provided | 57:23 59:22 | 106:19 |
| 17:20 49:8 | programmer | 68:19 84:10 | 60:14 69:22 | 107:19 |
| 131:20 | 121:24 | 116:16 | 71:6,13 73:5 | quote 107:15 |
| processes | 130:18,23 | provides | 73:7,8 75:18 | 135:22 |
| 49:17 61:16 | 133:4 | 43:19 83:4 | 81:4,20 | quoting 81:12 |
| processing | programmers | 139:8 | 89:18 100:14 | ——————— |
| 83:21 131:20 | 130:13 132:6 | providing | 100:23 101:8 | **R** |
| produce 6:9 | programming | 48:25 84:24 | 108:25 | R 2:1 3:1 146:1 |
| product 9:20 | 121:19,25 | 117:4 | 111:10 | 147:1 |
| 31:4,7 | 122:1 | proxy 131:7 | 117:22 | rack-mounted |
| products | programs 62:2 | psychology | 119:20 | 21:11 |
| 112:13,15 | 65:10 109:8 | 127:24 | 120:14,22 | racks 21:9,12 |
| proficient | project 108:21 | PTY 1:6 | 123:25 | 22:2,3 |
| 131:5 | 122:23 123:5 | Pull 76:25 | 126:19,24 | radial 65:2 |
| program 32:9 | 124:10,10 | pulling 38:7 | 135:2 136:14 | radios 123:2 |
| 62:21 63:3 | projects | purely 39:2 | 140:25 141:1 | Ramey 2:4,5 |
| | | | 144:22,23 | |

| | | | | |
|---|---|---|---|---|
| 4:4 17:7 | 137:4 138:1 | 147:17 | **reformat** 44:7 | 101:15,25 |
| 27:24 35:2 | 138:5,8 | **rectangle** | 71:19 | 102:10 103:7 |
| 35:18 38:11 | 146:5 147:16 | 22:24 63:24 | **refreshes** | 103:7,23 |
| 42:23 46:16 | **read/write** | **redirect** 143:5 | 134:22 | 113:14,24 |
| 50:4 54:16 | 26:4 | **refer** 54:5 | **regard** 69:22 | 117:10,14 |
| 55:25 59:19 | **reader** 84:3 | 69:15 98:15 | **regarding** | **remember** |
| 64:7 65:14 | **reading** 18:25 | 113:22 | 38:14 68:25 | 33:20 103:3 |
| 65:21 68:4 | 51:25 73:4 | 114:13 128:2 | 72:4,25 87:2 | 103:3 140:20 |
| 70:24 71:12 | 78:1 82:15 | 133:16 | 94:11 107:22 | **remind** 136:9 |
| 72:11 73:2 | 101:21 | 135:12,19 | 108:7 116:23 | **remote** 22:20 |
| 76:9,16 | **reads** 99:19 | 138:21 | 119:7 120:15 | 44:10 |
| 77:25 78:22 | **real** 27:8 137:4 | **reference** | 133:19 | **removing** |
| 79:18 80:4,6 | **reality** 57:11 | 10:12 64:3 | **relate** 106:25 | 78:11,16,23 |
| 80:24 81:1,7 | **realized** 44:16 | 64:14 87:14 | 126:10 | **rename** 90:16 |
| 82:2,5 85:12 | **really** 27:8 | 98:2 101:23 | **related** 20:7 | **repartition** |
| 86:2 92:17 | 33:5 34:7 | 104:22 | 68:13 87:3 | 44:6 |
| 94:22 96:12 | 40:18 50:22 | 105:10 106:2 | 104:4 126:2 | **repartitioning** |
| 98:10,12 | 51:3,5 57:8 | 111:11 | 127:5,13,17 | 17:19 44:22 |
| 100:10 | 72:23 79:25 | 118:13 | 127:19,20,20 | **repeat** 95:4 |
| 110:18 111:2 | 84:7 115:25 | 137:11 | 131:17 | **repeated** |
| 112:19 | 116:11,14 | **referenced** | **relation** 15:1 | 120:8 128:13 |
| 113:19 | 126:22 | 106:18 | **relative** 147:13 | **REPORTED** |
| 134:25 | 127:25 | **references** | **relatively** | 1:25 |
| 135:13 | **reason** 137:25 | 37:24 62:1 | 110:10 | **Reporter** |
| 136:23 138:7 | **reasonable** | 101:17 | **relay** 77:7 | 108:25 |
| 138:15 140:5 | 7:7,9 140:17 | 104:14 105:3 | **relayed** 143:24 | 145:14,20 |
| 140:9 142:16 | 140:17 | 105:14,23 | **reliance** 87:4 | 147:7 |
| 142:23 143:3 | **recall** 75:17 | 107:4 | **relied** 36:16,16 | **represent** |
| 143:14,16 | 94:4 104:17 | **referred** 31:5 | 66:11,18 | 21:10 22:17 |
| 144:7 145:1 | 105:19 | 102:11 | 74:9,13 | 24:6,10,20 |
| 145:11,20,22 | 110:22 | 111:19 | 91:22 104:14 | 75:14 96:1 |
| **RCW** 147:11 | 116:12 | **referring** 15:1 | 106:7 133:17 | 102:22 |
| **re-create** | 123:16 | 15:16 36:7 | 134:18 135:9 | **representati...** |
| 109:19,24 | 134:13 137:3 | 39:12 41:8 | **rely** 36:23 | 21:5,8 22:23 |
| 116:9 | 141:2 144:2 | 42:17 65:7 | 38:20 105:16 | 25:22 37:12 |
| **read** 6:25 | **received** 14:6 | 93:19 102:24 | 112:16 134:5 | 37:12,22,25 |
| 10:18 11:13 | **Recess** 46:17 | 104:18,24 | 134:9 | 48:4 49:13 |
| 20:16 54:19 | 91:11 135:17 | 108:17 | **relying** 38:19 | 52:21,22,25 |
| 56:20 64:11 | 140:7 143:6 | 119:16 122:7 | 39:15 40:14 | 53:3,4,4,17 |
| 64:13,14 | **record** 7:15 | 126:8,12 | 60:23 61:1 | 53:21 56:18 |
| 66:3 70:25 | 12:24 91:10 | **refers** 59:5 | 61:18,21 | 57:3,25 58:3 |
| 81:14 82:6,7 | 91:17 92:3 | 67:13 75:19 | 70:21 71:10 | 58:4 60:16 |
| 82:15,25 | 92:25,25 | 76:1 79:12 | 72:9 77:9 | 61:6,9,13 |
| 83:2,14 | 95:13 142:6 | 95:7 108:2 | 79:25 80:3 | 62:24 89:15 |
| 120:18 136:6 | 144:1 145:13 | 113:10 134:2 | 96:15 99:7 | **representati...** |

50:8 58:15 58:17
**represented** 48:5 58:25
**representing** 9:14 51:7
**represents** 11:8 21:13 39:24 40:1 50:5 54:2 90:6
**reproduce** 87:17
**require** 90:15 111:17
**required** 8:21 129:14
**requirement** 130:11,22 133:2
**requires** 60:8 81:25
**requiring** 54:13
**research** 116:19
**reserve** 145:11
**reserved** 145:23
**resolve** 119:19
**resource** 43:14 44:2
**resources** 9:24,25,25 10:1,2 11:10 13:16 14:2 15:3 16:2,7 16:10,15 17:5 19:9,9 20:25 24:21 26:10,21 30:3,6 43:9 48:4 54:25 55:8 59:14 60:8,10 66:6

70:1 71:3,25 83:6,15,20 83:24 84:1,4 84:11 107:21
**respect** 10:22 67:9,17 68:2 74:14 87:5 94:10 95:19 95:25 96:25 98:7 99:10 103:24 139:15,22
**respond** 36:8 36:9
**response** 47:16 68:13 74:16 95:23
**responses** 108:8
**responsibilit...** 124:5
**responsibility** 124:5
**responsive** 21:15 33:6 66:20
**rest** 145:11
**restate** 46:6
**review** 37:9 40:23 41:24 64:13 65:4 105:3
**reviewed** 36:13 40:23 134:12
**revised** 131:11 131:15
**right** 14:13 15:14 19:19 23:6 35:1 36:16 39:23 41:16 42:10 48:16 55:11 57:5 59:2 67:20 68:8

73:18 79:2 79:10 81:13 86:20 87:9 92:12 96:6 97:21 100:11 103:5 104:15 105:1 115:9 117:11,23 118:1,22,23 119:11 120:7 120:13 121:9 123:3 126:13 127:11 130:17 133:23 134:3 135:5 136:1 137:13 138:22
**robotics** 121:22
**robots** 121:19
**role** 5:24
**root** 56:2,4
**Rosenberg** 1:14 4:10,20 5:4,10 13:8 46:19 91:12 121:2 140:10 141:11 143:9 146:13 147:8
**rough** 145:16 145:21
**route** 125:7
**routinely** 122:10
**routing** 125:7
**run** 7:19,21 8:23,25 9:11 9:12 26:18 27:6 32:7,10 32:20 33:9 34:9,19 125:13 144:10
**running** 8:14

9:22 10:4,7,8 33:15 34:21 122:24 123:7 123:10 124:12
**runs** 7:1 8:4,13 8:17,19,20 9:1 11:18 12:4 32:25 34:15

_____

**S**

**S** 2:1 3:1 4:20 146:1
**SA** 1:5
**sake** 49:11 55:6
**Salmon** 3:7
**satisfy** 71:7,11
**save** 146:6
**saw** 41:19
**saying** 6:6 11:7 12:13 20:15 42:22 49:20 50:17 51:9 84:13 88:7 93:4 102:23 106:3 120:2 129:4 130:3
**says** 7:1 11:18 37:20 43:13 43:19 45:6 52:19 54:9 58:7 59:23 61:5,25 74:3 74:22 79:7 81:10,11 82:25 83:3 96:6,7 101:4 108:11 114:7 115:14 139:7
**school** 125:6,7
**Schwaller** 2:5
**science**

112:21
121:12 126:1 127:16,24,25 128:10,12 130:14,20,22 131:18 132:8 132:9,23
**sciences** 132:8
**scope** 27:23 129:2
**screen** 39:7 45:11 53:5 89:16,20,21 90:3,5,11
**Seattle** 1:19 2:15 5:1
**second** 6:17 13:23 23:2 29:6,7 30:5,6 32:23 48:6 61:25 71:20 93:1 120:6 137:4
**secondary** 23:4,5,10 47:24 48:1,7 74:5,5 81:12 82:9,12,13 82:18 92:22 92:23 93:1 99:21 114:9 114:10
**section** 100:12 111:9
**sections** 96:16
**sectors** 26:4 42:15,15
**security** 123:6 124:10
**see** 5:22,23 6:12,24 7:4 10:19 11:21 11:22 13:20 13:23 16:12

17:21,22
23:7 27:25
39:21,22
40:3 41:17
41:23,23,25
43:12,17,23
44:18 47:22
49:25 52:23
56:19 57:23
58:12 60:19
60:22 62:3
66:8 67:3
69:13 72:21
77:16 78:6
81:6 83:11
86:13 90:25
91:1,19 92:7
96:22 98:17
99:22 100:13
100:24
107:11
108:15 111:6
114:11,15,25
115:19,20
118:15
122:19
128:14
134:18,22
135:5 139:1
143:5
**seeing** 104:17
112:14 115:7
135:4
**seen** 30:8,18
30:21,22,24
31:2,7,17
**select** 137:16
**selected** 41:3
**selecting** 42:7
133:12
136:11 138:3
138:14
140:21 142:9
**selection**
39:24 47:23

137:11,18,23
**selects** 136:20
**send** 71:18
**sense** 31:22
36:6
**sentence**
11:17 20:14
23:2 37:20
38:7 52:19
56:15,15,20
58:6 61:20
61:22,23,25
64:12 69:11
72:17 73:15
74:21 82:22
83:2,18 85:6
95:4,7 97:9
106:13
107:20,23
108:10 115:8
115:11
119:14
**sentences**
94:24 95:1,2
97:10 119:7
**separate** 8:24
33:20
**separately**
13:2
**September**
1:17 5:1
66:14 125:25
126:11
146:14 147:9
**series** 47:8
119:20
**server** 6:5
123:10
**servers** 123:14
**set** 10:6 12:16
13:22 29:1,6
29:8 42:14
47:16 53:10
53:10 63:23
64:22 79:19

94:9 97:17
101:18
124:23 134:7
134:11
147:18
**sets** 90:1
129:22
132:17
**setting** 12:18
44:10,17
124:17
**seven** 68:17
69:1
**share** 33:17
**shared** 32:13
33:23 36:21
**sharing** 27:8
35:15
**SHEET** 146:8
**short** 135:2,13
**shorter** 94:25
**show** 6:11
48:10 80:10
103:22
107:16 116:7
**showing** 107:9
**shown** 15:11
**shows** 80:14
**shrink** 80:20
**shrinking**
80:23
**side** 33:14,14
33:15,15,15
**SIEGEL** 3:5
140:4 145:10
145:19
**sign** 147:16
**signature**
145:23
147:17
**Signed** 146:9
**silicon** 8:6
51:6
**similar** 10:23
66:1,10 67:5

67:15,18,21
68:18,23
82:19 91:7
99:2 106:13
119:17
120:21
**simple** 31:10
**simulation**
5:21 6:2
**simultaneou...**
27:6
**single** 33:12
123:10
133:11
**situation**
32:11 60:4
**size** 42:15
**skill** 7:6,10
12:2,3,18
36:19 37:11
37:17,21
38:9,16 39:9
49:7 51:15
52:20 61:5
62:23 63:8
66:13 70:9
72:25 74:12
74:22 87:15
103:15
107:16
108:12 109:7
109:14
110:16
111:13
112:10,16,20
113:15
125:20,21,24
127:3,8
129:5,8,22
129:24
131:11,23
132:3,17
133:22
**slick** 28:17
33:17

**slightly** 106:16
129:7
**software** 7:19
8:4,7,13,14
8:23,24,25
9:1,11,11,22
10:7 11:4
19:1 22:6
24:2,2,3 26:1
26:3 28:12
28:16 29:1
49:22 50:18
50:20 51:2,3
51:14,16,18
53:12,14
58:10 62:15
63:5,11 83:8
88:16 89:3
104:3 112:13
121:23 123:1
124:21 125:7
125:10,13
126:4 128:22
128:23 131:8
131:9
**solution** 34:4
63:6
**solutions**
35:15 141:23
142:8,18,24
**sorry** 47:13
73:3 79:4
87:12 98:11
99:4 102:23
104:20 115:2
128:7 135:15
143:2
**sort** 54:20 56:3
60:3 88:10
112:10
**sorts** 52:6
83:22
**sounds** 144:5
**source** 30:22
30:25 63:17

Rosenberg, Craig

September 30, 2016

22

100:13,15,24
110:11 116:7
**Southwest** 3:7
**space** 9:6
**Sparkman** 3:6
**speak** 46:4
**speaking** 11:2
11:3 49:10
**specific** 38:22
116:25
134:14
**specifically**
17:17 83:4
**specification**
36:17,18,18
37:4,7 41:25
44:19 55:3
60:11 61:11
74:9,10,11
74:24 75:5
83:4 96:9
113:10 117:7
117:10,14,15
135:7 136:19
142:25
**specify** 20:24
**speeds** 8:9
**Spelling** 3:18
**spoke** 33:19
53:7 88:14
129:18
**spoken** 36:3
**spots** 90:4
**square** 54:12
**ss** 147:4
**stand** 70:17
**standard**
19:18,22
141:21
**standardized**
20:5
**standing**
145:16
**stands** 63:16
**start** 39:18

40:9 83:6
95:8 110:4
122:20
**started** 122:20
143:14
**starting** 10:13
37:3 110:24
121:6 122:17
122:17 123:2
**starts** 33:24
**state** 12:24
146:4 147:3
**statement**
23:13 98:25
109:14
111:13
131:11
**statements**
67:13 98:4
99:6
**STATES** 1:1
**static** 113:2
**Steinman** 1:25
146:25
147:22
**stenographi...**
147:8
**step** 48:6
**steps** 28:3,8
28:21 47:8
47:16,19
48:3,23
104:3
**stereoscopic**
57:13
**stick** 29:22
**stop** 22:24
**storage** 9:25
11:11 18:8
23:4,5,10,15
23:16,19
24:3,6,12,16
25:5,8,14,15
25:16,17,18
29:20,25,25

30:6 47:24
48:1,7 49:21
51:23 53:1,6
53:20,21,25
54:2 56:17
56:24 57:18
58:4,7 59:6
59:14 65:19
74:5,6 81:13
82:9,12,13
82:18 92:22
92:23 93:1,2
99:21 114:9
114:10
**stored** 9:8
21:24
**stores** 56:25
**straddles**
50:22
**street** 2:22 3:7
121:9
**stretch** 50:20
**strictly** 28:20
36:25
**strike** 60:13
73:6 87:13
95:8
**strong** 57:11
121:22
**structure** 37:1
37:2 39:20
55:9 56:16
58:3 62:8
67:1 69:19
70:19,22
71:4,11
74:25 87:16
93:14 96:25
97:6 98:22
101:4,19,25
102:11 103:7
104:8 106:8
115:16 117:2
117:6 134:6
134:10,13,19

135:24
140:18 141:3
141:6 142:9
**structure(s)**
102:9
**structures**
40:4,9
**studied** 57:12
**subentities**
64:3,9,17
65:1,3
**subject** 21:18
**submission**
147:17
**subset** 62:13
**substance**
38:2,7
143:10,11,19
**substantial**
39:19
**substantive**
37:6,16
**substitute**
54:21 82:7
130:10
**substrate** 51:6
**succinctly**
100:15,23
**sufficient**
115:16,24
116:3 117:2
117:6 132:2
**Suite** 1:18 2:6
2:14 3:7
**Sullivan** 2:21
**sum** 74:13
**summary**
122:8
**summer**
132:22
**superuser**
56:1,1
**superusers**
55:22 56:4,7
**support** 11:1

32:3,4 89:7
134:15
140:18 141:4
**supports** 32:8
32:17
**sure** 7:16
10:24 11:5
16:25 17:3
20:14 28:23
29:14 35:11
35:22 46:8
46:21 56:21
60:3 72:6
73:9 78:3
83:3 112:8
130:2,25
134:21 140:6
141:16
**surprise** 96:9
**suspend**
136:17,25
142:5
**suspending**
133:14
136:12
140:23
142:11
**suspends**
136:22
**SVPA** 110:23
**Swing** 15:9
62:18
**switch** 135:23
137:8
**switching**
135:19 138:2
141:9
**sworn** 5:5
147:11
**synched** 33:25
**system** 7:2,18
7:20,21 8:5
9:15 10:5,5
11:8,19 12:5
12:7 13:17

20:8,22
21:25 22:10
22:19 23:16
23:17 25:4,5
25:6,8,10,15
25:18 26:11
26:16 27:21
28:5 29:1,2,8
29:13 30:10
30:19 31:15
32:8 33:2
34:8,10,15
34:24 39:6
40:2 44:1
46:10,12
47:1 48:4,19
49:2,5,13,15
53:9,10
56:24 59:18
59:24 66:6
70:2,11
80:20 83:6
83:15,20
84:23,25
85:2 86:1
88:20 89:23
107:21
111:25 112:1
124:16,17
129:11
133:15
135:20
136:13,18,21
137:1,2,7,8
137:23
138:14
140:24
141:25 142:3
142:12
**systems** 7:3
11:20 12:5
12:15,20
20:2 21:1,10
22:4,5,7
24:24 26:18

28:22 32:3
37:24 48:1
49:22 51:17
52:5 55:1
56:13 57:22
58:9 59:21
62:2 84:11
110:22
122:14,15,25
123:7,20
124:18,23
125:4 128:19
130:10 131:4
131:7,25
133:13
136:11,16
138:4,20,21
138:22,24,25
139:2 140:22
142:10

———————
**T**
**T** 4:1,7 5:8
140:8 143:7
146:1 147:1
147:1
**tab** 90:21
**table** 13:22
**take** 6:16 9:19
11:16 13:10
15:19 16:9
17:25 20:16
22:1 27:19
46:14 68:20
101:1 110:6
121:13 135:2
135:13 137:2
137:19 140:5
**taken** 146:14
147:8
**takes** 137:23
**talented** 132:6
132:19
**talk** 14:23 16:4
17:1 20:11

22:25 23:3
31:9 33:10
35:25 41:25
44:20 45:15
47:4 53:15
61:12,15
101:2 103:12
107:15
115:13
143:10
**talked** 26:8
31:9,14 35:4
35:12 44:23
70:3 80:8,11
96:25 99:24
102:18
106:22
107:20
110:15
112:12 113:8
113:9 115:21
117:21 118:1
135:9
**talking** 8:12
9:4 10:16,21
11:24 13:12
13:24,25
14:1 15:4
16:1 19:15
22:6,9,13
23:20 25:7
25:20,22
26:13 29:5
29:10 31:20
32:11 34:5
34:23 35:4
35:14 38:23
38:24 40:16
46:22,23
52:4 53:15
54:19 55:4
55:16 66:2
67:1,16
69:24,25
70:15,20

71:20 72:13
72:24 73:9
76:23 77:18
78:24 82:16
84:8,17,18
85:4,5,7,15
85:18 89:1,2
92:20 97:11
99:18 103:11
110:20 111:5
111:6 114:21
127:2,4
133:10
134:20 136:9
137:6 141:8
**talks** 18:3
48:14 55:21
61:12 77:23
106:19 111:7
111:20
**tall** 21:13
**tangible** 50:14
50:19,21
51:4
**task** 30:9
45:25 46:11
**taught** 121:25
122:4 130:14
132:11,13
**teaching**
129:10
**teachings**
37:22 60:18
**technical**
16:21
**technically**
10:3 30:21
**techniques**
19:24 20:3
62:15
**technologic...**
31:10
**technology**
19:16
**tell** 7:6 44:1

47:19 58:20
62:22 130:1
141:14
143:18 144:5
145:1
**telling** 105:4
143:9
**term** 8:1 13:24
15:2 21:9
92:10 93:3
94:5,10
96:18 116:13
138:21
**terminology**
137:17
**terms** 5:21
7:13 24:13
36:4,25 37:2
92:16,19
93:6 97:1
101:5 136:4
**testified** 5:6
22:2 56:23
71:1 80:18
96:1 104:13
119:13 124:6
124:25
125:15
140:16
**testify** 147:11
**testifying**
140:14
**testimony**
12:21 52:3,8
67:10 68:3
68:12,24
73:22 90:12
91:25 95:23
97:15,23
98:7 99:12
107:24 112:9
114:24 118:8
119:8 120:17
139:16,23
140:12,20

141:2 143:12
143:17
144:18
**Texas** 1:2 2:7
**text** 5:24 63:25
86:17 90:15
90:18 94:15
94:16,18,19
94:20,25
106:12 115:7
**textual** 59:15
**Thank** 64:11
72:15 74:19
113:21 124:1
**themself** 55:3
**theo.angelis...**
2:17
**THEODORE**
2:12
**thin** 29:21
**thing** 10:15
24:17,18
25:16 48:21
50:14,19,21
51:4,9,10,16
52:12 78:14
79:2 86:25
**things** 9:4
11:12 14:17
28:10 31:13
31:20 34:23
34:25 35:3
35:12,16
36:8 52:6
58:14,16,18
58:19,21
59:4 83:21
83:22 97:12
**think** 7:9,9 9:1
9:23 10:23
12:2,17 14:7
15:15 17:8
18:22 19:17
20:23 21:20
23:23 25:25

27:13 31:13
33:4,7 36:21
38:15 39:8
40:6 41:12
42:2,25
44:12 45:9
45:23 47:16
49:6 50:20
51:8,12,15
51:20,21
52:9,15
57:10,16
58:22 60:5
60:13 61:8
62:16 63:14
66:3 70:17
71:6 74:17
77:6 78:16
79:20 80:11
84:7,16
85:13,16
90:14 93:25
95:9 98:25
101:4 102:13
105:18,23
107:3,14
109:11,18
110:20 111:5
111:10,11,18
112:20
120:10
121:15,25
125:2 128:17
129:7,16,17
129:23
130:12,16,25
131:3,10
132:5,18
135:5 137:17
138:8,16
141:8 144:23
**thinking** 32:24
57:17 129:21
**third** 25:13
65:6 116:9

**third-party**
63:5 110:9
**thought**
131:11
139:10 145:3
**three** 43:1
120:7 136:15
137:12
138:22
145:15
**throwing**
10:24
**tie** 39:4
**tied** 105:5,6
**ties** 106:5
**time** 19:12,13
27:17 44:17
64:6 69:8
120:18 123:3
143:20
**title** 6:20 16:14
**today** 14:22
**TODD** 3:5
**todd.siegel...**
3:10
**told** 105:7,12
105:13,16
115:22 116:5
116:11,25
144:4,14
**toolbar** 77:1
**Toolkit** 63:20
**toolkits** 62:20
**tools** 63:11
65:16,16
77:7,10
124:15
**top** 7:21 8:4
9:1 102:4
104:21
108:11 123:8
141:21
**total** 74:13
120:10
**trace** 105:24

**traditional**
19:23
**transcribed**
147:9
**transcript**
147:11,12
**trapped** 89:24
**tremendous**
130:18
**trial** 145:12
**trick** 67:23
**trivial** 131:4
**trouble** 64:9
82:23 83:1
83:17
**true** 9:10 76:21
146:5 147:12
**truthfully**
147:11
**try** 35:9 46:6
109:19 119:1
136:3
**trying** 13:3
26:15 33:8
39:4 51:21
69:6,7 84:3
88:9,11
121:15 128:5
129:9,12
**turn** 5:16 6:22
12:23 35:20
43:3 49:19
56:14 133:5
133:8
**turning** 26:7
**two** 11:12
27:21 28:21
29:11 31:12
31:15,19
32:12,14
34:9 51:19
57:4 65:5
92:19 93:3
97:10 128:2
129:16,22

130:6 132:16
138:21,24
139:3,5
**tying** 42:21
**type** 7:17,25
8:5,9,11,11
11:2,6,14
22:5 50:3
90:17
**typical** 27:17
**typically** 29:18
33:7 56:2
88:19 91:4
**typo** 75:24
77:3 96:13
104:23 105:6
106:4 114:17
114:18
118:17 130:6
**typos** 93:16
128:7 129:18

——— **U** ———

**U** 146:1
**U.S** 4:15,17,21
**UI** 19:18,18,19
20:3,6 89:14
**ultimately**
51:10 54:24
**Um-hum** 10:14
16:6 22:8
39:17 47:12
57:2 62:4
69:17 72:16
74:2,7,20
75:21 79:11
81:22 83:19
94:8 99:17
101:10,13
115:12 126:5
135:25
**UML** 122:9
**underlined**
91:2
**underlying**

22:16 36:1
60:10
**underneath**
41:7
**undersigned**
147:7
**understand**
9:3 12:21
16:24 20:15
27:12,14,14
28:23 33:5
37:11 39:11
46:21 52:20
72:6 87:16
88:11 105:9
112:8 126:17
126:22 128:5
130:2 131:14
144:24
**understandi...**
18:24 82:23
83:18 100:17
145:14
**understood**
9:2 12:17
49:6 60:3,5
131:15
**undue** 116:10
137:9
**unique** 15:14
**UNITED** 1:1
**University**
121:8
**UNIX** 56:3
**upper** 64:23
**Urquhart** 2:21
**usable** 18:16
19:8 84:24
**USB** 29:22
**use** 9:19 10:8
15:11 24:9
26:13 27:11
28:1,16,25
41:17 45:5
52:5,6 56:11

63:13,16,18
63:19,23
81:16 82:8
84:24 89:8
90:20,21
109:8 114:1
123:13
125:11 137:7
**user** 13:25
14:9,10,11
14:14,18,19
14:20,25
15:20 16:14
16:16,17,20
17:12,13,14
17:15,25
18:11,12
19:7,8,23
20:7,20,21
21:1 23:3,4,9
23:9,14 28:8
28:12,13,16
28:17,19
29:6 35:5
36:4 39:1
41:1,5,14
42:12,14
43:25 45:9
45:11,18,20
45:24,25
46:2,11,12
46:20 47:1
48:10,12,18
48:24,25
49:1,4 53:18
54:18,20,21
54:23 55:2,4
55:7,16,18
56:11 59:13
59:15 60:9
62:12,14,20
62:21 65:10
65:11,18
70:6,16 71:2
71:5,16,17

72:13 73:12
80:15,19
82:11,17
84:10,12
85:16,19
86:5,8 87:21
88:2 89:7,12
89:17 91:2
97:16 103:13
109:10
112:22 126:4
127:7 131:19
137:14,22
141:18
**user's** 46:24
71:15 84:20
**users** 27:7
43:9 56:2,7
56:10
**uses** 43:25
82:17 97:19
**USPTO** 101:4
**usually** 8:5
12:10 21:11
88:18 115:8
**utilize** 28:12
32:21,21
45:12 63:6
64:2 88:17
90:17 103:15
110:8
**utilized** 24:8
102:20
**utilizing** 20:2
49:1 109:22

––––––––––––
**V**
––––––––––––
**v** 146:24
**vacuum** 8:25
**validity** 105:25
**valuable** 38:16
39:9
**value** 106:1
**variant** 65:6
**various** 15:6

19:18 21:23
22:17,22
24:5 38:14
41:2,17 42:4
42:14 48:17
48:25 51:1
57:21 62:11
62:20 63:2
69:11 72:18
76:23 86:10
90:1,4,7
102:5,18
104:2,2
108:2,3,19
110:6,21
112:4 114:4
116:6 122:24
124:22 142:1
**vast** 17:10
**vehicle** 81:19
**verifying**
104:11
**versed** 112:22
**version** 44:17
59:23 63:17
125:9,12
**versions** 65:5
125:4,14
**versus** 92:24
92:25 93:21
94:1 120:10
125:5 129:12
144:19
**VGA** 103:3
**View** 90:25
**virtual** 6:23 7:8
7:10,22,24
8:13,21 9:4,5
9:9,13,19,21
9:23 10:3,6
10:11,12
11:1,8,17
12:3,6,10,16
13:18 18:8
19:9 20:24

20:25 24:3
31:12 37:11
39:25 40:1
48:5 49:9,15
49:20 50:2,5
50:8,13
51:23 52:21
52:25 53:1,3
53:12,16,20
53:21,25
56:17,24
57:10,11,16
57:18 58:4,7
59:6,14
65:19 123:20
124:3 133:13
133:14
135:20
136:11,13,15
136:18,21
137:16 138:3
138:19,24
139:2 140:21
140:23
142:10,11
**VirtualBox**
124:9,9,13
125:11
**virtualization**
5:21 6:2,3,5
6:9 9:20
11:24 16:21
18:12 23:17
23:22 24:2
25:5,15,18
28:16,25
34:13,14
35:14 51:2
123:18 125:1
125:3
**virtualize**
20:21
**virtualized**
19:10 20:1,2
20:8,25

23:15,19
24:6,12,16
25:14,16,17
27:10 29:19
30:3,6,12,16
33:12 34:15
34:18 45:22
49:21 51:17
51:17 52:4
52:11 53:6
53:16 55:20
56:13,24
57:21 58:9
84:11 122:14
122:15 123:7
141:10,10
**virtually** 48:6
**visible** 91:17
94:7 95:13
97:20
**visual** 59:13
59:16
**visually** 18:5
**Vitae** 4:19
**VMware** 32:23
32:24 34:4
122:24 123:8
124:6,8
**volume** 59:9
**VOS** 31:4
**VPA** 110:23
**vs** 1:8
**VTOC** 135:23

**W**
**Wait** 81:20
**waiver** 147:17
**want** 8:16
14:23 17:8
20:14 21:14
24:19 28:23
31:20 33:5,6
35:22 36:3
41:24 46:1,4
46:21 48:19

54:5 56:10
63:8 64:15
65:4 67:19
67:23 72:6
82:17 85:22
90:16 105:14
105:20 112:8
126:16
130:21 136:3
143:5,5
144:6,11
**wanted** 29:3,4
70:10 142:5
142:6
**wants** 28:14
55:19 73:11
85:20
**Washington**
1:19 2:15,23
5:1 121:9
146:4,9
147:3,7
**wasn't** 19:1,2
19:12 25:21
57:6 105:12
105:13 116:5
116:5,18
129:13
144:18,20
**way** 8:18 14:7
21:17 25:19
26:21 27:18
30:4 32:2,4,6
32:13,23
33:17 36:6
38:13 39:13
42:12 45:3,9
46:10 49:9
59:7 67:22
71:16,22
78:20 82:11
82:15 84:2
85:2,14
88:24 91:7
95:8 102:8

106:17
117:15
126:23
132:16,18
137:25
140:13
**ways** 15:6
32:15 41:12
41:15 42:6
43:1 46:9
48:17,21
91:5
**we'll** 16:4 17:1
20:5 22:25
42:20 145:11
**we're** 11:24
13:3,25 14:1
14:21 16:1
16:25 19:15
25:7,22
26:15 27:20
27:20 29:5
32:11 35:4
38:23,23
40:16 53:15
66:2 70:15
70:20 77:18
89:1,2 90:14
99:18 133:8
133:9 136:9
**we've** 34:23
35:4,12,14
55:16 61:16
70:3 72:23
73:9 84:7,17
99:3 106:22
110:20 111:5
114:21 115:7
117:9,21
134:19,25
**went** 122:1
**wheel** 109:20
109:24
**WHEREOF**
147:18

**widened** 71:14
**Widget** 63:19
**widgets** 19:18
19:23 20:3,6
64:20 65:1
110:5
**WILLIAM** 2:4
**window** 33:1
64:1 74:6
81:13 82:9
82:10,14
91:18 92:24
94:7 95:14
97:21 114:10
**Windows** 9:19
9:21,23 10:2
10:4,5,8,16
10:17,22,22
11:9 12:9,11
12:14 24:7,9
24:10,25
25:12 26:14
26:16,17,23
26:25,25
32:9,17,18
32:19,25
33:2,3,12,13
34:15,20
63:14 123:8
125:10,12,14
**wish** 145:15
**witness** 5:4
98:11 109:3
143:3 147:10
147:16,18
**word** 10:8
27:11 50:18
54:21 74:23
75:22 76:4
76:22 77:5
81:17 82:7
94:6,12 96:2
96:8,10
97:20 114:20
116:2 120:19

**words** 16:14
27:13 75:6
75:10 93:22
105:19
**work** 19:7
33:22 105:10
121:13
122:16
123:19
**worked** 122:21
123:5
**working** 89:3
113:3
**works** 34:11
**world** 25:21
132:5
**worth** 11:13
**wouldn't** 8:18
18:23 34:12
38:12 45:8
56:6 61:4
76:19 96:9
125:13
**wramey@ra...**
2:9
**write** 88:16,18
112:2,4,11
116:7 119:1
**write-off** 17:22
**written** 30:19
144:19
**wrong** 87:12

**X**
**X** 4:1,7,7 5:8
34:16,22
140:8 143:7
144:22
**Xwindows**
62:15 102:21
103:3 108:19
110:22

**Y**
**yeah** 6:10

10:18 15:18
16:11 17:16
18:22 24:17
27:25 32:5
34:20 35:19
36:21 47:15
52:14 56:20
57:5 59:15
61:4 63:12
68:22 75:3
78:9 79:24
80:2 87:20
90:13 102:2
104:11,19
107:3 109:11
110:23
120:18 128:7
134:21 135:5
138:9 143:16
**year** 121:15
**years** 37:13
131:6
**years'** 126:3
128:15 130:9
**young** 130:15

_____

**Z**

**zeros** 51:8

_____

**0**

**0** 107:12

_____

**1**

**1** 4:15 8:5,9,11
11:2,6,14
13:13 40:13
40:20 41:9
67:17 68:1
104:18,20
133:10 139:8
**1-17** 72:19
**1:41** 135:17
**1:57** 135:17
**10** 9:19 10:2,4
10:16,22

12:11,14
24:7,25
26:14 107:6
107:11 139:4
**10/15/2016**
147:22
**10:37** 46:17
**10:48** 46:17
**103** 4:17
**11-14** 69:16,18
86:11 102:6
104:1,6
**11th** 2:22
**12:00** 91:11
**12:24** 91:11
**120** 4:19
**121** 3:7
**13** 4:15 80:10
110:24
125:19,23
126:13,14
127:10
129:16
131:13
**13-17** 103:5
**13-22** 78:7
**13-26** 62:6
**13-30** 77:14
**133** 4:21
**14** 125:20
126:25
127:13 128:2
128:4,5
129:19 130:3
131:12,22
**140** 4:4
**143** 4:5
**15** 20:11,16
23:2 139:4
**15-19** 102:8
104:9
**16** 13:10 26:7
42:3,3,17,19
54:7 58:23
65:24 67:2

73:25 80:12
80:14 82:19
90:24 91:1
91:14 114:14
117:18
118:14,20
**1600** 3:7
**17** 42:3,3,19
58:23 61:11
82:20
**17-22** 83:5
84:14 97:9
**183** 4:17 17:22
23:23 36:18
37:23 38:5
39:9 60:21
60:25 61:15
61:19 66:11
69:16 70:6
70:12 71:21
74:10 85:23
86:12 87:4
98:3 99:8
101:18,20,25
102:2,7
103:1,18,23
104:10,15
105:3,4,14
105:15,16,23
106:2,8
108:3 117:10
117:14 134:9
134:12,14,17
135:10
**19** 35:21 36:7
36:12,15
66:11 95:22
**19-inch** 21:9
21:12 22:3
**1977** 121:25
122:1
**1984** 121:16
**1985** 121:16
124:19
**1990** 122:19

**1996** 6:18
**1997** 122:20
**1998** 19:13
**1999** 19:13
66:14 125:25
126:11

_____

**2**

**2** 4:21 7:17,25
8:11
**2.46** 107:12
**2:05** 140:7
**2:11** 140:7
**2:14** 143:6
**2:16-cv-0009...**
1:8 146:24
**2:18** 143:6
**2:25** 145:24
**20** 37:5,19
38:8,21
39:18 64:10
67:6,10
**200-page** 13:3
**2000** 26:16,25
26:25 32:17
32:18
**20001** 2:23
**2004** 123:3
**2005** 123:3
**2010** 123:4
**2012** 122:22
**2016** 1:17 5:1
26:14,22
146:10,14
147:9,19
**202.538.8128**
2:24
**206.623.7580**
2:16
**21** 43:4 47:5
47:20 64:10
67:13 101:12
**22** 37:10 49:19
52:19 68:7
68:10,14

**22-25** 78:10
**22-29** 78:24
**23** 56:14 58:7
68:19,25
**24** 37:5,19,20
38:8,21
39:12,14
60:15 65:9
73:18,22
99:4,4
**25** 65:25
**26** 75:8,19
76:1 93:21
**27** 66:10
**2717** 1:25
147:22
**28** 66:25 99:14
102:1,12
103:25 114:6
116:23
117:16,19
118:21,22
**29** 67:12
125:25
126:11
**2900** 1:18 2:14
**2D** 53:5 109:20
110:7

_____

**3**

**3** 4:19 44:18
62:6,8,9
64:10 103:5
109:9 110:14
110:21,23
111:11
112:12 113:8
139:9
**3-10** 102:8
104:9
**30** 1:17 5:1
68:6,9 69:2
146:14 147:9
147:16
**30(e)** 147:16

Rosenberg, Craig

September 30, 2016

28

**31** 68:17 69:4
69:10 72:17
73:15 86:18
87:3,9,10,11
94:17
**32** 73:17 87:9
**33** 74:1 79:5
93:20,21
**34** 79:2,3,4
**35** 74:8
**36** 74:21 75:13
77:13 82:22
86:10 87:6
93:11 94:17
**37** 87:8,10,14
87:24
**38** 87:8
**386** 10:13
**39** 91:13 95:25
96:11
**3D** 121:17

_____
**4**
_____

**400** 13:9,13
15:12 20:13
21:18 23:13
28:18 31:5
35:1,6,16
36:17 37:3,7
37:18,23,23
38:10,20
39:2 41:6
43:5 44:20
45:16 49:16
50:7 55:21
58:23 60:18
60:24 61:10
62:1,6 63:10
64:14 65:13
65:24 66:12
70:4,17 71:8
71:10 72:10
72:19 73:10
73:13,25
74:9 75:20

77:15 80:9
82:19 83:3
85:17,18
87:22 91:14
96:14 99:8
99:14 100:8
100:13,25
101:17,21
102:24 103:2
103:25
104:14 105:2
105:13,22
106:3 107:5
107:8 108:3
109:9,23
110:13 117:7
117:15
126:18,20
127:7 129:6
129:19
131:12 132:3
132:13 134:5
137:15,19
**41** 91:21
**42** 92:2 93:9
94:15
**43** 95:10
**44** 95:6,10
99:4
**45** 95:14
106:19
**47** 95:17
**48** 96:17,21
98:4
**49** 98:14

_____
**5**
_____

**5** 4:3,9 43:5
75:19 76:6
76:10,25
79:1,2,3,4
83:5 84:14
97:9 111:6
147:19
**5.28.010**

147:11
**50** 4:9 5:14
12:24 99:2
**5020** 2:6
**503.595.5300**
3:9
**51** 4:11 6:13
6:16 10:11
11:18 40:21
99:15 102:12
117:21
**52** 4:15 13:6,9
40:21 41:10
**53** 4:17 102:4
102:5 103:20
**53-59** 75:20
76:7,12,25
**54** 4:19 117:25
118:4,7
119:23 120:1
120:2,12,25
121:7
**55** 4:21 106:11
106:19
108:10 133:6
**56** 106:11
113:22
117:25 118:4
118:7 119:23
120:2,12
**56-60** 76:2,3
76:14,15,23
**57** 114:6
**58** 114:13
**59** 114:19
115:2,3,5

_____
**6**
_____

**6** 4:11
**6,401,183** 4:18
**6,690,400** 4:16
**60** 40:13,22,24
41:9 117:24
119:23 120:3
120:12

**62** 117:24
119:23 120:3
120:12
**63** 118:10
**64** 118:13
**65** 118:25
119:3
**66** 119:23
120:5,11
**677** 17:23
36:17 37:23
38:3,14 39:8
39:16 60:21
60:25 61:15
61:18 66:12
70:7,12
71:21 74:9
85:23 87:4
98:3 99:8
127:6,13,15
128:25 129:6
129:17
132:13 133:5
133:10 134:2
134:16 135:7
136:19
137:10,20
139:8 141:3
142:24
**68** 119:23
120:5,11
**6th** 2:22

_____
**7**
_____

**7** 77:14 78:7
78:10
**7,356,677** 4:22
**71** 119:3
**72** 119:23
120:5,11
**74** 119:23
120:6,11
**750** 2:6
**77** 119:3
121:14

**77006** 2:7
**777** 2:22
**78** 119:24
120:9,11

_____
**8**
_____

**8** 76:2,13,15
76:23 78:24
**80** 119:24
120:10,11
**8086** 10:12
**83** 119:3 133:9
133:12
140:19,25
141:7
**832.581.4221**
2:8
**85** 133:16,23
139:12,15
**86** 134:1
135:12,18
136:7 137:6
138:12
139:19,23
141:7,8
**87** 138:18
139:7
**89** 139:11

_____
**9**
_____

**9/7/2016** 4:9
**9:36** 1:16 5:2
**90** 17:9 57:13
139:18
**90s** 125:9,9
**921-923** 4:14
**925** 1:18 2:14
**95** 9:21,23
10:5,8,17,22
11:9 12:8,9
24:9,10
26:17,25
32:17,19
**97204** 3:8
**98104-1158**

Rosenberg, Craig                              September 30, 2016

29

```
 2:15
998 64:15 65:4
```